UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Miami Division

CASE NO: 13-21413-CIV-Cohn/Seltzer

TERESITA SORRELS and
JOSEPH SORRELS, her husband

        Plaintiff,

vs.

NCL (BAHAMAS) LTD., a Bermuda
company d/b/a  NORWEGIAN CRUISE LINE

        Defendants.

_____/

**PLAINTIFF'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

**I.  Preliminary Statement**

Contrary to the Defendant's contention, the Plaintiff has not asserted that she "slipped and fell on rain water."  Instead, the basis of the Plaintiff's lawsuit is the overwhelming evidence which has established that the teak deck utilized by the Defendant for its passengers aboard the Norwegian Sky had a dangerously low slip resistance in certain parts when wet and that the Plaintiff slipped and fell while walking on the teak passage way after it had rained.  The precipitating cause of the Plaintiff's accident was a dangerous and defective floor surface which had an inadequate slip resistance (coefficient of friction) in portions when it became wet, regardless of the source of the liquid.[1]

The Defendant's preliminary statement also persists in continuing to make the same repeated

---

[1]  As discussed in more detail subsequently, when the Defendant's expert David Willis performed his initial inspection and testing on the deck, it was clear and sunny so that he used less than a cup of water from either a glass or pitcher to wet the surface to perform his coefficient of friction/slip resistance testing.  Defendant's expert testified that this procedure produced a substantially similar condition to that existing at the time of the Plaintiff's accident when the deck was wet due to rain, so that his test results were valid.  See Wills deposition, pages 14-22.

1

misstatements, which the Defendant has continually made throughout the course of this case. The Plaintiff has never claimed "that Norwegian was negligent because it failed to warn her of the open and obvious rain water on the outdoor deck." See NCL motion, p. 1. Both Terri Sorrels herself as well as her expert, Dr. Ronald Zollo, have clearly and repeatedly acknowledged that the Plaintiff was aware that it had been raining and that the deck was likely wet when she first walked out onto it.[2] Instead, it has always been the Plaintiff's contention that the Defendant failed to warn her that portions of the deck were slippery when wet, which is a far different proposition. In fact, as the Defendant itself states on page 16 of its Motion, "rain water on an outdoor deck is not a dangerous condition in and of itself."

Ms. Sorrels testified that since ships sail in both sunny and rainy weather, she would have expected that the shipowner would advise or warn passengers in some manner if the exterior decks were unsafe or unreasonably slippery when wet. See Sorrels deposition, pp. 98-103. In the absence of such a warning, she stated that she would walk "normally," at a "normal walking pace," "watch[ing] where she was going." Sorrels deposition, pp. 100-103.

Significantly, Solange Winifred, the first NCL crew member to respond to Ms. Sorrels after she had fallen, testified that when she walked across the wet deck to her, she too "walked normally." When asked whether she "felt the need to take any additional precautions because the deck was wet," Ms. Winifred responded "no." Winifred deposition, pp. 28-9. After further agreeing that "the ship sails whether it is sunny or raining," Ms. Winifred went on to testify that the ship would often post temporary signs "warning passengers that the decks can be slippery when it is raining," but that none were posted at the time of the subject accident. See Winifred deposition, pp. 24-9. Ms. Winifred's testimony concerning the periodic and intermittent use of signs warning passengers that the deck could be slippery when wet was confirmed by Security Officer Milan Rai, who investigated the subject accident on behalf of the vessel. See Rai deposition, pp. 16-19. Mr. Rai also confirmed that he did not recall seeing any signs posted that night. Rai deposition, p. 16.

In testing the coefficient of friction and slip resistance of the subject deck, both Dr. Ronald Zollo, Plaintiff's expert and Mr. David Wills, Defendant's expert had very similar findings. Each

---

[2] Since the security video was not produced by the Defendant until after her deposition, the Plaintiff gave her deposition 15 months later based upon her memory of the events that night.

expert found significantly different readings on different planks[3] and also often on the same plank, depending upon which direction was being tested.  See Exhibit 10 to Zollo deposition and pp. 149-60 and 184-7; Exhibits 3 and 4 to Wills deposition.  Dr. Zollo found slip resistance/coefficient of friction readings ranging from a low of 0.17 to a high of 0.70 during his testing of the wet deck under virtually identical conditions to the Plaintiff's accident following a rain storm.  *Id.*  Likewise, Mr. Wills, the Defendant's expert found a similar wide spread variation in his test results which were taken on the same day as Dr. Zollo ranging from a low of 0.35 to a high of .8.  *Id.*[4]

Dr. Zollo testified that while a reasonable standard for slip resistance "in general" is 0.5, that the more appropriate standard for a ship sailing on the high seas, which provides a less stable platform for walking is 0.6.[5]  Zollo deposition, pp. 61, 106, 155, 330-1 and 346-7.  Accordingly, many of the planks tested by both Dr. Zollo and Mr. Wills failed to meet these standards, while others exceeded them.

Dr. Zollo stated in both his Expert Witness Disclosure and subsequent deposition that the tremendous variance between slip resistance which he (and Mr. Wills) found created a trap by lulling a passenger into a false sense of security as he or she traversed those areas where the skid resistance was appropriate.   This is why the Plaintiff did not have any difficulty during the initial portion of her journey which is further reflected by the security video, that has been filed herewith as Exhibit "1."

This video clearly shows that during the initial portion of her journey across the walkway,

---

[3]  Both experts used the exact same measuring equipment, the English XL Tribometer.

[4]  Although the Plaintiff's accident was captured on a security video, both experts testified that because of its low resolution, it was not possible to identify the exact plank on which the Plaintiff slipped.  Accordingly, both experts testified that they were required to test a number of planks in the area where the Plaintiff fell.  See Zollo deposition, pp. 150, 153; Wills deposition, pp. 45-6.

[5]  The basis for Dr. Zollo's opinion regarding the minimum safe threshold is set forth in more detail in the Plaintiff's Response to Defendant's Motion to Strike Dr. Zollo as a witness and accordingly is incorporated herein by reference.  See pages 15-17 of said Response.  Although the Defendant's expert offered a different opinion as to the minimum safe threshold, this conflict is irrelevant for the purposes of the Defendant's Motion for Summary Judgment.

*Terri Sorrels v. NCL*
*Plaintiff's Response to Defendant's Motion for Summary Judgment*

the Plaintiff was able to walk in a normal fashion without difficulty, until she reached the spot where she fell, when both of her feet went literally sliding out from under her. As Dr. Zollo further explained that due to "the wide range of friction resistance along the walkway . . . a passenger walking across the surface will be unaware of the presence of slippery areas as it is not open and obvious to individuals using normal attention especially if they are not clearly advised in advance." See Dr. Zollo's Expert Witness Disclosure, p. 4 attached hereto as Exhibit "2."  Also see Zollo deposition, p. 77 (where a person initially walks on a wet area which is not slippery it gives rise to the expectation that the remainder of the wet surface will likewise not be slippery).[6]

Therefore, it is clear that based upon the record in this case as well as the applicable law, NCL's Motion for Summary Judgment must be denied since: (1) it owed its passengers, including the Plaintiff, the duty to provide a reasonable safe walking surface as well as to warn that portions of its exterior teak deck was unreasonably dangerous when wet, (2) NCL had notice of this condition and (3) the testing of both experts clearly indicates that the slip resistance created an unreasonably dangerous condition.

## II.  Response to Defendant's Statement of So-Called Undisputed Facts

---

[6] Defendant's other liability expert, Bryan Emond also conceded this point as well:

Q:    In order for a passenger to be able to address the risk of slpping on a wet teak deck, the passenger would have to appreciate that the teak deck posed a hazardous slipperiness to them, right?

A:    Yes.

. . .

Q:    So you are saying if you walk for 100 feet and didn't feel that there was a risk of slipping on the deck, that there was no risk of her slipping on the deck?

A:    No. I am saying she had an opportunity to assess it.  That is all I said.

Q:    But if the slipperiness of the deck differed in the first 100 or 130 feet that she walked on, compared to the area where she fell, she would not have an ample opportunity to assess the risk of slipping, would she?

A:    If that were the case, yes.

Emond deposition, pp. 36-7.

4

### 1. Defendant's Statement of Facts

Pursuant to the provisions of Local Rule 56.1, the Plaintiff hereby responds to the Defendant's Statement of claimed Undisputed Facts and would respond to each of the numbered paragraphs therein as follows:

1.      Agreed.

2.      Agreed.

3.      The Plaintiff agrees that it had been drizzling intermittently prior to the time that she boarded the Norwegian Sky and thereafter during the day, however, she did not know for how long or exactly when.  Sorrels deposition, pp. 50 and 86.  The Plaintiff otherwise denies this statement as phrased.

4.      The Defendant denies this statement as phrased, since it does not set forth a time frame. The Plaintiff testified that when she went to the buffet for dinner, which would have been at least 6-7 hours before the accident, she said she would have assumed the decks would have been probably wet at that time "if it was raining."  Sorrels deposition, p. 88.

5.      The Plaintiff agrees that after boarding the Norwegian Sky, she at some point went to a "buffet place" that had two glass doors to the adjoining outside area, however, she does not recall whether she went out or stayed inside the doors.  The Plaintiff further recalled that it had been drizzling intermittently, however, does not recall whether it was raining while she was in the buffet area.  The Plaintiff testified that she assumed that while it was raining, the deck was wet.  Otherwise, the Plaintiff denies the statements contained in paragraph 5.  Sorrels deposition, pp. 82-9.

6.      The Plaintiff agrees that Marta Arbulu testified that at some point after she boarded the ship she had dinner at a buffet which had "indoor/outdoor sitting," while the vessel was sill in port which would have been at least 6 or 7 hours prior to the subject accident and that Ms. Arbulu recalls that it had been raining off and on after she had boarded.  Ms. Arbulu further testified that while the parents in the group ate in the inside portion of the buffet, she went outside at one point in order to take pictures.  Ms. Arbulu testified that when she went outside to take these pictures, she observed that the deck was wet.  Otherwise, the Plaintiff denies the statement asserted by the Defendant.  Arbulu deposition, pp. 23-6.

7.      The Plaintiff agrees that she had no difficulty walking on the wet teak deck prior to

the time that she actually slipped and fell, however, otherwise denies the Defendant's statement as phrased.  Sorrels deposition, p. 98-103.

8.      The Plaintiff agrees that Ms. Arbulu testified that she herself did not fall or have any difficulty walking on the wooden deck during the brief time period that she walked on the deck, however, the witness further testified that when she had walked on the teak deck, it had not been raining and the deck was dry. The Plaintiff agrees that Ms. Arbulu testified that she did not observe any crew member or passenger fall on the wooden deck. The Plaintiff otherwise denies the Defendant's statement.

9.      The Plaintiff denies this statement since it is taken out of context and incomplete. The statement does not contain a time frame.  Katrynna Sorrels testified that when she boarded the ship, which would have been close to 12 hours prior to the subject incident, it was raining at that time. She further indicated that at some point thereafter, which she could not identify, she was on the pool deck.  When asked whether she "observe[d] the condition of the floor," she responded by saying "no."  See Katrynna Sorrels deposition, pp. 4-8.

10.     The Plaintiff denies the accuracy of the statement attributed to her, since it inaccurately distorts her testimony.  The Plaintiff testified on her deposition that she is aware that a cruise ship sails in both rain and shine and that accordingly, it was her understanding and expectation that an exterior deck would be safe for anyone to be walking on it when wet from the rain.  If the deck was not safe or slippery because of rain, the Plaintiff testified that she would have expected the cruise ship operator to warn or otherwise advise passengers.  Sorrels depositions, pp. 98-103.

The specific reference to the Plaintiff's deposition by the Defendant omits important parts of both the question and answer.  As reflected on page 295 of her deposition, defense counsel was asking the Plaintiff about a spill on an interior hospital floor of undefined composition where she worked.  When defense counsel asked her whether such a spill might tend to make the floor more slippery that a dry floor, the Plaintiff said "I can't answer that," since she was not an expert. See Sorrels deposition, pp. 295-6.

Likewise, the reference to the testimony of the Plaintiff's 15 year old daughter contained in this numbered statement is likewise taken out of context.  On her deposition,

6

*Terri Sorrels v. NCL*
*Plaintiff's Response to Defendant's Motion for Summary Judgment*

Defendant's counsel asked the Plaintiff's young daughter if when she would visit a friend who had swimming pool whether she would be "a little bit more careful" when the pool area was wet then dry.  Katrynna responded over objection by saying "I really don't know."  Deposition, pp. 24.  Defendant's counsel then asked the teenager whether anyone had ever told her that she should be more careful walking on a floor that was wet, without any description whatsoever as to the type of flooring or the circumstances.  The witness responded over objection, "I don't recall.  It is kind of obvious."

11.    The Plaintiff agrees that in the early morning hours of Saturday, April 14, 2012 she listened to music in a lounge aboard the ship with other parents and left the ship around mid-night to go to the teen center to pick up her daughter.  She further agrees that at en route, she passed through a door way and stepped out into an open air wooden deck located on deck 11.  The Plaintiff agrees that she walked some distance on the deck, but is not sure of the exact distance, prior to slipping and falling.

The Plaintiff did not claim that she slipped and fell on a puddle.  Instead, she testified that after she slipped and fell forward, she landed in a sitting position on the deck.  As she sat on the deck in great pain and shock, with her wrist "deformed" from the severity of the fracture, she felt a puddle to the right side of her body with her hand, which may have also been under her buttock.  As reflected by the security video, the Plaintiff's body traveled some distance forward after her feet went out from underneath her before she landed on the deck.  The Plaintiff further testified that she did not have any specific recollection one way or another of seeing any puddles prior to falling, when she was deposed 15 months after the subject accident. Sorrels deposition, pp. 129-132, 140-1.  Zollo deposition, pp. 300-1.

12.    The Plaintiff agrees that the Defendant has accurately quoted testimony from her deposition, which was taken 15 months after her accident in which she had what has been described by her treating physician as a "high impact" and complex fracture, following which witnesses have described the Plaintiff as being in a state of shock and in severe pain.  See deposition of Delia De Leon, pp. 23 and 49-50.  It should be further noted that the security video, <u>which to this date has never been identified on the Defendant's Rule 26 Disclosures</u>, was not produced until after the Plaintiff's deposition.

13.     The Plaintiff disagrees with the statement as phrased by the Defendant. When asked on her deposition whether the "lighting [was] sufficient for you to observe the condition of the wooden deck," the Plaintiff responded by stating "I cannot say that it was sufficient, or not. . . one way of the other." Although the Plaintiff acknowledged that she had an unobstructed view, "it was still dark." Sorrels deposition, pp. 161-2.

14.     The Plaintiff disagrees with the statement as phrased by the Defendant, which is unaccompanied by any references to the record. While the Plaintiff agrees that the deck was wet as a result of rain water, the evidence in the case has shown that liquids, including rain water will cause outside contaminants (ie: suntan lotion, etc.) in the pores of the teak to mobilize to the surface, which will in turn cause it to become more slippery in certain areas. Zollo deposition, p. 212.

15.     The Plaintiff denies that the Defendant's statement, which is not attributed to any source in the record, is accurate. As discussed in more detail in the Plaintiff's Preliminary Statement," which is incorporated herein by reference, there is overwhelming evidence in this case that the deck constituted a hidden defect and/or trap, especially as a result of its highly variable slip resistance as found by the experts for both parties. See "Preliminary Statement." Also see Dr. Zollo's Expert Witness Disclosure, attached as Exhibit "2."

16.     Although the Defendant has correctly quoted excerpts from the Plaintiff's deposition, the Plaintiff denies the Defendant's statement that it "did not have any notice" of the puddle described by the Plaintiff. As reflected by the testimony of Dr. Zollo, the puddles are the result of uneven elevations between the various teak planks comprising the deck and they existed at the time of the accident as reflected by the security video as well as his own inspection 17 months later. See Zollo deposition, pp. 299-304.

Moreover, as discussed in more detail in both the Plaintiff's "Preliminary Statement" and her subsequent discussion of the facts in this case, the existence or non-existence of a puddle is irrelevant to the liability issues in this case. What is relevant is the lack of sufficient slip resistance of the deck, which as discussed in more detail in the Plaintiff's Response to the Defendant's Motion to Strike Dr. Zollo's testimony, has nothing whatsoever to do with the existence or non-existence of any puddle.

17.     Although the Plaintiff did not see anyone else slip on the deck where her accident

occurred in the brief time that she was actually on the deck, the record contains evidence of at least 22 other substantially similar accidents.  See Zollo deposition, pp. 229-30, 231-298 and Defendant's Answers to Plaintiff's Interrogatories attached hereto as Exhibit "3."

## 2.  Plaintiff's Statement of the Facts

Pursuant to the provisions of Local Rule 56.1(a) the Defendant sets forth the following undisputed facts:

18.     The Defendant was aware of the slippery nature of portions of the teak flooring located on deck 11, when wet, since it was undisputed that at times the deck department would post special portable signs on the outside deck warning passengers that the decks can be slippery when wet after or during rain.  Deposition of Solange Winifred, pp. 24-8; Milan Rai, pp. 16-19.

19.     The Defendant was further aware of the slippery nature of the teak flooring located on deck 11 when wet as reflected by the testimony of Solange Winifred, who worked aboard the vessel as an assistant waiter.  Ms. Winifred testified that she was instructed as part of her job that whenever she saw any liquid on the teak floor of the Outdoor Café, that she should immediately put up a sign and clean it, because it was known to her supervisors that the teak floor would be slippery when it was wet.  Winifred deposition, pp. 18-19, 23.  Ms. Winifred further testified that this was one of the topics covered in her department's monthly safety meetings.  Winifred deposition, pp. 22-3.

20.     The Defendant did not post any warnings signs at the time of the Plaintiff's accident advising passengers that the teak surfaces on deck 11 would be slippery when wet.  See Winifred deposition, pp. 13, 28; Rai deposition, p. 16, Kilgour deposition I, pp. 53-4.

## III.  Applicable Law

## 1.  Standard for Summary Judgments

As set forth by the Eleventh Circuit in *Tippens v. Celotex Corporation,* 805 F.2d 949, 952-3 (11th Cir. 1986), a summary judgment is only proper where

> There is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  F.R.Civ.P. 56(c).  The district court shall consider all evidence of record when reviewing the motion for summary judgment - pleadings, depositions, interrogatories, affidavits, etc. - and can only grant summary judgment "if *everything* in the record . . .

demonstrates that no genuine issue of material fact exists."

. . .

If one or more of the essential elements is in doubt, then summary judgment
must not be granted.  Summary judgment is such a lethal weapon, depriving
a litigant of a trial on the issue, caution must be used to insure only those
cases devoid of any need for factual determinations are disposed of by
summary judgment.  Summary judgment should be granted only when the
evidence produced by the non-moving party, when viewed in a light most
favorable to that party, fails to establish a genuine issue.

(Emphasis in the original).  *Also see Lane v. Celtex Corp.*, 782 F.2d 1526 (11th Cir. 1986).

As further observed by the Eleventh Circuit in *Reese v. Herbert,* 527 F.3d 1253, 1271 (11th Cir. 2008), "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Also see Stewart v. Booker T. Washington Ins.* 232 F.3d 844, 850 (11th Cir. 2000); *Hairston v. The Gainesville Sun Publishing Co.*, 9 F.3d 913 (11th Cir. 1994).  The limitations on the grant of summary judgments are "to be strictly construed so as to insure that factual issues will not be determined without the benefit of the truth-seeking procedures of a trial."  *Jackson Tool & Die, Inc., v. Smith*, 339 F.2d 88, 91 (5th Cir. 1964).

## 2.  Shipowner's Liability for Passenger Injury

There is a significant difference in the elements of a claim based upon a carrier's failure to remedy a dangerous situation created by another and a claim arising from a hazard or defect the carrier has contributed to creating.  Where the cruise line is charged with negligence for a failure to correct a hazard created by another, the passenger must establish that the cruise line had either constructive or actual notice of the condition.  *See e.g. Keefe v. Bahamas Cruise Lines, Inc.*, 867 F.2d 1318 (11th Cir. 1989).  Where, however, the basis of the claim is that the cruise line participated in creating the hazard, notice is not an element of the plaintiff's burden of proof.  *See e.g. Rockney v. Royal Caribbean Cruises Ltd.*, 2001 WL 420993 (S.D. Fla. 2001)(summary judgment denied where cruise line employee created the hazard by the placement of the bingo board which fell upon the passenger); *Palmieri v. Celebrity Cruises, Inc.*, 1999 WL 494119 (S.D. N.Y. 1999)(denial of summary judgment for injuries caused by defect in cabin where the cruise line was responsible for the cabin layout); *McDonough v. Celebrity Cruises, Inc.*, 64 F.Supp.2d 259 (S.D. N.Y. 1999)(summary judgment denied where Plaintiff was struck in the head by coconut filled drink

falling from a railing in the because of the ship's method of service of the drinks).

### 3.   There is Overwhelming Evidence That the Defendant Was on Notice of The Dangerous Nature of the Deck

Where notice is an issue, it can be established by proving constructive as well as actual notice. Actual notice exists where a carrier recognizes the need to post warnings signs, but either fails to do so on the occasion in question or utilizes signs which are inadequate.  *See e.g. Harnesk v. Carnival Cruise Lines, Inc.*, 1992 A.M.C. 1472 (S.D. Fla. 1991)(negligent placement of warning signs sufficient to establish actual notice of danger); *Mabrey v. Carnival Cruise Lines, Inc.*, 438 So.2d 937 (Fla. 3d DCA 1983)(Ferguson, J.).

Constructive notice can be proved in many different ways. One is through the existence of prior *similar* accidents.  *See e.g. Beretta v. Home Lines, Inc.*, 1980 AMC 1857 (S.D. N.Y. 1990)(one accident sufficient to create a question of fact on notice).  In order to give rise to notice, such prior accidents only need to be "substantially similar" and not identical. *See e.g. Weeks v. Remington Arms Co.,* Inc., 733 F. 2d 1485 (11th Cir. 1984).  Therefore, accidents occurring at different locations on the Defendant's premises or involving similar products are admissible to establish notice, where they share one or more of the essential characteristics of the subject accident.  *See e.g. Ramos v. Liberty Mut. Ins Co.,* 615 F.2d 334 (5th Cir. 1980)(error to exclude evidence of the failure of a specially made derrick for one customer in suit by a subsequent customer based upon a similar failure); *Borden, Inc. v. Florida East Coast Ry Co.,* 772 F.2d 750 (11th Cir. 1985)(evidence of incident at a different location); *Worsham v. A.H. Robbins. Co.*, 734 F.2d 676, 687 (11th Cir. 1984)(evidence of prior incidents were admissible in suit against medical device manufacture where they were sufficiently similar to show that they provided defendant with notice of the possible consequences of its failure to take action).  *Also see McGary v. Holland American Line Westours, Inc.*, 2004 A.M.C. 721 (W.D. Wash 2003).

Constructive notice can be shown through the failure of the vessel to meet either the company's own safety regulations or industry standards.  *See e.g. Galentine v. Holland American Line-West Tours, Inc.*, 333 F.Supp. 2d 991 (W.D. Wash. 2004).  *Also see Cook v. Royal Caribbean Cruises Ltd.*, 2012 WL 1792628 (S.D. Fla. May 15, 2012).

Constructive notice of a defective condition can also be established by showing that a dangerous condition existed for a sufficient length of time that it should have been discovered

*Terri Sorrels v. NCL*
*Plaintiff's Response to Defendant's Motion for Summary Judgment*

through the exercise of reasonable care by the carrier. *See e.g. Erikson v. Carnival Cruise Lines, Inc.*, 649 So.2d 942 (Fla. 3d DCA 1995)(large puddle); *Grayson v. Carnival Cruise Lines, Inc.*, 576 So.2d 417 (Fla. 3d DCA 1991)(same).

Although it is only necessary to show the existence of notice under any one principle, substantial evidence of notice exists in this case under all of the principles above.

### a.  Existence of Other Substantially Similar Accidents

In response to the order of the Magistrate Judge compelling discovery [D.E. 33], the Defendant provided a list of 31 other fall type accidents which occurred on deck 11 of the Norwegian Sky. See Exhibit "3." In reviewing these interrogatory answers, Dr. Zollo identified 22 of these accidents as being "substantially similar."[7] Zollo deposition, pp. 229-30. On his deposition, Dr. Zollo went through each of these accidents and explained why he considered them to be substantially similar. Zollo deposition, pp. 231-298.

While at least two of the 31 identified accidents (no. 29 and 30) also involved slip and falls due to a wet deck caused by rain water, Dr. Zollo testified that at least 20 additional slip and fall accidents were "substantially similar" when comparing their essential characteristics to the essential characteristics of this accident, which involved a teak deck that was unreasonably slippery when wet due to a liquid. In defining what constitutes "substantially similar" from an engineering standpoint,

---

[7] The substantially similar accidents identified by Dr. Zollo were numbers 1, 5, 8, 9, 11, 13, 14, 15, 16, 17, 18, 19, 20, 22, 23, 24, 25, 27, 28, 29, 30 and 31. Zollo deposition, p. 229-30.

Plaintiff's counsel has attached a chart prepared by counsel showing the approximate location of each accident based upon the information provided by the Defendant. It is not suggested that this chart constitutes evidence, but is attached only to provide some context as to the general location of each of the numbered accidents based upon the information provided by NCL. See Exhibit "4."

Although the Plaintiff had set the deposition of the Defendants's corporate representative for the purposes of determining the full circumstances surrounding each of these accidents (see *Taylor v. Carnival Corp.*, 2013 WL 4157520 (S.D. Fla. Aug. 14, 2013)., when the witness appeared she was unprepared to respond to the questions. In this regard, the witness had only viewed the witness statements by each of the involved individuals, without the other information in the possession of the Defendant, which had been requested. In order to resolve the issue without involving the court, the parties agreed that the Defendant would provide the information that it had available in response to the Plaintiff's pending interrogatory, Exhibit "3."  See deposition II of Jane Kilgour, pp. 30-32, 35-6, 39-43, 62-64. Obviously, the Plaintiff has been required to rely upon the Defendant to provide this information, and accordingly, any deficiencies in the information is not the fault of the Plaintiff.

Dr. Zollo testified

> When I say "substantially similar," we are talking about a teak deck that is wetted by contamination of liquid form. That is what I'm saying is substantially similar, because performance under the standardized test reflects the nature of those conditions.

Zollo deposition, p. 342.

Dr. Zollo went on to further note that in determining whether another accident is substantially similar one looks to see whether its essential characteristics are such as to reasonably place the premises owner on notice that it should take steps to determine whether there is a need for corrective action to make the area safe. "[I]f you have reports of adverse effects or adverse performance of a deck or a floor surface, then you are obligated to investigate that, and determine whether it is some sort of coincidence or if there is some defective condition." See Zollo deposition, p. 342.

As reflected by the schematic and photographs of deck 11 (from Exhibits 9 and 10 of deposition of David Wills) attached hereto as Exhibit "5," there are three separate areas of teak decking. . The largest is the mid-ships area surrounding the pool, where the subject accident occurred.  The other two areas of teak decking are located in both the bow and stern portions of deck 11.  All three of the areas are made of the same teak material, which has not charged in any fashion since at least 2009, when the first of the 22 other substantially similar accidents was reported to have occurred.   See deposition I of NCL Corporate Representative, Jane Kilgour, pp. 89-94 and deposition II, p. 16.

In discussing the substantially similarity of other slip and fall accidents occurring on different locations on deck while it was wet, Dr. Zollo testified that one would look

> at the entire teak deck because it is all exposed . . . And as a matter of fact, even the areas under cover are very substantially exposed to wetting because that's where the water is going to naturally drain. . . It's the same teak deck and the same wet condition . . . It would not matter to me whether it was starboard or port side, it is the same deck and the same conditions.

Zollo deposition, pp. 343-5.

Although Dr. Zollo did not test the entire teak deck outside the area where the subject area occurred, he did test the area where accidents numbered 20 and 29 (rainwater) occurred and found the same dangerously low slip resistance in his English XL Tribometer testing (four tests averaging

0.42).  Zollo deposition, p. 345-6.

As further noted above, the Defendant's own expert, David Wills testified that when he first tested the subject deck on June 14, 2013 "it was a beautiful day . . .[a] typical day in paradise," which differs significantly from the conditions that existed at the time of the subject incident. Nevertheless, Mr. Wills testified that by placing "less than a cup" of water on the deck, he was able to create a situation which he considered to be substantially similar to the subject accident, so as to validate his  coefficient of friction (slip resistance) testing.   Wills deposition, pp. 15-22. Accordingly, even the Defendant's own expert has indicated that by placing a small amount of water, amounting to less than a cup, on the teak deck would create a sufficiently similar condition in order to validate his testing.

The testimony of both experts regarding what is considered to be substantially similar from an engineering standpoint, is similar to the definition utilized by the Eleventh Circuit.  As noted above, the standard for admissibility only requires that the other accidents be "substantially similar," not that they be "identical."  Therefore, accidents occurring at different locations on the Defendant's premises or involving different products have all been found admissible to establish notice, so long as they share one or more of the essential characteristics of the subject accident.  *See e.g. Weeks*, 733 F.2d 1485 (evidence of similar malfunctions in different models of the defendant's guns)*; Ramos*, 615 F.2d 334 (court erred by excluding evidence of the failure of a telescoping oil derrick manufactured for one customer in a subsequent lawsuit brought by another customer for the collapse of an oil derrick manufactured for it, where there were similarities in design); *Borden, Inc.*, 772 F.2d 750 (court erred in excluding evidence of similar act of vandalism occurring at one of the defendant's railroad other locations).

As observed by the Eleventh Circuit in *Weeks*, 733 F. 2d at 1491:

> The relevancy of similar accident evidence has been firmly established in this circuit:
>
> > Evidence of similar accidents might be relevant to the Defendant's notice, magnitude of the danger involved, the Defendant's ability to correct a known defect, the lack of safety for intended uses, strength of the product, the standard of care, and causation.

The courts have applied different standards as to the degree of "substantial similarity" necessary for prior accidents to be admissible.  Where the purpose of the evidence is to establish notice, "the rule requiring substantial similarity of those accidents to the accident at issue should be relaxed."  *Jackson v. Firestone Tire & Rubber Co.*, 788 F.2d 1070 (5th Cir. 1986); *Schmelzer v. Hilton Hotels Corp.*, 2007 WL 2826628 (S.D. N.Y. Sept. 24, 2007).  Accordingly, in *Jackson*, the court allowed evidence of accidents involving other models of Firestone tires which shared the same characteristic defect.  In reversing the trial court's exclusion of such evidence, the court rejected the argument that the plaintiff's accident was "unique," stating "we decline to take such a narrow and unrealistic view of the matter."  788 F.2d at 1082-3.  The court went on to hold "any differences in the circumstances surrounding these occurrences go merely to the weight to be given to the evidence."  788 F.2d at 1083.

In reaching this conclusion, the Fifth Circuit relied upon the pre *Bonner* opinion of the Fifth Circuit in *Bailey v. Southern Pacific Transportation Co.*, 613 F.2d 1385 (5th Cir. 1980), which is therefore binding precedent in this circuit.  In *Bailey*, the court held that evidence of "other happenings" consisting of mechanical difficulties with a crossing signal were admissible to establish the railroad's notice despite the fact that the malfunctions occurred at different times of the day or that the witnesses were traveling in different directions.  The court went on to hold that any such differences went "strictly to the weight to be given to the evidence."  613 F.2d at 1389.

The same relaxed standard of admissibility has also been exhibited in more recent Eleventh Circuit cases on the issue of notice.  For example, in *Jones v. Otis Elevator Co.*, 861 F.2d 655 (11th Cir. 1988), the Eleventh Circuit held that evidence of prior incidents in which an elevator had been found shut down without involving an actual rider or accident were nevertheless admissible to establish the company's notice of potential problems with its elevator in a subsequent lawsuit by a passenger, who was injured when the elevator did not stop at the ground level, but instead hit the bottom of the elevator shaft several times causing injuries. The Court rejected the elevator company's argument that the incidents were too dissimilar because in the litigated one producing the plaintiff's injuries the elevator did not disengage when the normal stopping device malfunctioned.  The Eleventh Circuit responded by stating "we find no merit in this argument.  A malfunction in the normal stopping device was common to each incident."  *Also see Worsham*, 734

F.2d 676, 688-9 (evidence of prior incidents in suit against medical device manufacturer were admissible where they were sufficient to put the defendant on notice of the "harmful tendency or capacity of [the] product").

    As pointed out in *Schmelzer v. Hilton Hotels Corp.*, 2007 WL 2826628, '2 (S.D. N.Y. 2007);

> The degree of similarity required depends upon the purpose for which prior accidents are offered.  Court have applied a relaxed standard where the prior accidents are offered only to show that the defendant had notice.  *See e.g. Jackson v. Firestone Tire & Ruber Co.*, 788 F.2d 1070, 1083 (5ᵗʰ Cir. 1986). Since all that is required is that the previous injury or injuries be such as to call the defendant's attention to the dangerous situation that resulted in the litigated accident, the similarity and circumstances of the accidents can be considerably less than that which is demanded when the same evidence is used for one of the other valid purposes. [citation omitted].

Accordingly, the record evidence of these 22 other accident involving slip and falls on the wet teak deck on which the Plaintiff was injured at the very least give rise to a question of fact as to the Defendant's notice of the dangerous conditions of its deck.

    **b.  There is Clear Evidence in the Record that NCL Failed**
    <u>**to Comply With Its Own Policies and Procedures As Well as Industry Standards**</u>

    Solange Winifred, who was the first crew member to respond to the Plaintiff after she fell, testified that at various times there were "special signs that are posted on the outside decks," such as the one where this accident happened, warning passengers that the decks can be slippery when wet when it is raining.  She testified that these temporary signs  would be posted at some times, but not others.   Winifred deposition, p. 24-8.  Ms. Winifred's testimony was confirmed by Security Officer Milan Rai, who likewise testified that these temporary signs were posted on some occasions, but not others.  Milan Rai deposition, p. 16-19.  Neither Ms. Winifred nor Mr. Rai recalled seeing any signs posted on the evening of the accident.  Winifred deposition, p. 13, 28; Rai deposition, p. 16.  Also see Kilgour deposition I, pp. 53-4.

    Ms. Winifred, who has worked for three years as an assistant waiter for NCL aboard the Norwegian Sky, also testified that her job duties involved cleaning the floor of the Outdoor Café located at the aft portion of deck 11, which contains the same teak deck flooring.  Winifred deposition, pp. 16-17.  Also see Exhibit "4."  In fact, 4 of the prior slip and fall accidents (numbers 8, 12, 15, and 28) occurred in this area.

Ms. Winifred further testified that she was instructed as part of her job that whenever she saw "water or some other liquid on the floor of the Outdoor Café," that she should immediately put up a sign and clean it, because it was known to her supervisors that the teak "floor would get slippery when it was wet." Winifred deposition, pp. 18-19, 23. In fact, she testified that this was one of the topics covered in her department's monthly safety meetings. Winifred deposition, pp. 22-3.

Accordingly, the testimony of NCL's own crew members clearly establishes that the Defendant recognized the dangers posed by its teak deck when wet as well as the need to warn passengers of this danger. The above-described testimony clearly establishes competent substantial evidence to establish the Defendant's notice of the dangerous nature of its teak deck when wet. Since it is undisputed in the record that the Defendant did not utilize any signs to warn the Plaintiff or other passengers of the excessively slippery and dangerous nature of the teak deck when wet at the time of the subject incident, the above testimony also establishes the Defendant's liability for breach of its own rules and policies, providing yet another grounds on which the defendant's motion for summary judgment must be denied. See Winifred deposition, pp. 13, 28-30; Rai deposition, p. 16; Kilgour deposition, pp. 109-110; Wills deposition, p. 63.

Finally, as noted above and also discussed in more detail in the Plaintiff's response to the Defendant's Motion to Exclude Dr. Zollo, pp. 15-17, there was also substantial evidence in the record to establish that the Defendant violated industry standards by utilizing a teak deck in which portions had a slip resistance of under 0.5 and 0.6. *See Cook*, 2012 WL 1792628.

### c.  Length of Time

As reflected by the Defendant's discovery responses identifying other slip and falls occurring on the teak deck while it was wet, these accidents go back for years prior to the Plaintiff's accident. For example, accident number 29 involving Silvia Chapa-Cadena occurred on May 27, 2009. Ms. Chapa-Cadena indicated that she had slipped and fallen on the starboard side of deck 11, between the entrance to the atrium and the pool deck. When NCL's security staff investigated the accident, they confirmed that "the deck was wet." As noted above, Dr. Zollo tested the deck in close proximity and found that it suffered from the same dangerously low slip resistance (4 tests averaging 0.42) as where the Plaintiff's accident occurred. Zollo deposition, pp. 345-6. This condition therefore existed for at least 3 years prior to the date of the Plaintiff's accident.

Significantly, accident number 30, which also involved a passenger who slipped and fell as a result of a wet deck due to rain, occurred on October 18, 2011.  See Exhibit "3," page 18. Once again, the investigating crew member found that the "deck was wet."  Significantly, this particular slip and fall occurred "mid-ship starbird side near pool," which is in the same exact vicinity as where the Plaintiff's accident occurred. See Exhibit "4."  This accident occurred approximately 6 months prior to the Plaintiff's accident.

There is also significant evidence in the record to establish that NCL was aware that it had been raining on and off throughout the day of the subject accident since at least 5:00 p.m., if not earlier.  Nevertheless, NCL took no steps to either sweep the decks clear of water as reflected by the photographs (from Exhibit 8 of Wills deposition) attached hereto as Exhibit "5," which were taken on the date of the subject inspection or to post the warning signs discussed by crew members Winifred and Rai.

## IV. Conclusion

On pages 7-9 of its motion, the Defendant sets forth five cases from different jurisdictions for the proposition that "rain water is an open obvious condition for which there is no duty to warn." Each of these cases differ significantly to the present one for a number of different reasons.

First, none of these cases involve the application of maritime law, nor the controlling precedence of the Eleventh Circuit.  Secondly, as previously pointed out, the Plaintiff has not asserted that the Defendant is liable for failure to warn her that the deck was wet or that it had puddles.  Instead, it has always been the Plaintiff's contention that the Defendant failed to warn her that <u>portions</u> of the deck were slippery when wet, which is a far different proposition.

Thirdly, there was a complete lack of evidence in most of these cases establishing that the flooring surface was unreasonably dangerous or slippery.  The slip resistance testing performed by both parties experts in this case clearly establish that the deck was unreasonably slippery in certain locations and that there was a tremendous variance between the co-efficient of friction from plank to plank and sometimes even within the same plank, depending upon the direction of testing.

Fourthly, while none of these cases refer to the existence of prior substantially similar accidents, there is evidence in the record of the present case of at least 22 other such accidents in his case.  Fifthly, there is no evidence in the cited cases that the premises owner recognized the

dangerous character of its premises or the need to post warnings, such as exists in this case.  Finally, none of these cases involved a trap situation such as the present one in which the great variance in slip resistance between individual planks (and sometimes the same plank) lulled users into believing that the entire floor was sufficiently slip resistance.

On pages 10-11 of the Defendant's motion, it cites three additional cases arising under Florida law involving slip and fall injuries on puddles adjacent to a pool.  Not only do these cases all suffer from the same defects as the first batch discussed above, but each of these cases arose prior to Florida's adoption to comparative negligence at a time when any degree of contributory negligence would bar a plaintiff's claim as a matter of law.   The importance of this distinction is clearly evidenced from the opinion in *Andrews v. Narber*, 559 So.2d 869 (1952), which expressly form the basis for the two later cases.

Another significant difference between these cases is that they were also all based upon the claim that the defendant was negligent for allowing water to remain on the walkway area.  In each of these cases, the flooring area was being utilized as a pool.  Here, the pool was closed and the area was being used as a walkway for passengers to travel from one end of the ship to the other. As such, it was reasonably anticipated by the Defendant that the passengers would not be dressed in "pool attire or footwear," but instead the more formal clothes that would be expected to be used for shows, lounges and similar night time shipboard activities.

None of the few maritime cases cited by the Defendant helps its cause either. *Monteleone v. Bahama Cruise Lines, Inc.*, 838 F.2d 63 (2d Cir. 1988) and *Luby v. Carnival Cruises, Inc.*, 633 F.Supp. 40 (S.D. Fla. 1986) both involved passengers who tripped and fell over protruding objects, which as repeatedly discussed above, differ considerably from the dangerous trap which existed in this case. Just as importantly, *Monteleone* hinged upon the shipowner's lack of notice of the dangerous condition, as did the additionally cited opinions in *Keefe v. Bahama Cruise Line, Inc.*, 867 F.2d 1318 (11th Cir. 1989), *Adams v. Carnival Corp.*, 2009 AMC 2588 (S.D. Fla. 2009); *Levi v. Regal  Cruises Ltd.*, 116 F.3d 465 (2d Cir. 1997)(unpublished), *Cummiskey v. Chandris, S.A.*, 719 F.Supp. 1183 (S.D. Fla. 719) and *Mercer v. Carnival Corp.*, 2009 AMC 802 (S.D. Fla. 2009). Unlike these cases, there is considerable evidence, as discussed above, establishing that the Defendant had both actual and constructive notice of the dangerous slippery condition created by its teak deck when

wet and yet failed to take the appropriate action to either remedy it or warn its passengers of it.

Finally, the Defendant's reference to the decision in *Wish v. MFC Crociere S.A.*, 2008 WL 5137149 (S.D. Fla. Nov. 24, 2008) is equally unavailing. Unlike the present case, the shipowner in *Wish* placed 6 warning signs on the deck "advising passengers that the deck may be slippery when wet." This same message was also repeated on plaques attached to all entrances of the pool deck. In addition, the ship also had 6 crew members hired to remove excess water with squeegees and mops. Unlike this case, the court in *Wish* noted "significantly, there is nothing in the record to suggest that those policies and procedures, which include warning signs and clean up crews were not in place."

Another significant difference in *Wish* is that the accident occurred mid way through a 12 day cruise, unlike the present case in which the subject accident occurred on the <u>first</u> evening of the cruise. Ms. Wish who had six days in which to familiarize herself with the vessel, testified that she was aware of the fact that the deck was slippery when wet. As discussed above, Ms. Sorrels on the other hand has testified that it was her expectation that the deck was safe to walk on prior to her actual fall. As also previously discussed at length, this expectation was reasonable in light of the lack of warnings to the contrary and the highly variable nature of the slip resistance of the deck, particularly in the area leading up to the point where the Plaintiff slipped and fell.

For the foregoing reasons, the Defendant's Motion for Summary Judgment must be denied in this case.

DATED October 28, 2013.
Miami, Florida 33133.

Respectfully submitted,

By: /s/ Robert D. Peltz
    ROBERT D. PELTZ (FL.BARNO.: 220418)
    E-mail: Peltz@leesfield.com
    CAROL L. FINKLEHOFFE (FL.BAR NO.: 15903)
    E-mail: Finklehoffe@leesfield.com
    **LEESFIELD & PARTNERS, P.A.**
    Attorneys for Plaintiff
    2350 South Dixie Highway
    Miami, Florida 33133
    Telephone: 305-854-4900
    Facsimile: 305-854-8266

*Terri Sorrels v. NCL*
*Plaintiff's Response to Defendant's Motion for Summary Judgment*
<u>*Attorneys for Plaintiffs*</u>

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on **October 28, 2013**, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing is being served this day on all counsel of record identified on the Service List below in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically notices of Electronic Filing.

By:   /s/ Robert D. Peltz_____
      ROBERT D. PELTZ (FL.BARNO.: 220418)
      E-mail: Peltz@leesfield.com

## SERVICE LIST

| | |
|---|---|
| **ROBERT D. PELTZ** (F.B.N. 220418) <br> E-mail: Peltz@leesfield.com <br> **CAROL L. FINKLEHOFFE** (F.B.N. 0015903) <br> E-mail: Finklehoffe@leesfield.com <br> LEESFIELD & PARTNERS, P.A. <br> 2350 South Dixie Highway <br> Miami, Florida 33133 <br> Telephone:     305-854-4900 <br> Facsimile:      305-854-8266 | **JERRY D. HAMILTON, ESQ.**(F.B.N. 970700) <br> Email: <br> jhamilton@hamiltonmillerlaw.com <br> **HECTOR RAMIREZ, ESQ**. (F.B.N. 484857) <br> Email: Hramirez@hamiltonmiller.com <br> **JESSICA CALVO, ESQUIRE** (F.B.N. 484857) <br> HAMILTON, MILLER & BIRTHISEL, LLP <br> 150 S.E. Second Avenue, Suite 1200 <br> Miami, FL 33131 <br> Telephone: 305-379-3686 <br> Facsimile:  305-379-3690 <br> <u>*Attorneys for Defendants*</u> |

21