Deposition
Excerpts

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2              MIAMI DIVISION

 3              CASE NO:  13-CV-21413-COHN/SELTZER

 4

   TERESITA SORRELS and JOSEPH
 5 SORRELS (her husband),

 6         Plaintiffs,

 7 vs.

 8 NCL (BAHAMAS) LTD., a Bermuda
   Company d/b/a NORWEGIAN CRUISE LINE,
 9
           Defendant.
10 _____/

11

12
                     HAMILTON, MILLER & BIRTHISEL, LLP
13                   150 Southeast 2nd Avenue
                     Suite 1200
14                   Miami, Florida 33131
                     Tuesday, 9:30 a.m.
15                   October 1, 2013

16

17

18         DEPOSITION OF RONALD ZOLLO

19

20         Taken before Jeanette Sanchez, Florida

21 Professional Reporter, Notary Public in and for the

22 State of Florida at Large, pursuant to Notice of

23 Taking Deposition filed in the above case.

24

25
```

 **JEANNIE REPORTING (305) 577-1705**

1          **A.**    Okay.

2               I'm of the opinion, based on my

3     experience with teak decks, that teak decks perform

4     at the margin of what is suitable for safe walkway

5     surfaces, and that only with careful maintenance

6     can the margin be achieved where it's over a

7     minimum reasonable standard of 0.5.

8               However, we know that the standard of

9     0.6 is more suitable as a minimum standard for

10    marine applications, and I think teak decks would

11    very definitely be compromised under those

12    standards.  That's an opinion.  There's more.

13          **Q.**    When did you reach that opinion,

14    between, because your report is dated September the

15    19th, 2013, we're sitting here in a deposition, and

16    we're hearing that opinion for the first time on

17    October 1st, 2013, so, I'm asking you, when did you

18    reach that opinion?

19               MR. PELTZ:  Object to the form and

20          predicate.

21               THE WITNESS:  I can't say.  Obviously,

22          it was not included in my report, so I

23          didn't think it was necessary or

24          appropriate, but based on your questions,

25          I've reached that opinion, and based upon



1    this, because I'm looking at this.

2              Q.    I would like to see this also.

3              A.    Well, you can wait.

4                    MR. PELTZ:  You're not going to pull

5              it out from underneath him, are you?  He's

6              looking --

7                    MR. HAMILTON:  I would like to see

8              what he's looking at.

9                    THE WITNESS:  For example, and I'll

10             give you an example of how the industry

11             uses the terminology in both context.  In

12             ASTM 1166, which is a carefully reviewed

13             document, it says:  Under 11.12.1.2,

14             walkway passenger decks and all other

15             walking surfaces shall have a nonskid

16             surface sufficient to provide a coefficient

17             of friction of 0.6 or higher ensured when

18             the surface is wet.

19                   Now, that establishes that it's a

20             loose terminology and it's used widely in

21             both contexts and it's, no, it's nothing

22             you want to parse and try to trap somebody

23             on.  It's ridiculous.  You're wasting time.

24    BY MR. HAMILTON:

25             Q.    Okay.

 **JEANNIE REPORTING (305) 577-1705**

```
 1    recommended and I did it in north, south, east, and
 2    west direction, recognizing that they're not points
 3    on the compass, but just four principal directions,
 4    essentially, two of them parallel to the grain of
 5    the wood and two of them across the grain of the
 6    wood.
 7         Q.    So, you're referring to the little
 8    yellow sheet that has some notes on it, so, let me
 9    go ahead and we'll mark this as Exhibit No. 10.
10              On Exhibit No. 10, where would the
11    test results dry be?
12         A.    Right here.
13              (Thereupon, Defendant's Exhibit No. 10
14         was marked for identification.)
15    BY MR. HAMILTON:
16         Q.    You're pointing to some test results
17    that are all within the 0.8, is that correct?
18         A.    They are, but it is under the heading
19    dry.
20         Q.    Right, understood.
21              Okay.
22              And by the way, when you do these test
23    results to the 0.8's, every time that you did a
24    test result, did you clean the actual foot itself?
25         A.    Yes.
```



1       **Q.**    Okay.

2              Now, wet, you tested the deck wet?

3       **A.**    Yes.

4       **Q.**    And what were the results of the first

5    set of wet, well, actually, before I get to the

6    results, where did you do the wet, the first set of

7    wet testing?

8       **A.**    I did it on some planks that are in

9    the area of where the fall incident occurred.

10      **Q.**    Can you indicate on this chart

11   generally speaking by putting a W where you would

12   have done the wet testing?

13      **A.**    I think the wet testing is kind of in

14   this range here.

15      **Q.**    Were you able to identify specifically

16   where Mrs. Sorrels fell from the CCTV?

17      **A.**    I think you can from the CCTV get an

18   aerial location.  No one is going to know what spot

19   or plank or anything like that.  It's not that good

20   of a video.

21      **Q.**    Okay.

22              So, the wet testing you indicated,

23   that was the first wet testing that you did, what

24   results did that yield?

25      **A.**    Well, various results in principal

**JEANNIE REPORTING (305) 577-1705**

```
 1    direction.  I got .61, .7, .54, .55.  In the
 2    puddling area, I got .62, .46, .50, .54.
 3              Then on the rubbery --
 4         Q.   The --
 5         A.   The rubbery substance that was
 6    separating the planks, I got .51, .6.  It's a
 7    little difficult because the test foot comes off
 8    the rubber and on to the wood.
 9              But I did many tests in the wet
10    condition under various planks and the .43, .48,
11    .64, .51 --
12         Q.   We're talking --
13              MR. PELTZ:  Let him finish.
14    BY MR. HAMILTON:
15         Q.   No, I'm talking about the first set of
16    wet testing you did.
17         A.   Well, that's the first area.  That's
18    the whole area.  I did many tests in that area.
19              MR. PELTZ:  Are you finished with your
20         answer?
21              THE WITNESS:  No, there's more.
22              MR. PELTZ:  Go ahead.  Finish with
23         your answer.
24              THE WITNESS:  I found a particular
25         plank that began to raise suspicions, and I
```



**JEANNIE REPORTING (305) 577-1705**

```
 1            tested several times west, south, east,
 2            west, north, north.  I got .29, .34, .32,
 3            .14, .25, .28, very low values.
 4                 And then I went to another area, which
 5            is not in the same area.
 6  BY MR. HAMILTON:
 7            Q.   So, let's go back to my question.
 8                 My question was:  Your first wet
 9  testing that you did, the first set of wet testing
10  you did --
11            A.   Yes.
12            Q.   -- was in an area of where Mrs.
13  Sorrels fell, and you indicated that with a W,
14  correct?
15            A.   All of those tests that I've given you
16  were in that area.  So, it's not a first.  It's a
17  question of, I started in that area, and I stayed
18  in that area.  But I moved slightly around.
19            Q.   Understood.
20                 My question is:  When you took your
21  tribometer machine and you put it down on the deck,
22  the wet deck for the first time, and you fired it
23  for the first time --
24            A.   Okay.
25            Q.   -- which values did you first get off
```



**JEANNIE REPORTING (305) 577-1705**

1     of the first set of four testings that you did?

2            **A.**    That would be this first set of values

3     on the plank that gave those four values.

4            **Q.**    So, what you did, so I make sure I

5     understand it, is that you went to the area where

6     you thought Mrs. Sorrels fell?

7            **A.**    Yes.

8            **Q.**    And then you did your first test in

9     the area where you actually thought she fell,

10    correct?

11           **A.**    No, I did all the tests in the area

12    where I thought she fell.  Now, you have to be

13    careful though, because I'm not saying I know the

14    plank that she stepped on when she fell.

15           **Q.**    Understood.

16           **A.**    So, that's all in the area where that

17    W is.

18           **Q.**    I'm saying when you actually went

19    there the first time and you were going to do your

20    first wet testing, you went to the area that you

21    thought she fell?

22           **A.**    Yes.

23           **Q.**    Correct?

24           **A.**    Yes.

25           **Q.**    And you did your first test as best as

  **JEANNIE REPORTING (305) 577-1705**

1    you could in the area where you thought she fell,

2    correct?

3         A.    Again, I went to the area where I

4    thought she fell, and I do the first test on a

5    particular plank that's in that area.

6         Q.    Okay.

7         A.    But I don't know that she stepped on

8    that plank, so, you've got to be careful.  I can't

9    say I thought she fell on that plank.

10        Q.    So, the first test that you did

11   yielded results of .61, .70, .54, .55, correct?

12        A.    Yes.

13        Q.    In a wet condition?

14        A.    Correct.

15        Q.    And at least that first test indicates

16   to you that there is a suitable walking surface in

17   that area?

18        A.    Well --

19             MR. PELTZ:  Object to the form.

20             THE WITNESS:  -- be careful.  It

21        indicates it's suitable under the .5

22        standard, but, marginally so under the .6.

23        In fact, it only barely passed the .6 on

24        the two tests and it failed on the two

25        tests.


**JEANNIE REPORTING (305) 577-1705**

155

```
1    BY MR. HAMILTON:
2            Q.    You believe, don't you, sir, that a .5
3    standard is, creates a suitable walking surface,
4    don't you?
5            MR. PELTZ:  Object to the form.
6            THE WITNESS:  Yes, I think it does, it
7            does.
8    BY MR. HAMILTON:
9            Q.    You testified to that?
10           MR. PELTZ:  Let him finish.
11           THE WITNESS:  But not under the
12           conditions, marine conditions, which
13           recommends it to be at a .6.
14           So, in other words, it satisfies for
15           terrestrial environments, but we have a
16           higher standard, according to the ASTM
17           standard, which if you want to be prudent
18           and follow it, you're going to provide a
19           safe walking condition.
20   BY MR. HAMILTON:
21           Q.    Have you ever offered any testimony
22   under oath, sir, where you testified in the past
23   that onboard a vessel a .5 creates a suitable
24   walking surface?
25           A.    A minimally suitable condition is .5
```

```
1    under most general conditions, yes.  And if you are

2    following the prudent standard for marine

3    environments, it's .6, and I have no, really,

4    that's it, that's all I'm doing, is applying those

5    standards.

6              Q.    Have you testified before with respect

7    to a cruise ship that the standards, well, strike

8    that.

9                    Have you testified before in a case

10   involving a slip and fall onboard the cruise ship,

11   that it's well known and accepted that a 0.5 value

12   based on research is the minimum standard of the

13   value that should be, that should give suitable

14   safe slip resistant surfaces?

15             A.    Yes.

16             MR. PELTZ:  Excuse me, let me object

17        to the form and predicate, unless you're

18        going to identify what you're asking it

19        from.

20             MR. HAMILTON:  I'm not asking him from

21        anything.

22             MR. PELTZ:  Yes, you were, you were

23        reading something.

24             MR. HAMILTON:  All right.

25             So, this is a good point for a break.
```

```
 1              (Thereupon, a short recess was taken.)

 2              MR. PELTZ:  Just so we're clear on

 3         this, I will agree, if you want to make

 4         your experts available on another day, we

 5         can do him on Friday, but, otherwise, the

 6         only alternative I have is to do it

 7         Saturday morning.

 8              MR. HAMILTON:  Well, we can do it on

 9         Friday if you want to move the experts'

10         depositions or simply not take them at all.

11              MR. PELTZ:  Well, no, I'm not going to

12         take the liability experts' depos, if you

13         want to move them to, if you want to work

14         with me, I'm happy to work with you to make

15         it a convenient date.

16              MR. HAMILTON:  We'll talk about it

17         after the depo.

18    BY MR. HAMILTON:

19         Q.   All right.

20              Mr. Zollo, we were talking about

21    testing.

22              And why is it that you do four

23    different tests in different directions, why do you

24    do that, what's the purpose of that?

25         A.   Well, generally speaking, that's
```



**JEANNIE REPORTING (305) 577-1705**

```
 1    what's required in most standard practices in the
 2    use of the English XL, and it's prudent, because
 3    you avoid directionality, in this case we have
 4    directionality in the wood grain to some extent and
 5    on the cut of the wood of the particular plank.
 6    That's why.
 7          Q.   And is the purpose then to average
 8    these numbers to see what the average of numbers
 9    come out to be?
10          A.   Yes.
11          Q.   Fair enough.
12               Can we say that the first test, the
13    first test you did in the area of where Mrs.
14    Sorrels fell, that average was above a .5?
15          A.   Well, I don't know, I haven't done the
16    average.  I will do it.
17          Q.   Well, we can just take a look at the
18    numbers, can't you, and see that they're above a .5
19    average?  There's nothing below .5 there?
20          A.   Oh, above .5, sorry, absolutely.
21          Q.   Okay.
22          A.   No, no, absolutely.  Yeah.
23          Q.   All right.
24               So, then you did your second test, the
25    actual time that you put the machine down the
```

**JEANNIE REPORTING (305) 577-1705**

1    second time, you put it down into a puddle,

2    correct?

3              A.    Correct.

4              Q.    All right.

5                    And was that puddle in the vicinity?

6              A.    Yes.

7              Q.    When we say in the vicinity of Ms.

8    Sorrels' fall, do you remember where you put, did

9    you take a picture of where you actually set your

10   machine up?

11                   Here are your pictures.

12             A.    I did take a measurement.  I mean,

13   pretty much.  It's, I took a measurement of 22.6

14   feet from that direction.

15             Q.    What direction, sorry?

16             A.    Okay.  Let's go by the photographs.

17                   Okay.

18                   I'm trying to find the photograph that

19   encompasses everything.  Let's see if I have that.

20   I thought I have it here.  Let's see.

21                   Okay.

22                   This is the area.

23             Q.    I'm sorry, what are you pointing to?

24             A.    Well, I'm looking at the bottom middle

25   photograph on the set of photographs that I took

**JEANNIE REPORTING (305) 577-1705**

1    that has seven photographs on it.

2         Q.    I thought we went ahead and marked

3    this as an exhibit.

4              I thought there was a third sheet to

5    photographs, maybe not.

6              We will go ahead, I thought we marked

7    these.

8         A.    You marked the other four now.

9         Q.    Let's mark this as Composite 11, which

10   consist of two sheets, A and 11-B.

11             (Thereupon, Defendant's Exhibit

12        Nos. 11-A&B were marked for identification)

13   BY MR. HAMILTON:

14        Q.    Composite Exhibit A consists of seven

15   photographs and Composite Exhibit 11-B consists of

16   nine photographs.

17             Okay.

18             So my question was:  Mr. Zollo, did

19   you take a photograph specifically of where you

20   placed your tribometer when you were doing the

21   first test?

22        A.    No, I didn't take, I mean, I took

23   photographs in general, and then I did the testing

24   as I recall.

25             But it does encompass the area where I

 **JEANNIE REPORTING (305) 577-1705**

229

```
1              A.    No.  I'm not sure exactly where the
2     area is, except by this map.  I'm not sure how
3     accurate this map is as to specific area.
4              Q.    Okay.
5                    Now, the next case that you checked
6     off or the next interrogatory number that you
7     checked off in terms of the answer was number 11?
8              A.    No.  I have 9.
9              Q.    Oh, you have 9, okay.  Maybe I
10    missed 9.
11                   I don't see 9 checked on the exhibit
12    that I copied for you.
13             A.    Well, it may be different because I
14    re-looked at this more thoroughly, and --
15             Q.    So you went back?
16             A.    Shall I make a list of the ones I
17    marked for you?
18             Q.    Yeah, why don't you just give me a
19    whole list.
20             A.    Okay.  Number 1 --
21             Q.    Hold on a second.
22             A.    Okay.
23             Q.    So number 1?
24             A.    Number 1.  Number 5.
25             Q.    Number 5; correct.
```

**JEANNIE REPORTING (305) 577-1705**

```
1              A.    Number 8.

2              Q.    Number 8; correct.

3              A.    Number 9.

4              Q.    Number 9, right.

5              A.    Number 11.

6              Q.    Yes.

7              A.    Number 13.

8              Q.    Yes.

9              A.    Number 14.   Number 15.

10             Q.    Yes.

11             A.    Number 16.   Number 17.

12             Q.    Uh-huh.

13             A.    Number 18.   Number 19.   Number 20.

14    Number 22.   Number 23.   Number 24, and number 25.

15    Number 27.

16             Q.    Uh-huh.

17             A.    Number 28.   Number 29.   Number 30, and

18    number 31.

19             Q.    Okay.

20                   31, okay.

21                   All right.   So, let's talk about

22    number 9.

23             A.    Okay.

24             Q.    Do you know the substance that

25    Ms. Stewart, who is identified in number 9, fell
```

JEANNIE REPORTING (305) 577-1705

```
 1    on?
 2              A.    It says, "Fell on ice cream."
 3              Q.    Did -- any indication that Ms. Stewart
 4    fell on the rainwater?
 5              A.    No, I see no such indication.
 6              Q.    Is there any indication that
 7    Mrs. Stewart's incident occurred within a ten-foot
 8    radius of where Mrs. Sorrels' incident occurred?
 9              A.    I don't think so, but I don't know for
10    a fact by the accuracy of the map here, but I don't
11    think so.
12              Q.    Okay.
13                    Do you know how ice cream may affect
14    the slip resistance of a deck over wet -- a wet
15    condition such as water?
16              A.    Well, it's a -- it's a liquid
17    contaminant obviously in the frozen and liquid
18    state, but it's a contaminant that acts as a
19    lubricant much the same as water might.
20              Q.    Correct.  I'm asking you:  Do you know
21    what the difference is between ice cream as a
22    lubricant and water as a lubricant as it relates to
23    slip resistance?
24              A.    They each both -- they both will --
25    each will degrade.  I know -- I know the
```

JEANNIE REPORTING (305) 577-1705

```
 1    similarities.  I don't know -- there's a lot of
 2    differences, I guess.  One is ice cream, and one is
 3    water, but -- the different materials, but they
 4    accelerate to degrade -- under certain conditions
 5    they can degrade a surface below standards.  Under
 6    certain conditions they can not adversely affect
 7    the surface.  It has to do with the surface
 8    material, rather than the contaminant.
 9         Q.   I'm actually looking for some type of
10    more in depth scientific explanation, other than
11    just a basic explanation that they are simply
12    contaminants.  I'm looking to determine whether or
13    not you have ever done any type of work study,
14    testing to determine the difference between ice
15    cream as a contaminant on a teak surface versus
16    water as a contaminant on a teak surface, and what
17    the difference may be in slip resistance with
18    respect to those two contaminants on a teak
19    surface.
20         A.   There is more than one question there.
21    I'm not sure of the answer.
22              MR. PELTZ:  Object to the form.  Those
23         are multiple questions, go ahead.
24              THE WITNESS:  No, I haven't done that
25         kind of work to determine how they -- what
```



**JEANNIE REPORTING (305) 577-1705**

233

```
1              differences there might be.
2      BY MR. HAMILTON:
3              Q.   Okay.
4                   Is there any indication that
5      Eileen Stewart, who's reflected in number 9, knew
6      that the deck had a contaminant on it?
7              A.   I don't know that.
8              Q.   Going back to number 8, any indication
9      that Michele Budd knew that the deck had some type
10     of contaminant on it before she walked on the deck?
11             A.   I don't know.
12             Q.   Going back to number 1 and number 5,
13     any indication there that those passengers knew
14     that the deck had any type of contaminant on it
15     before they walked on the deck?
16             A.   I have no such indication.  I have no
17     knowledge.  And that's number 1.  What's the other?
18             Q.   Number 1 and number 5.
19             A.   Five.  I have no indication of what
20     she knew before the incident.
21             Q.   Any indication in number 1 and 5 that
22     rainwater was involved?
23             A.   I have no indication whether it was
24     involved or whether it was not involved.
25             Q.   All right.
```

**JEANNIE REPORTING (305) 577-1705**

```
 1                    Let's move on to the next accident.
 2      But before I get there, let's go back to number 9.
 3                    Is there any indication in
 4      Mrs. Sorrels' case that she slipped and fell in ice
 5      cream?
 6             A.     No, not that I'm aware of, no.
 7             Q.     Okay.
 8                    Number 11 is the next one you have
 9      checked off?
10             A.     Correct.
11             Q.     Jack Powell?
12             A.     Yes.
13             Q.     This says he fell while playing table
14      tennis, do you see that?
15             A.     I do.
16             Q.     Any indication that when Mrs. Sorrels'
17      accident occurred, she was playing any type of
18      sport?
19             A.     No.  I observed her on the video, just
20      -- just walking and not playing at all, other than
21      just walking in a normal fashion.
22             Q.     Any indication that this substance
23      that was on the floor was water?
24             A.     When?  Who?  When?  I'm not sure of
25      the question.
```

**JEANNIE REPORTING (305) 577-1705**

```
1              Q.    We're talking about Jack Ryan Powell.

2              A.    Oh, okay.  We were just talking about

3      Ms. Sorrels a second ago.

4              Q.    All right.

5              A.    Okay.

6                    So what is the question, sir?

7              Q.    Any indication that Jack Ryan Powell,

8      the substance that he may have encountered was

9      water or rainwater?

10             A.    Well, it does say it's a wet deck.  He

11     alleged it was a wet deck.  I don't know.

12             Q.    You're not answering my question.  My

13     question was about water.  It wasn't about wetness.

14                   Did you understand my question?

15             A.    Oh, I see.

16             Q.    I'm certain --

17             A.    I see.

18             Q.    -- you equate wetness with water.

19                   MR. PELTZ:  Object to the form.

20             Argumentative.

21                   THE WITNESS:  I see.

22     BY MR. HAMILTON:

23             Q.    All right.

24                   So --

25             A.    No.  There's no indication that the
```

**JEANNIE REPORTING (305) 577-1705**

```
1     wetness was from water.

2          Q.    Okay.

3               Any indication that rainwater was

4     involved?

5          A.    No.   There's no indication as to -- as

6     to what caused the wetness.

7          Q.    Any indication that this accident

8     either occurred within, say, a ten-foot radius of

9     where Mrs. Sorrels' accident occurred?

10         A.    I don't know exactly, but I don't

11    think it's within a ten-foot radius, but it's still

12    on the same teak deck.

13         Q.    Certainly not in this same location as

14    Mrs. Sorrels, correct?

15         A.    I don't think it's in the same

16    location, exact location, let's put it that way,

17    but it's on the same deck.

18         Q.    Not even on the same side of the ship,

19    is it?

20         A.    No.   It's on the port side, and the

21    other -- but it's -- a teak deck is on both sides.

22         Q.    I'm sorry.   You said one's on the port

23    side --

24         A.    One's on the port side, and one's on

25    the starboard side and it's all teak decking
```

 **JEANNIE REPORTING (305) 577-1705**

```
 1        throughout that area.

 2               Q.    Mrs. Sorrels was on the starboard

 3        side?

 4               A.    Yes.

 5               Q.    And Powell was on the port?

 6               A.    Correct.

 7               Q.    In fact, just so that the record is

 8        clear, Mrs. Sorrels would characterize her

 9        accident, just looking at this diagram that we've

10        previously marked, based upon that diagram that her

11        accident was starboard midship?

12               MR. PELTZ:  Object to the form.

13               Repetitious.

14        BY MR. HAMILTON:

15               Q.    The location of her accident was

16        starboard midship, would that be a fair

17        characterization?

18               A.    I think it's closer to midship than --

19        certainly, yes.

20               Q.    Right.  And the accident that was

21        identified as number 8, that would be port side

22        aft?

23               A.    Yes.

24               Q.    And the accident that you identified

25        as number 1 would be port side.
```

**JEANNIE REPORTING (305) 577-1705**

```
 1              What would you characterize this area
 2    of the ship where one is reflected?
 3         A.   Well, it's marginally port side.  It's
 4    on the middle center of the ship, and it's
 5    definitely -- according to this map, it's off the
 6    center line towards the port side.
 7         Q.   Okay.
 8              And number 9, the location of number 9
 9    would be port side?
10         A.   Yes.  Well, yes.  It's off the center
11    line toward the port side.  If you believe in the
12    accuracy of this map, that's where it is, yes.
13         Q.   All right.  So, going back to Jack
14    Ryan Powell again, number 11, it says:  "Passenger
15    was bending to take a shot playing table tennis
16    when he hit the table causing him to fall
17    backwards."
18              Do you see that?
19         A.   I do.
20         Q.   Any indication that --
21              MR. PELTZ:  Object to the form.
22         That's not completely accurate.
23              MR. HAMILTON:  A form objection.
24         Works.
25    BY MR. HAMILTON:
```

1      Q.    Is there any indication where it says:

2    "Passenger was bending to take a shot playing table

3    tennis when he hit the table causing him to fall

4    backwards," is there any indication that those set

5    of facts were somehow involved in the Sorrels' case

6    where she was playing table tennis and took a shot

7    and hit a table causing her to fall backwards?

8      A.    No, I don't think those facts at all

9    are related to Ms. Sorrels' case.

10     Q.    The next number is 13.

11     A.    Yes.

12     Q.    And it looks like a person by the name

13   of Gandhi?

14     A.    Yes.

15     Q.    Is there any indication that rainwater

16   was involved in her case?

17     A.    No.

18     Q.    Is there any indication of what the

19   substance was that she fell on, Ms. Gandhi?

20     A.    The only indication is a wet deck.   No

21   indication of what caused the wetness, just like

22   the other one.

23     Q.    Okay.

24           Is there any indication as to whether

25   or not Ms. Gandhi knew that the substance was there

**JEANNIE REPORTING (305) 577-1705**

```
1    prior to her fall?

2           A.    I see no such indication.

3           Q.    And this incident, did it occur before

4    or after Mrs. Sorrels' accident?

5           A.    Well, the date of the incident for Ms.

6    or Mr. or Mrs. Gandhi was 3-24-2013, and the date

7    of Ms. Sorrels' is April 14, 2012, so the answer to

8    your question would be, it would be after

9    Ms. Sorrels' incident.

10          Q.    You said -- you checked off number 14?

11          A.    I did, yes.

12          Q.    Any indication of rainwater in that

13   case?

14          A.    It doesn't say rainwater, no, sir.  I

15   see no indication that it was rainwater.

16          Q.    Do you know what the substance was

17   that Ms. Hoover encountered?

18          A.    No, other than it says it's a wet

19   deck.

20          Q.    Okay.  And is it fair to say that

21   Mrs. Hoover's accident or incident was after

22   Mrs. Sorrels' incident?

23          A.    Yes.

24          Q.    Now, looking at the location of this

25   accident, it says -- the interrogatories say:
```

**JEANNIE REPORTING (305) 577-1705**

1    "Deck 11, starboard midship, near a pool and a

2    stairway to Deck 12."

3                    See that?

4          **A.**    I do.

5          **Q.**    And looking at the chart that was

6    prepared by Plaintiff's counsel in this case, you

7    see where the indication of 14 is?

8          **A.**    Yes.

9          **Q.**    Is that in the same vicinity where

10   Mrs. Sorrels fell?

11                   When I use the term "vicinity," we

12   know Ms. Sorrels fell directly across from the pool

13   area.

14                   You've seen the CCTV; correct?  That's

15   what I mean by "vicinity."

16                   MR. PELTZ:  Object to form.

17                   Go ahead.

18                   THE WITNESS:  I judge Ms. Sorrels'

19              fall to be in the area of the corner of the

20              pool here.

21                   And 14 is some distance, but I don't

22              know how far away.  I can give you an

23              estimate, if you wish.

24   BY MR. HAMILTON:

25          **Q.**    I'm just asking you if it's in the

**JEANNIE REPORTING (305) 577-1705**

1      same vicinity.

2              **A.**    I think it's in the same vicinity.

3              **Q.**    Okay.

4                      For purposes of my question,

5      "vicinity" means, as you've just indicated, in the

6      corner of the pool where Mrs. Sorrels' accident

7      occurred.

8              **A.**    Okay.  Okay.

9              **Q.**    My question is:  Is 14 in the corner

10     of the pool where Mrs. Sorrels' accident occurred?

11             **A.**    No.

12                     MR. PELTZ:  Object to the form, and

13                     predicate.

14     BY MR. HAMILTON:

15             **Q.**    Any indication that Ms. Hoover knew

16     what the substance was -- strike that.

17                     Any indication that Mrs. Hoover knew

18     that there was some contaminant or some substance

19     on the deck before she fell?

20             **A.**    I didn't see any indication that she

21     knew that it was wet.

22             **Q.**    Number 15, Consuelo Segovia, any

23     indication rainwater is involved in this case?

24             **A.**    No, I see none.

25             **Q.**    Okay.

**JEANNIE REPORTING (305) 577-1705**

```
 1              Does it tell you what this actual
 2   substance is?
 3         A.   Other than saying it was wet, liquid,
 4   but I don't know what it was.
 5         Q.   The location of the accident, is it in
 6   the same vicinity as we have described it and
 7   defined it as Mrs. Sorrels' accident?
 8              MR. PELTZ:  Object to the form, and
 9         predicate.  I don't think you defined it.
10   BY MR. HAMILTON:
11         Q.   Just to be clear, the definition that
12   I would like you to use for "vicinity" is, as you
13   have described it, within the corner area of the
14   pool, which is on the starboard side where
15   Mrs. Sorrels fell.
16              Is it in the same vicinity?
17              MR. PELTZ:  Object to the form.
18              THE WITNESS:  No.
19   BY MR. HAMILTON:
20         Q.   Number 15 is identified as occurring
21   port side, aft; correct?
22         A.   If that's what it says, then it's
23   correct.  I don't see that written here, but it's
24   listed on the --
25         Q.   Location?
```



**JEANNIE REPORTING (305) 577-1705**

```
 1                 A.    Oh, port side, aft, yeah, I see that,

 2      yes.

 3                 Q.    Okay.  And you see on the chart

 4      created --

 5                 A.    Yes.

 6                 Q.    -- by the plaintiff's lawyer?

 7                 A.    Correct.

 8                 Q.    Any indication that Ms. Segovia knew

 9      that there was some type of contaminant or some

10      type of substance on the deck before she fell?

11                 A.    No, I don't know if she knew or was

12      aware before she fell.  I have no indication

13      whether or not she was aware.

14                 Q.    Any indication that warnings were

15      given to Ms. Segovia?

16                 A.    I see no indication that she had

17      observed any warnings or had heard any warnings.

18                 Q.    Natasha Brown, number 16?

19                 A.    Okay.

20                 Q.    The location of the incident is

21      identified as Deck 11, starboard near the Garden

22      Café.

23                       Do you see where the Garden Café is on

24      this chart?

25                 A.    Yes.
```

**JEANNIE REPORTING (305) 577-1705**

```
 1              Q.    And is the Garden Café -- again, going
 2    back to my definition of "vicinity," was it within
 3    the same vicinity as Mrs. Sorrels' accident?
 4              MR. PELTZ:  Same objection.
 5              THE WITNESS:  By your definition, it's
 6         not in the same vicinity.
 7    BY MR. HAMILTON:
 8              Q.    And this incident with Natasha Brown,
 9    that does indicate that she fell on rain, correct?
10              A.    Yes, it does.
11              Q.    So, when rain was involved, at least
12    this interrogatory, this number identified rain;
13    correct?
14              A.    Yes.
15              Q.    Number 17, any indication that --
16    which is Angel Hernandez, any indication that
17    rainwater was involved in this case?
18              A.    No.
19              Q.    Any indication of what the substance
20    was?
21              A.    Other than wet, it doesn't say what
22    the liquid substance might have been.
23              Q.    Wet is not a substance, though, is it?
24              A.    Well, wet in the common understanding
25    means a liquid substance on the -- if we're talking
```

 **JEANNIE REPORTING (305) 577-1705**

```
 1   about a deck, on the deck.

 2              And that's the way I'm interpreting

 3   it.

 4        Q.   I'm just asking you if you know what

 5   the actual substance was.

 6              MR. PELTZ:  Object to the form, and

 7              predicate.

 8   BY MR. HAMILTON:

 9        Q.   Do you know what the substance was?

10        A.   You mean, on Hernandez, no --

11        Q.   All right.

12        A.   -- except that -- except that it's

13   wet.

14        Q.   Any indication that Ms. or

15   Mr. Hernandez knew before they walked over the deck

16   that there was some type of substance or

17   contaminant on the deck?

18        A.   There's no indication either way,

19   whether they knew or didn't know.

20        Q.   It says here that Hernandez was

21   playing ping-pong.

22        A.   Yes, it does.

23        Q.   That's not what Mrs. Sorrels was

24   doing; correct?

25        A.   Correct.
```

**JEANNIE REPORTING (305) 577-1705**

```
 1              Q.    You agree that depending on the

 2    activity of a certain passenger, that certainly can

 3    increase the hazard to that passenger in terms of

 4    slipping and falling; correct?

 5              MR. PELTZ:  Object to the form.

 6              THE WITNESS:  That is somewhat

 7              speculative.  It doesn't have to, if it's a

 8              proper surface, a suitable surface.  It

 9              depends on the nature of the individual,

10              kind of footwear and so forth and so on,

11              perhaps.  Because even on a suitable

12              surface, you know, footwear can enter that

13              equation, although it's not used in

14              evaluating surfaces, it does have an effect

15              on slipperiness, on people slipping.

16    BY MR. HAMILTON:

17              Q.    Were you finished?

18              A.    Yeah.

19              Q.    How about just body mechanics, the

20    fact that if somebody is playing table tennis and

21    going back and forth in terms of their movements,

22    that that certainly can cause an increase in the --

23    in their -- well, strike that.

24              Let me phrase it this way.

25              Someone playing table tennis, going
```

```
 1        back and forth, on a wet deck certainly would be

 2        more subject to the possibility of slipping on a

 3        deck that's wet than a person who's simply normally

 4        walking; correct?

 5                    MR. PELTZ:  Object to form.

 6                    THE WITNESS:  I wouldn't agree with

 7                that.  There's no way to answer that

 8                question.  It's pure speculation.

 9        BY MR. HAMILTON:

10            Q.   Right.

11                    So you'd need to have some type of

12        scientific study to determine what the body

13        mechanics were of a human for it to -- for you to

14        determine the appropriate slip-resistant qualities

15        of a deck, wouldn't you?

16                    MR. PELTZ:  Object to form.

17                    THE WITNESS:  Frankly, I don't

18                understand the question.  I really don't.

19        BY MR. HAMILTON:

20            Q.   All right.  Let me do it this way.  I

21        think it's going to be easier.

22                    Are you saying that a person who is,

23        for instance, playing table tennis on a wet deck,

24        are you saying that they have an equal chance of

25        slipping on that deck than -- similar to a person
```

**JEANNIE REPORTING (305) 577-1705**

1    who is walking cautiously on the same wet deck?

2                    MR. PELTZ:  Object to the form.

3                    THE WITNESS:  I think it's very

4              possible that that is, in fact, the case.

5              It depends on the circumstances, the nature

6              of the deck primarily, and the experience

7              of the individual.

8    BY MR. HAMILTON:

9         Q.    Does body mechanics have anything to

10   do with whether or not a person is more likely to

11   slip or not?

12                   MR. PELTZ:  Object to the form.

13                   THE WITNESS:  Certainly the forces

14             applied to the deck, to a surface, let's

15             say, are affected by the gait, body

16             mechanics, the activities and so forth.

17             That's certainly true.

18   BY MR. HAMILTON:

19        Q.    Right.

20        A.    Whether or not it causes a slip is

21   purely speculative.

22        Q.    All right.  So, when one studying

23   issues of slip resistance with respect to a floor

24   surface, one should look at issues relating to the

25   human gait, force, and also the actual surface that

 **JEANNIE REPORTING (305) 577-1705**

```
 1        the person is coming in contact with; correct?
 2                       MR. PELTZ:  Object to the form.
 3                       THE WITNESS:  No.
 4        BY MR. HAMILTON:
 5              Q.   Okay.
 6                   All right.  Going back to Hernandez,
 7        any indication that he had any warnings before he
 8        had his incident?
 9              A.   Hernandez.
10              Q.   Number 17.
11              A.   I don't know whether or not he was
12        warned.  I have no indication of that.
13                       (Thereupon, a discussion was held off
14                   the record.)
15        BY MR. HAMILTON:
16              Q.   Have you ever done any type of
17        pedestrian traction research?
18              A.   I've been involved with -- I've done a
19        lot of research in terms of studies and reading,
20        and participation in workshops that deal with that
21        subject.  That's all I can tell you.
22              Q.   So you've done some reading and
23        research.
24                   When you say research on studies, what
25        do you mean?
```

JEANNIE REPORTING (305) 577-1705

1        **A.**    I mean, I participated in workshops

2    that led to the development of standards in those

3    subject areas.

4        **Q.**    Which workshops that led to the

5    development of any standard, which workshops did

6    you participate in?

7        **A.**    Well, there's one in -- two of them, I

8    believe, in southern California that I attended as

9    a member of the committee, at least two, maybe

10   there was more.

11       **Q.**    Did you put those on your C.V.?

12       **A.**    No.

13       **Q.**    Okay.  Have you ever published in the

14   area of pedestrian traction research?

15       **A.**    I published in the area of slip and

16   fall type incidents involving pedestrian safety,

17   that kind of thing.  We discussed that last time.

18   But I don't know if it will rise to the level of

19   research.  It was more practical applied

20   consequences or factors that affect public safety

21   in that regard.

22       **Q.**    Have you ever heard of the term

23   "required coefficient of friction"?

24       **A.**    Have I ever heard of that term?  I'm

25   sure I've heard of the term, because it's just

1    three words in the English language.  But if you

2    mean a minimum standard for coefficient of friction

3    for public safety, if that's what the intention is,

4    it depends on the context in which they are used,

5    how those words are used.

6         Q.    Do you know the scientific definition

7    of "required coefficient of friction"?

8         A.    I don't think there is a scientific

9    definition for "required coefficient of friction."

10        People might use that referring to

11   minimum reasonable standards or minimum standard

12   under various conditions of use.

13        Q.    Have you ever done any type of

14   research to correlate how human slips correlate

15   with tribometer measurements?

16        A.    I've read some reports.  I don't get

17   engaged in that area of research, but I've seen the

18   lab -- been in the laboratory where these types of

19   tests were done and conducted.

20        No, I don't -- it's not the area of

21   research that I participate in primarily.

22        Q.    Do you agree with the statement that

23   there are no codified standards or laws that

24   establish 0.5 or any other value as the minimum

25   required coefficient of friction or slip resistance

```
1    value for a walkway?
2                    MR. PELTZ:  Object to the form.
3                    THE WITNESS:  No, I don't, to the
4              extent that -- that I don't believe that
5              appears in codes which are adopted by
6              governing bodies or standard or statutes
7              that are developed by governing bodies.  I
8              don't think those numbers appear in there.
9                    However, having said that, they do
10             appear in many, many standards and many
11             contexts have been used for many years as
12             to what's suitable for slip resistance.  So
13             they appear in standards which are
14             recognized in the architectural engineering
15             industry as being useful for public safety
16             purposes.
17   BY MR. HAMILTON:
18             Q.   Do you believe that in order for
19   tribometer measurements to be used in human slip
20   research, there should be some correlation between
21   what the tribometer measurement is and human slip
22   research in the first instance?
23                    MR. PELTZ:  Object to the form.
24                    THE WITNESS:  I'm not sure I really
25             understand the question, but tribometers
```

JEANNIE REPORTING (305) 577-1705

```
 1              are evaluated in terms of their suitability

 2              and ability to distinguish among various

 3              types of services, under various conditions

 4              of use, and those tribometers can qualify

 5              to do that and can be used.

 6                   It depends on the conditions used, to

 7              my knowledge.  There's only two that are

 8              suitable for wet testing.

 9    BY MR. HAMILTON:

10         Q.   Do you believe that there should be a

11    unified methodology for correlating human slip

12    research results with tribometer measurements?

13                   MR. PELTZ:  Object to the form.

14                   THE WITNESS:  I don't think it's

15              possible to do that.  I don't think the

16              technology is advanced to the point where

17              it's even possible to do that.  Someone

18              could say there should be, and that may be

19              their opinion.

20                   But I don't think -- I think it's

21              naive.  I think it's not possible.

22    BY MR. HAMILTON:

23         Q.   So you don't think it's possible to

24    have a unified methodology for correlating human

25    slip research results to tribometer measurements?
```



**JEANNIE REPORTING (305) 577-1705**

1          MR. PELTZ:  Object to form.

2          THE WITNESS:  With the current state

3      of the art, that is not possible, in my

4      opinion.

5  BY MR. HAMILTON:

6      Q.  Okay.  Let's turn to number 18.  The

7  individual identified in 18 is a gentleman by the

8  name of Collantes, C-O-L-L-A-N-T-E-S.

9          Any indication that Collantes

10  encountered rainwater?

11     A.  I see no such indication.

12     Q.  All right.  Is there any indication as

13  to what the actual substance was that Mr. Collantes

14  or Ms. Collantes encountered?

15     A.  Other than it was wet, I see no

16  indication of what caused the wetness.

17     Q.  In fact, it specifically says the

18  substance is unknown; correct?

19     A.  That's someone's opinion.  I see that

20  written, but I don't know what it is.

21     Q.  Okay.  Any indication that Collantes

22  knew that there was some contaminant or substance

23  on the deck prior to going up on the deck?

24     A.  No indication whether he or she knew

25  or didn't know.

```
 1              Q.    Any indication based on my definition

 2     of "vicinity" that this incident occurred within

 3     the same vicinity as Ms. Sorrels' incident?

 4                    MR. PELTZ:  Object to form.

 5                    THE WITNESS:  Based on your

 6              definition, I don't see that in the same

 7              vicinity.

 8     BY MR. HAMILTON:

 9              Q.    Just to be clear on the document that

10     was marked -- and I can't remember what exhibit

11     number this was.  It was exhibit number -- it was

12     marked as a separate exhibit.  I just don't

13     remember what it was.

14                    It shows that it wasn't marked, but I

15     think it was, but I will go ahead and just -- for

16     completeness sake, just go ahead and mark it

17     number 12.  I know this is previously marked.

18              A.    I didn't remove anything from my file.

19     If it was previously marked, it was marked.  I just

20     took that out of my file.

21                    (Thereupon, a discussion was held off

22              the record.)

23     BY MR. HAMILTON:

24              Q.    So you were looking at Exhibit 3, and

25     I have a bunch of different numbers on it, but we
```

```
 1    are going to have to go through these numbers, and

 2    point where you did the tasting, and put a "D" on

 3    it.

 4                    Yeah, it was marked, and it -- this is

 5    not right.

 6                    (Thereupon, a discussion was held off

 7            the record.)

 8    BY MR. HAMILTON:

 9            Q.    So the exhibit that we were referring

10    to with respect to the different numbers on the

11    chart that the plaintiff's counsel created was

12    Exhibit No. 3.

13                    And my question was going to be --

14    well, my question is:  As to Collantes, that

15    incident occurred -- where it says "18" --

16            A.    Yes.

17            Q.    -- how would you describe on this

18    chart where this incident occurred, "18"?

19            A.    I'd say it was on the aft end of the

20    pool.

21            Q.    Okay.

22            A.    And I would say it was the same

23    vicinity because it's the same deck around the same

24    pool --

25            Q.    Uh-huh.
```

**JEANNIE REPORTING (305) 577-1705**

1      **A.**     -- and it's the vicinity -- if you

2      don't mean location, I mean, it's -- it's at the

3      other end of the pool, and the pool is

4      longitudinally longer than it is wide.

5      **Q.**   All right.  And I may have asked this

6      and I apologize if I did ask this:  But did I ask

7      you whether or not there was any indication of

8      rainwater in that case?

9      **A.**   No.  It just says "wet."

10     **Q.**   And the substance was unknown;

11     correct?

12     **A.**   There's no indication of what the

13     substance was.

14     **Q.**   Moving on to number 19, which is the

15     Johnson matter, again, here, is there any

16     indication of rainwater?

17     **A.**   No, other than the indication that

18     it's wet.

19     **Q.**   Okay.

20           And it says that it was in the area of

21     midship near the jacuzzi; you see that?

22     **A.**   I do.

23     **Q.**   Okay.

24           And there are two number 19s because

25     there's no indication of what side it was on --

259

```
 1              A.    Correct.

 2              Q.    -- correct?

 3              A.    Correct.

 4              Q.    So we don't know if it was on the port

 5      side or starboard side?

 6              A.    It doesn't really matter.  It's the

 7      same deck on both sides.

 8              Q.    Now, when you say "the same deck,"

 9      you're talking about the general teak decking --

10              A.    Yes.

11              Q.    -- on the entire ship?  This is the

12      teak decking that you got inconsistent results on?

13              A.    I don't know about the entire ship,

14      but certainly Deck 11.

15              Q.    Right.  You got results -- you got

16      five sets of results that averaged above a .5, and

17      a sixth one that averaged below .5; is that

18      correct?  Did I have that number right, or --

19              A.    No, I don't think you should

20      mischaracterize my testimony.

21              Q.    I'm not trying to mischaracterize your

22      testimony.

23              A.    Well, I'm saying it doesn't properly

24      -- I'm sorry, it doesn't properly characterize --

25              Q.    This sheet --
```

**JEANNIE REPORTING (305) 577-1705**

```
 1            A.    -- my testimony.

 2                 MR. PELTZ:  Let him finish his answer.

 3   BY MR. HAMILTON:

 4            Q.    This sheet shows what the results

 5   were.

 6                 MR. PELTZ:  Mr. Zollo, finish your

 7            answer.

 8                 THE WITNESS:  Okay.  What's the

 9            question?

10   BY MR. HAMILTON:

11            Q.    Right.  I've got a list, so I can make

12   sure I'm accurate in how I characterize the sheet.

13                 You did one, two, three, four, what

14   appears to be five groupings of tests that averaged

15   above .5; correct?

16                 MR. PELTZ:  Object to the form.

17                 THE WITNESS:  Well, I don't know what

18            the averages are, because they're not

19            written here.

20   BY MR. HAMILTON:

21            Q.    We went through them already.

22            A.    Okay.  So then you asked me this

23   question already.

24                 MR. PELTZ:  Then I object on the

25            grounds it's repetitious, also.
```



**JEANNIE REPORTING (305) 577-1705**

BY MR. HAMILTON:

      Q.    You did the averages.  I'm just asking you --

      A.    I don't know.  I can't answer that.

      Q.    A predicate question is what I'm asking you.

      How many groups of tests did you do?

      MR. PELTZ:  You want both wet and dry?

      MR. HAMILTON:  Yes, how many tests in total.

BY MR. HAMILTON:

      Q.    How many groupings?

      A.    Well, there's one group dry, and there's another smaller group on rubber.  There's another group wet, and there's another group in a puddle, and then there's another small group on the rubber.

      Q.    How many are we up to?

      A.    I don't know.

      Q.    How many groups did you just describe?

      A.    I don't know.  And there is a final grouping that's on the deck.

      Q.    So let's count them.  You said there's one group dry, that's number one; there's another small group on the rubber, that's two; there's

```
 1    another group wet, that's three; there's another

 2    group in a puddle, that's four.

 3                  There's another small group on the

 4    rubber, so you said that's five, and then one group

 5    that, I guess, you tested on a piece of teak wood;

 6    correct?

 7         A.    No, no, I was referring to this being

 8    a small group, and this being another group and

 9    this another group.

10         Q.    Okay.  So, let's count them.  Please

11    count them for me.

12         A.    I don't have them grouped that way.

13    You are characterizing them as a group.  You are

14    free to do what you wish.  But I didn't group them

15    that way.  That is your characterization.

16         Q.    You said there were groups.

17         A.    Well, then I would say, one, two,

18    three, four, five, six, seven groups.

19         Q.    Seven groups, okay.  Thank you.

20                  All right.

21                  And so, out of the seven groups, do

22    you recall that out of those seven groups that six

23    of those groups yielded an average above .5?

24                  MR. PELTZ:  Object to the form, and

25                  predicate.  Misstates his testimony.
```



**JEANNIE REPORTING (305) 577-1705**

```
 1                    THE WITNESS:  I don't recall that, no.
 2      BY MR. HAMILTON:
 3             Q.    Okay, fair enough.
 4             A.    Right.
 5             Q.    So, do you know where on the deck,
 6      Ms. Johnson --
 7             A.    Excuse me, we're leaving out another
 8      group on the second page.
 9             Q.    Oh, there are eight groups?
10             A.    Yes.
11             Q.    Got you.  Do you know if Ms. Johnson's
12      incident occurred where Ms. Sorrels' incident
13      occurred?
14             A.    In location, this geometrical
15      location, the answer is no.  One is at one end of
16      the pool, the other is the other, but it's
17      essentially the same deck.
18             Q.    Yeah, well, Johnson is a little bit
19      different.  I think Johnson is, if I remember --
20      okay, I got you.  I got you.  That's my mistake.
21                    Number 20 --
22             A.    Okay.
23             Q.    -- Lincoln, any indication of
24      rainwater?
25             A.    No indication of rainwater.
```



**JEANNIE REPORTING (305) 577-1705**

1          Q.    Any indication that Lincoln knew that

2    there was a substance on the deck, prior to walking

3    out on the deck?

4          A.    No indication of whether or not they

5    knew -- or Ms. Lincoln.

6          Q.    The plaintiff's lawyer's chart

7    reflects that the incident occurred on the port

8    side; correct?

9          A.    No.

10         Q.    No.  Where is number 11?  I'm sorry,

11   number 21, sorry.

12         A.    Wait a minute.  Which one are we

13   talking about?

14         Q.    Number 21.

15         A.    Oh, 21, I don't have marked.

16         Q.    Oh, I'm sorry, 20.

17         A.    Yeah, 20.

18         Q.    Twenty is Lincoln.  Got you.  My

19   confusion.

20              So, number 20, again, it indicates it

21   to be Deck 11 starboard, exiting the elevator area;

22   correct?

23         A.    Yes.

24         Q.    And Mrs. Sorrels' accident did not

25   occur on Deck 11 starboard while exiting the

  **JEANNIE REPORTING (305) 577-1705**

```
 1    elevator, did it?
 2         A.   I think there was some indication that
 3    she exited -- exited and walked across.  And that's
 4    what she indicated what she did, just like
 5    apparently the person in number 20 did, said the
 6    same thing.
 7         Q.   You understood my question?
 8         A.   I did.  But, you know, some people
 9    just say that they had exited or -- they use
10    different terminology.  I don't know "while
11    exiting" means while she was stepping over the
12    threshold, or she was exiting as in means of
13    egress, at the exitway.
14         Q.   Mrs. Sorrels' accident occurred by the
15    elevator?
16              MR. PELTZ:  Object to the form.
17              THE WITNESS:  No, Ms. Sorrels' did not
18              occur -- no.  It occurred closer to the
19              pool.
20    BY MR. HAMILTON:
21         Q.   Did it occur while exiting the
22    elevator?
23         A.   I think she said that.  Let me make
24    sure.  Let me make sure what she said.
25         Q.   She exited an elevator at some point.
```

**JEANNIE REPORTING (305) 577-1705**

```
1              MR. PELTZ:  Excuse me.  He gets to

2         finish his answers without being cut off.

3              MR. HAMILTON:  He's not being cut off.

4              THE WITNESS:  She said she was walking

5         through double doors onto the outer deck,

6         and that's how I believe, based on my

7         experience, that the inspection -- that

8         those were the double doors leading from

9         the elevator area.

10             And then it shows later on, of course,

11        how far she got.

12   BY MR. HAMILTON:

13             Q.   All right.  I'm asking you here:  This

14   number 20 says that she fell, and it says "while

15   exiting the elevator area."

16             I'm asking you specifically:  Did

17   Mrs. Sorrels fall while exiting the elevator area?

18             MR. PELTZ:  Object to the form.

19             THE WITNESS:  I think you're parsing

20        the words here.

21             These people indicated where they fell

22        and how they fell.  She said she was

23        walking through the --

24             Mrs. Sorrels said she was walking

25        through the double doors.  We know that she
```

 **JEANNIE REPORTING (305) 577-1705**

```
 1              was well beyond the double doors, so it

 2              just shows you how people characterize what

 3              their experience is.

 4                   When the individual on this very, very

 5              brief interrogatory was asked apparently,

 6              if she was even asked, I don't know, it

 7              says, "while exiting the elevator area."

 8                   Then it says, "Deck 11 pool deck."

 9              That's what it says.  "Starboard side,

10              while exiting the elevator area."

11                   That could mean after she exited the

12              elevator area.  That's the way I would

13              interpret it.

14    BY MR. HAMILTON:

15         Q.   What do you attribute that statement

16    to Mrs. Sorrels that she fell while walking through

17    the double doors?

18                   MR. PELTZ:  Object to form, and

19              predicate.

20                   Sorry.

21                   THE WITNESS:  Page 129 on her

22              deposition, I believe.

23    BY MR. HAMILTON:

24         Q.   And, so, it's your testimony that

25    Mrs. Sorrels stated that her fall occurred while
```

```
 1      she was walking through the double doors?

 2                  MR. PELTZ:  Object to the form.

 3                  THE WITNESS:  No, that's not my

 4             testimony.  I think it's clear that's not

 5             my testimony.

 6      BY MR. HAMILTON:

 7          Q.   Okay.  Well, you're quoting that

 8      portion of her deposition to suggest that

 9      Mrs. Sorrels testified that her fall occurred while

10      she walked through the double doors?

11                  MR. PELTZ:  Object to form, and

12             predicate.

13                  THE WITNESS:  Certainly not.  In fact,

14             if you read the transcript here, you will

15             see that I said we know where she fell

16             based on the video.

17               So, she's obviously not while walking

18             -- while walking, quote, while walking

19             through the double doors.

20      BY MR. HAMILTON:

21          Q.   And she never said that, did she, in

22      her testimony that she fell while walking through

23      the double doors?

24                  MR. PELTZ:  Object to form.

25             Predicate, argumentative.
```

 **JEANNIE REPORTING (305) 577-1705**

```
 1              THE WITNESS:  She said she was walking

 2         through the double doors, and I'm going to

 3         paraphrase.  Let's go to Page 129.  Let's

 4         do that.

 5              I have her deposition here.  I don't

 6         want to put words in her mouth, because I

 7         just paraphrase when I take notes.

 8              Page 129, let's see what she says.

 9              Okay.  It actually might start on page

10         128.

11              Okay.  So here's the question:

12              "No problem," on the bottom of

13         Page 128.

14              "Okay.  So, you are -- "So you're,"

15         meaning "you are" -- "walking out through

16         those double doors onto the outer deck?

17              And she says:  "Uh-huh."

18              And the question is:

19              "What did you see?"

20              And she goes on.

21  BY MR. HAMILTON:

22         Q.   Okay.  So, my question to you is:

23  Mrs. Sorrels never testified that she fell while

24  exiting or walking through the double doors;

25  correct?
```



**JEANNIE REPORTING (305) 577-1705**

1          **A.**    I'm not going to testify as to what

2     she testified to.  Her words are here, and it's a

3     matter of interpretation depending upon who's

4     reading them and how you want to interpret it.

5     I've already given you my impression of what she

6     was saying.

7          **Q.**    All right.  You've testified that she

8     somehow fell while walking through the double

9     doors, based upon her testimony?

10              MR. PELTZ:  No, object to form, and

11              predicate.

12    BY MR. HAMILTON:

13          **Q.**    You're the one misconstruing her

14    testimony.

15              MR. PELTZ:  It's argumentative.

16              MR. HAMILTON:  How about form.

17              MR. PELTZ:  This is such an incredible

18              waste of time and harassment.

19              THE WITNESS:  No, I didn't say that.

20              You know it.  I think the record is clear.

21              I'm saying -- I'm trying to describe to you

22              how people characterize events that occur

23              to them, and just to say that she said she

24              walked through the double doors, and we

25              know she didn't fall there, because we see

 **JEANNIE REPORTING (305) 577-1705**

```
1              the video.
2     BY MR. HAMILTON:
3         Q.    So, you're an expert on how people
4     characterize how they describe accidents now?
5              MR. PELTZ:  Object to the form.  This
6         is argumentative, and --
7     BY MR. HAMILTON:
8         Q.    "Yes" or "no"?
9         A.    Given 30 years of experience of
10    talking to people and getting descriptions from
11    them as to what occurred, I think I have
12    considerable expertise in knowing how they describe
13    things, and I think it's just a basic understanding
14    of human factors.
15        Q.    Gotcha.
16              All right.
17              Going to the next one.
18              Rider.
19        A.    Say again.
20        Q.    Number 22.
21              And the name of the passenger there is
22    Rider, R-I-D-E-R.
23              Any indication that there was
24    rainwater on the floor?
25        A.    I see no such indication.
```

 **JEANNIE REPORTING (305) 577-1705**

1     Q.    Do you know what the substance was

2     that she fell on?

3          A.    Other than wet substance, I don't

4     know, or wet-causing substance, I don't know.

5          Q.    And this accident occurred at the aft

6     pool -- I mean, aft pool deck; correct?

7          A.    Starboard side aft pool deck, looks

8     like same -- similar to number 18.  Let me see.

9     And it is a similar location.

10         Q.    Any indication that Rider knew what

11    the substance was before she fell?

12         A.    No indication either way, whether or

13    not she knew.

14         Q.    Number 23, same question:  Any

15    indication that there was rainwater on the deck for

16    23, which is Danielson.

17         A.    No indication that there was

18    rainwater.

19         Q.    Any indication of what the substance

20    was?

21         A.    No indication of what the substance

22    was, other than it was wet.

23         Q.    This says that the incident occurred

24    on Deck 11 pool deck towards the atrium elevator.

25         A.    That's what it says.

 **JEANNIE REPORTING (305) 577-1705**

1      Q.    Was Mrs. Sorrels' accident towards the

2   atrium elevator?

3      A.    I don't know what -- what's called the

4   atrium elevator.

5      Q.    So you don't know?

6      A.    Sorry?

7      Q.    So you don't know?

8           MR. PELTZ:   Object to form, and

9           predicate.

10           THE WITNESS:   Yes, I don't know what

11           the atrium elevator is, except if we look

12           at number -- what number was that?

13   BY MR. HAMILTON:

14      Q.    Number 23.

15      A.    Number 23, it is in the area where the

16   elevators are servicing the deck.  That's all I can

17   say.

18      Q.    So you're just relying on Exhibit 3

19   that was not created by you?

20      A.    Correct.

21      Q.    And you don't know whether or not

22   there was any type of scientific work done to

23   actually come up with these particular locations;

24   correct?

25      A.    I judge that they were -- they were

 **JEANNIE REPORTING (305) 577-1705**

1 derived from these documents, the interrogatories,

2 but I can't say with certainty. I think the

3 description, Deck 11 starboard side, aft pool deck,

4 is what's being used.

5    Q. But in your attempt to identify a

6 specific location, as is done in Exhibit 3, would

7 just be mere speculation at this point, wouldn't

8 it?

9    MR. PELTZ: Object to the form.

10    THE WITNESS: Well, again, all I -- I

11    don't know. All I can say is that

12    apparently somebody used these

13    interrogatories to try to plot, based on

14    whatever limited description there was,

15    these positions on the deck. That's all I

16    know.

17 BY MR. HAMILTON:

18    Q. Can you scientifically plot -- based

19 upon these answers, can you scientifically plot the

20 location of the actual accident, as reflected in

21 Exhibit 3, based upon the information in the

22 interrogatories?

23    MR. PELTZ: Object to the form.

24    THE WITNESS: I don't know what you

25    mean by "scientifically plot." Can you

 **JEANNIE REPORTING (305) 577-1705**

```
 1              plot, yes, you can.  It has been done.
 2   BY MR. HAMILTON:
 3        Q.    Anybody can plot.  I'm asking you
 4   whether or not there's any science involved in
 5   plotting.
 6              MR. PELTZ:  Were you finished with
 7         your answer?
 8              THE WITNESS:  Yes.
 9              MR. PELTZ:  Okay.
10   BY MR. HAMILTON:
11        Q.    Yeah, anybody can plot.  My
12   nine-year-old son can plot.
13              I'm asking you if there's any science
14   that can be used to determine the actual location
15   of the accident based upon the interrogatory
16   answers in front of you.
17              MR. PELTZ:  Object to form.
18              THE WITNESS:  I think it's a
19         reasonable interpretation of what's written
20         on these pages.  That's all I can tell you.
21         But I don't agree that anybody can plot.
22   BY MR. HAMILTON:
23        Q.    Yeah, well, going back to my question,
24   which is:  Can you tell me what the scientific
25   methodology was that was used to determine the
```



```
 1        actual locations reflected in Exhibit 3?
 2                    MR. PELTZ:  Objection.  Repetitious.
 3                    THE WITNESS:  I think I've already
 4               told you what methodology was used.  They
 5               interpreted what was being written here on
 6               these interrogatory responses and put --
 7               created a map of -- of what -- what is
 8               interpreted as being the locations.
 9        BY MR. HAMILTON:
10               Q.   Who told you that?
11               A.   Nobody told me that.  That's my
12        understanding.  I was --
13               Q.   Well, you have to have the
14        understanding from somewhere, right?
15                    MR. PELTZ:  Excuse me.
16                    You keep interrupting him.  He gets to
17               finish his answer.
18                    MR. HAMILTON:  I thought he was
19               finished, Mr. Peltz.
20                    THE WITNESS:  I was provided this by
21               the plaintiff's attorney.  That's all I can
22               tell you.
23        BY MR. HAMILTON:
24               Q.   Where does the understanding come
25        from?
```



**JEANNIE REPORTING (305) 577-1705**

```
 1              MR. PELTZ:  Objection.

 2              THE WITNESS:  I'm not sure which

 3        understanding you're referring to.

 4              MR. PELTZ:  Object to the form, and

 5        predicate.

 6    BY MR. HAMILTON:

 7        Q.   You said, "It was my understanding."

 8              And I said, "Where did the

 9    understanding come from"?

10        A.   From my -- the fact that I was offered

11    this from the plaintiff's attorney.  And I judge,

12    based on the correlation between the two, that he

13    or she used these interrogatories to plot locations

14    on Deck 11.

15        Q.   Okay.  So, for instance, looking at

16    number 23, does it say port side, or does it say

17    starboard side?

18        A.   It does not indicate.

19        Q.   And where does the plaintiff's lawyer

20    put 23?

21              MR. PELTZ:  Object to the form.

22    BY MR. HAMILTON:

23        Q.   On his Exhibit 3, what does he put?

24              You answered my question.

25        A.   Just a minute.
```

 **JEANNIE REPORTING (305) 577-1705**

278

```
1              MR. PELTZ:  Object to the form.
2              THE WITNESS:  In this case, number 23
3         is placed on the port side of the
4         elevators.
5    BY MR. HAMILTON:
6         Q.   Okay.  Can you tell me, again, based
7    upon what information one would put 23 on the port
8    side?
9         A.   On none, other than to say there's no
10   difference between the port side of the elevators
11   in terms of the floor, the decking, and the
12   starboard side of the elevator.  There isn't any
13   difference.
14        Q.   Okay.  So, other than the fact that
15   you think there's no difference between port and
16   starboard sides on a particular deck, again, my
17   question is:  What information, since you say that
18   it's a reasonable interpretation based upon no
19   science, can you tell me what would have led you,
20   the expert engineer, to put this on the port versus
21   starboard side?
22             MR. PELTZ:  Excuse me.  Let me object
23        to the form.
24             MR. HAMILTON:  That's all you need.
25             MR. PELTZ:  I'm going to object to the
```


**JEANNIE REPORTING (305) 577-1705**

```
 1         argumentative nature.  I'm objecting to

 2         counsel laughing and making faces when

 3         you're asking the question.

 4              I don't think it's necessary to be

 5         disrespectful to the witness, and I object

 6         to that.

 7              MR. HAMILTON:  I'm not laughing, and

 8         I'm not being disrespectful to any witness.

 9         I apologize that you seem to find my

10         Jamaican accent to be funny, but it's not

11         funny in any which way, shape or form.

12              So, to make fun of my accent --

13              MR. PELTZ:  No one is making fun of

14         your accent.

15              MR. HAMILTON:  I'm sorry, but you are.

16              MR. PELTZ:  Don't try and play the

17         victim here.

18              MR. HAMILTON:  I'm sorry, but you are.

19              MR. PELTZ:  You know me well enough to

20         know --

21              MR. HAMILTON:  You are.

22              MR. PELTZ:  I find that beyond

23         offensive that you would make a

24         recommendation -- make a comment like that.

25              MR. HAMILTON:  You are.  I find it
```

**JEANNIE REPORTING (305) 577-1705**

```
 1              offensive that just because you think I

 2              have an island accent you think it's funny.

 3                   MR. PELTZ:  No one has suggested that,

 4              and for you to make a comment like that,

 5              particularly --

 6                   MR. HAMILTON:  That's what you're

 7              saying on the record.  You're saying --

 8                   MR. PELTZ:  No, I'm saying you're

 9              making -- you're laughing --

10                   MR. HAMILTON:  I'm not laughing.  This

11              is the manner in which I speak.

12                   MR. PELTZ:  It's not the manner in

13              which you speak.

14                   MR. HAMILTON:  It's the manner in

15              which I speak.

16                   MR. PELTZ:  It's totally

17              disrespectful.  If you want to get into --

18                   MR. HAMILTON:  I think that for folks

19              to come in and now criticize that, you

20              know, somehow my accent is somehow being

21              laughable, or at least a laughable process,

22              I think it's insulting, offensive, and I

23              think I'm not going to stand for that.

24                   MR. PELTZ:  Well, you know --

25                   MR. HAMILTON:  I'm going to --
```

 **JEANNIE REPORTING (305) 577-1705**

```
1              MR. PELTZ:  -- I think we should bring
2         this to the Court's attention --
3              MR. HAMILTON:  I'm going --
4              MR. PELTZ:  -- because, frankly, I'm
5         happy to go ahead and really discuss --
6         since you've made these -- since you've
7         made these accusations --
8              MR. HAMILTON:  I'm going to --
9              MR. PELTZ:  -- we can talk about --
10             MR. HAMILTON:  You're the one that
11        made the accusations --
12             MR. PELTZ: -- our conversations
13        together.
14             MR. HAMILTON:  You're the one that
15        makes the accusations of my laughing and
16        being disrespectful.
17             MR. PELTZ:  No, I said that you --
18        well, you were.  You were being -- laughing
19        and disrespectful.  And the witness is
20        here--
21             MR. HAMILTON:  The way you -- the way
22        you interpret laughter, I guess, is through
23        -- again, I apologize, but I can't help the
24        way I speak, and the fact that I speak with
25        an accent and I speak, I guess, you
```

1      interpret that to be laughing.  I interpret

2      that to be my normal speaking voice, but I

3      won't waste any more time --

4           MR. PELTZ:  Well, that's actually a

5      despicable statement, and you know that

6      that is untrue, and --

7           MR. HAMILTON:  I won't waste any more

8      time with it.

9           MR. PELTZ:  -- that is unprofessional.

10          MR. HAMILTON:  I won't waste any more

11     time with it, and we can move on with the

12     deposition.

13          THE WITNESS:  I will make a statement

14     for the record because she's not getting

15     it.

16          (Thereupon, a discussion was held off

17     the record.)

18 BY MR. HAMILTON:

19     Q.   Going back to my questions, Mr. Zollo,

20 I think we were at 23.

21          We were talking about the incident

22 of 23.

23          I asked you a question as to whether

24 or not there was any information here based upon

25 your previous answer that there was some reasonable

 **JEANNIE REPORTING (305) 577-1705**

1      deduction from the interrogatories to plaintiff's

2      number 23, as to whether or not there was any

3      indication as to whether this occurred port side or

4      starboard side.

5                 And your answer to that was?

6                 MR. PELTZ:  Object to the form.

7            Repetitious.  Argumentative.

8                 THE WITNESS:  Is that the question --

9            do you want me to answer it?

10                MR. HAMILTON:  Now, that's laughter

11           from Mr. Zollo.

12                THE WITNESS:  No, come on, that's a

13           joke.

14                MR. HAMILTON:  I didn't ask you a

15           question.  That was a joke.

16                THE WITNESS:  Okay.  I'm sorry.  I

17           won't make any more jokes.

18                MR. HAMILTON:  I'm sorry.

19                THE WITNESS:  Can I answer -- respond?

20                MR. HAMILTON:  You can, you can.

21           Without the laughter.

22                THE WITNESS:  Okay.  I think it's

23           entirely reasonable, based on what's here,

24           and there's no indication whether or not

25           it's port side or starboard side.

 **JEANNIE REPORTING (305) 577-1705**

284

```
1              It says:  "Pool deck going toward the
2         atrium elevators."
3              So somebody has to make a decision of
4         where to put a -- plot a mark for this
5         number 23, and there's no difference
6         between the pool deck on the starboard side
7         and on the west side, on the starboard side
8         or on the port side, then the decision was
9         made to place it there.
10             I don't say it's necessarily
11        absolutely accurate, but there may be a
12        difference without any -- I mean, a
13        distinction without any difference.
14   BY MR. HAMILTON:
15        Q.   Do you know what the coefficient of
16   friction was on the port side of the -- of the pool
17   deck where this incident occurred?
18        A.   No, I don't.
19        Q.   Do you know the coefficient of
20   friction on the starboard side of the pool deck
21   where the Danielson incident occurred?
22        A.   No.
23             MR. PELTZ:  Which one is Danielson?
24             MR. HAMILTON:  Number 23.
25             Just so the record is clear, I said
```

**JEANNIE REPORTING (305) 577-1705**

```
 1                "this incident," when I said the "port

 2                side," but I was referring to the Danielson

 3                incident.

 4    BY MR. HAMILTON:

 5           Q.   Do you know the coefficient of

 6    friction or slip resistance of the pool deck where

 7    the Danielson incident occurred?

 8           A.   Only if it's -- which number is this,

 9    sir?

10           Q.   23.

11           A.   23.  The answer is, strictly speaking,

12    of course, no, because I didn't test there, but I

13    did test at a similar area on the -- on the

14    starboard side.

15           Q.   All right.  In fact, you said you did

16    a test of Area 20, correct?

17           A.   Yes.

18           Q.   When you talk about Area 20, you're

19    talking about the 20 that's reflected on

20    Plaintiff's Exhibit 3; correct?

21           A.   Correct.

22           Q.   And that's the only other area you

23    tested onboard the vessel?

24           A.   Yeah.  I can't say the only other

25    area.  I didn't test a single spot in the other
```

**JEANNIE REPORTING (305) 577-1705**

```
1     areas, but I tested several planks around the area,

2     so it's an area.

3                      But, yes, the only remote area from

4     the area of the incident, that is correct.

5                 Q.   So you would characterize 20 as

6     remote?

7                 A.   Well, it's much -- it's clearly --

8     clearly, 20 is --

9                 Q.   Just using your words.

10                A.   Yeah, it's a word that indicates it's

11    not in the immediate vicinity, as you had described

12    the vicinity before.

13                Q.   I'll rely on your words.

14                MR. PELTZ:  Object to the form.

15           Objection.  Argumentative nature.

16                MR. HAMILTON:  We'll rely on "remote."

17           The record will reflect that Mr. Zollo is

18           laughing.  Apparently, that's --

19                THE WITNESS:  No, because you laughed,

20           I laughed with you.  Come on.  I'm laughing

21           with you, not at you.

22                MR. HAMILTON:  I don't know.  It's

23           hard to tell.

24                MR. PELTZ:  Object to the form.

25           Object to it.  It's argumentative.
```

 **JEANNIE REPORTING (305) 577-1705**

```
 1    BY MR. HAMILTON:

 2         Q.   Okay.  We're at number 24.

 3         A.   Yes, sir.

 4         Q.   Any indication of rainwater?

 5         A.   No.

 6         Q.   In this incident it says that a

 7    passenger fell backwards while trying to hit a ball

 8    while playing table tennis; is that correct?

 9              MR. PELTZ:  Object to the form.

10              THE WITNESS:  Yes.

11    BY MR. HAMILTON:

12         Q.   And certainly those -- strike that.

13              That was a factual situation

14    surrounding Mrs. Sorrels' accident; correct?

15         A.   Correct.

16         Q.   Any indication that there was

17    rainwater involved in this case?

18         A.   No.

19         Q.   Any indication that Summers, which is

20    the person reflected in number 24, knew prior to

21    falling that there was some type of substance or

22    some type of contaminant on the deck?

23         A.   No indication either way of whether or

24    not what they knew.

25         Q.   This incident occurred on the port
```



1    side; correct?

2          A.    It does say port side, correct.

3          Q.    And you did not test this particular

4    area for coefficient of friction or slip

5    resistance; correct?

6          A.    Correct.

7          Q.    25 is -- I will spell the name,

8    S-E-R-E-M-E-T-I-S, Seremetis.

9                Any indication that there was

10   rainwater on the deck here, in 25?

11         A.    No.

12         Q.    Any indication as to what the

13   substance was?

14         A.    No, other than wet.

15         Q.    Any indication that a person here,

16   Seremetis, knew that there was some contaminant or

17   substance on the deck prior to falling?

18         A.    No indication of what they knew --

19   whether they knew it was wet or not.

20         Q.    It says here that this passenger was

21   barefoot; correct?

22         A.    If that's what it says.  Yes, it does.

23         Q.    And Ms. Sorrels certainly wasn't

24   barefoot at the time of her incident?

25         A.    No, she was not.

 **JEANNIE REPORTING (305) 577-1705**

1        Q.    It says here also that the passenger

2    was trying to turn a pool lounge chair, see that?

3        A.    That's what it says.

4        Q.    That's not what Mrs. Sorrels was doing

5    at the time of her accident?

6        A.    She was not.

7        Q.    Number 27, any indication of rainwater

8    here that caused number 27, which is Jacqueline

9    Stewart?

10        A.    No.

11        Q.    Any indication of what the substance

12    was?

13        A.    No, other than something to cause it

14    to be wet, the deck to be wet.

15        Q.    All right.  The area, number 27, that

16    is by the Garden Café; is that correct?

17        A.    It says:  "Exiting the Garden Café."

18    I don't know if that's where it occurred by the

19    Garden Café, but that's what it says.

20        Q.    Did you test the coefficient of

21    friction or slip resistance of that area?

22        A.    No.

23        Q.    Before turning to 28, any indication

24    -- no, sticking with 27, any indication that

25    Stewart knew that there was some contaminant or


**JEANNIE REPORTING (305) 577-1705**

1    some wetness on the deck prior to walking on the

2    deck or prior to the fall?

3         A.   What they knew is not indicated here

4    at all.

5         Q.   Number 28, Lori Ann Perry.

6              By the way, was this your first time

7    on the NORWEGIAN SKY?

8         A.   I don't know.

9         Q.   Do you know if you have done any

10   testing before on the NORWEGIAN SKY?

11        A.   I don't know.

12        Q.   Were you the expert in the

13   Lori Ann Perry case?

14        A.   I don't honestly know.

15        Q.   I didn't see it on the list that you

16   provided.

17             So, if it's not on your list and it

18   occurred in 2010, do you know if that simply is off

19   of your list or --

20        A.   No, I don't know.

21             MR. PELTZ:  Object to the form, and

22             predicate.  The list is of depositions and

23             testimony.

24             THE WITNESS:  That is correct.  Maybe

25             I wasn't asked to testify.  I don't know.

```
 1    BY MR. HAMILTON:

 2          Q.    Okay.

 3          A.    And I can't say.  I don't recognize

 4    the name, frankly, as I sit here.

 5          Q.    Gotcha.

 6                Now, Lori Ann Perry was a case that

 7    involved Mr. Peltz?

 8          A.    Oh, no.  I've never worked for

 9    Mr. Peltz.

10          Q.    Okay.

11          A.    I don't recall ever having worked for

12    Mr. Peltz, at least.

13          Q.    Now, is there any indication that for

14    Lori Ann Perry there was rainwater involved in her

15    incident?

16          A.    I see no indication of rainwater,

17    except there was water.

18          Q.    Did you test the area, where

19    Lori Ann Perry fell?

20          A.    No.

21          Q.    Any indication that Lori Ann Perry

22    knew of any substance or contaminant before she

23    fell?

24          A.    No indication of whether or not she

25    knew of any foreign substances.
```



**JEANNIE REPORTING (305) 577-1705**

1      Q.    Number 29, Silvia Cadena, it says here

2   that the location was Deck 11 starboard between the

3   entrance to the atrium and pool deck.

4            Did you test that area?

5      A.    Well, that's close to the area, 20,

6   that I did test and it's the same deck.

7      Q.    Okay.

8            I'm asking if it was -- I didn't ask

9   if it was close.

10            I'm asking you:  Did you test that

11   area?

12      A.    Well, I don't -- I think I did test

13   that area, but I can't say, you know.  These aren't

14   -- these aren't areas that are, as you said,

15   scientifically determined, but they are plotted

16   areas based on the description given in these

17   interrogatories.

18      Q.    It's indicated that Ms. Cadena was

19   wearing high heels.

20            Do you know if Ms. Sorrels was wearing

21   high heels?

22      A.    High heels has nothing to do with my

23   opinions.

24      Q.    I'm just asking you if you know.

25      A.    Please.  I don't recall.  Honestly, I


**JEANNIE REPORTING (305) 577-1705**

```
 1     thought I did -- she had, as I recall, looking at
 2     the video --
 3                MR. PELTZ:  Take your time.  Just look
 4            through.
 5                THE WITNESS:  You know, I don't recall
 6            everything I read in her deposition, but I
 7            seem to recall some description of the
 8            shoes.
 9                I would have to look at the
10            deposition, because I didn't record that as
11            part of my brief review of her deposition.
12            Let's see if there's anything in here that
13            indicates -- oh, I don't have an index, so
14            I'm going to have to go through it.
15     BY MR. HAMILTON:
16            Q.   I think you have photographs of the
17     shoes, don't you?
18            A.   Yeah.  Yes, I do have photographs.
19            Q.   Do you characterize those as high
20     heels?
21            A.   They certainly aren't flat shoes.
22     It's a -- it's a sandal type shoe with a --
23     probably an inch or two-inch heel.
24            Q.   Any indication that Ms. Cadena knew
25     there was rain on the deck prior to her fall?
```

1         **A.**    Ms. Cadena?

2         **Q.**    Number 29.

3         **A.**    I have no indication of whether or not

4    she knew -- it was rainwater, she indicates, but

5    not whether or not she knew in advance, I don't

6    know.

7         **Q.**    Number 31, Danielle Hobbs?

8         **A.**    Yes.

9         **Q.**    It says there:  "Fell on the deck near

10   a hot tub."

11             MR. PELTZ:  Did you mean to skip 30?

12             MR. HAMILTON:  I'm asking about 31.

13             MR. PELTZ:  Okay.

14             MR. HAMILTON:  Okay.

15   BY MR. HAMILTON:

16        **Q.**    Did you test the area where Danielle

17   Hobbs' claim occurred?

18        **A.**    Well, I tested the deck in the --

19   that's in the vicinity of where Ms. Sorrels fell,

20   and I did test around that area, yes, and -- but I

21   can't say exactly what spots.

22        **Q.**    All right.

23             I guess to make this more simplistic,

24   your notes only reflect that you tested Area 20;

25   correct?


**JEANNIE REPORTING (305) 577-1705**

1        **A.**    Well, they do reflect that I tested

2    Area 20, but not only.

3        **Q.**    Right.  Well, any other areas that you

4    tested, then, were in the area or the vicinity of

5    Mrs. Sorrels' accident?

6        **A.**    No.

7        **Q.**    No?

8        **A.**    No.

9        **Q.**    Okay.

10            So, you tested one area dry.

11            What was the dry area you tested?

12       **A.**    That was somewhat remote from the area

13   where the fall occurred.  You like that word, I

14   know.  But it was in the dry area.  I had to find a

15   dry area.  It was raining, and I was under cover,

16   so I did find an area of the deck that had not been

17   wetted, and it was indeed dry and that's where I

18   did those tests.  And it was on the starboard side

19   towards the -- what would be the gunnels or the

20   side of the ship.

21       **Q.**    All right.  And the areas other than

22   the dry area that you tested, would you be able to

23   indicate on Exhibit 3, generally -- I think you

24   probably did actually.  You did on Exhibit 3 --

25       **A.**    I did.

**JEANNIE REPORTING (305) 577-1705**

1          Q.    -- where you tested?

2          A.    I did.

3          Q.    And then you did indicate on Exhibit 3

4    wet areas that you tested, the areas that you

5    tested wet with the puddle; correct --

6          A.    No.

7          Q.    -- by indicating a W?

8          A.    Well, there's too many factors in the

9    question.

10              MR. PELTZ:   I'm going to object to the

11         form.   Multiple questions.

12              THE WITNESS:   I tested that vicinity

13         in the area where the videos indicated that

14         she fell.   Some of it was puddled, some of

15         it was not.

16   BY MR. HAMILTON:

17         Q.    And you indicated on this Exhibit 3

18   where you have done the testing for the puddling --

19         A.    Yes.

20         Q.    -- by putting a W?

21         A.    Okay.   I'm not sure of the question.

22   Can I hear it again?

23         Q.    Sure.   I mean, my questions are very

24   simple.

25              You indicated the approximate area

 **JEANNIE REPORTING (305) 577-1705**

1    where you did dry testing.

2        **A.**    Yes.

3        **Q.**    I'm asking you where did you do your

4    wet testing, other than Area 20, where did you do

5    your wet testing --

6        **A.**    Well, that's also --

7        **Q.**    -- and I believe that's indicated by

8    the W.

9        **A.**    It's true.

10       **Q.**    Correct.  When I say "wet testing," I

11   mean, including all testing wet, meaning, wet

12   whether it was a puddle, wet whether it was wet on

13   the rubber.  I'm including all wet testing.

14       **A.**    Okay.

15       **Q.**    And does that W indicate where all the

16   wet testing was done except for Area 20?

17       **A.**    Yes.  I think that's fair to say, it's

18   in that vicinity, yes.

19       **Q.**    Okay.

20              Mr. Peltz pointed out number 30, so

21   let me go back to 30 --

22       **A.**    Okay.

23       **Q.**    -- which is Dulat.

24              Any indication that Mr. Dulat knew

25   that the deck was wet with rainwater before walking



**JEANNIE REPORTING (305) 577-1705**

1    out on the deck?

2         **A.**   No indication whether he knew it or

3    didn't know it.

4         **Q.**   Okay.  And it says here:  "Midship

5    starboard near pool," as the location.

6         **A.**   Okay.

7         **Q.**   From this particular information, can

8    you actually tell specifically where he fell?

9         **A.**   No, other than it is midship starboard

10   near pool."  That's what's indicated.

11        **Q.**   Fair enough.

12             Do you know how many people -- since

13   the teak deck was put down, how many people may

14   have traversed on that teak deck?

15        **A.**   Certainly not.

16        **Q.**   Do you know how many people have

17   traversed on the teak deck since it was put down

18   when the teak deck was wet with any substance?

19        **A.**   No.

20        **Q.**   Do you know what the capacity of the

21   ship is?

22        **A.**   No.

23        **Q.**   And that would go as to both passenger

24   and crew.

25             You don't know what the capacity of

```
 1        the vessel is in terms of carrying people?
 2             A.   I do not know the answer to that
 3        question, and it has no -- it would have no bearing
 4        on any of the opinions I offered.
 5             Q.   Okay.
 6                  I would like you to turn to your
 7        report very quickly?
 8             A.   Okay.
 9             Q.   Now, looking at your report, on page 1
10        of your report, it says that you looked at the
11        video involving Mrs. Sorrels, and it shows the
12        presence of numerous puddles throughout isolated
13        areas of the deck.
14                  And so you were able to determine by
15        looking at a video that there were puddles on the
16        video?
17             A.   I was.
18             Q.   Were there any puddles in the exact
19        area where Mrs. Sorrels fell?
20             A.   There were.
21             Q.   And so they were visible to your eye
22        on the video?
23             A.   I made a judgment that I could see
24        puddling based on the reflections and so forth.  I
25        believe that's my recollection, yes.
```

 **JEANNIE REPORTING (305) 577-1705**

1          Q.    And the video was of a good quality;

2     correct?

3                MR. PELTZ:  Object to the form.

4     BY MR. HAMILTON:

5          Q.    "Good" being subjective, which I

6     understand, but how would you describe the quality

7     of the video?

8                MR. PELTZ:  Object to the form.

9                THE WITNESS:  I wouldn't describe it

10               as being exceptionally poor.  It was a

11               video from some distance, and it adequately

12               portrayed the incident.  That's all I can

13               tell you.

14    BY MR. HAMILTON:

15         Q.    But at least to your eye, based upon

16    the quality of that video, you could tell that

17    there were puddles?

18               MR. PELTZ:  Object to the form.

19               THE WITNESS:  I did.

20    BY MR. HAMILTON:

21         Q.    Did you observe Mrs. Sorrels falling

22    in a puddle?

23         A.    I don't know exactly where her feet --

24    her foot was when she slipped and fell, but I think

25    she said she landed in a puddle.

 **JEANNIE REPORTING (305) 577-1705**

1      Q.    Okay.

2      A.    That doesn't mean that she stepped in

3  a puddle.  It just means that she landed in.

4      Q.    My question is:  Can you discern that

5  from the video --

6      A.    No.

7      Q.    -- that she stepped in a puddle?

8      A.    No, I don't think so.

9      Q.    Okay.  Now, turning to page 2 of your

10  report, you said that -- in the second full

11  paragraph it says:  "At the inspection the writer"

12  -- which I assume is you --

13      A.    Yes.

14      Q.    -- "exposed still images of the

15  condition of the exterior Deck 11 area construction

16  and maintenance."

17              What were you referring to there?

18      A.    The photographs that are in my file

19  that you've seen, I believe.

20      Q.    And those are photographs that we have

21  marked as exhibits?

22      A.    Yes.

23      Q.    And then you say further on that the

24  condition was noted to be substantially similar,

25  and that you noted puddled areas.

1    **A.**    Yes.

2        **Q.**    And did you take photographs of the

3    puddled areas, which you consider to be puddling?

4        **A.**    Yes.

5        **Q.**    Okay.  Can you show me which

6    photograph you're referring to where you believe

7    there is puddling?

8        **A.**    Well, where the reflection is sharpest

9    there's puddling.  Some are more clearly

10   distinguished in photographs than others, but I see

11   it throughout.  I see total settling areas of

12   puddling.

13       **Q.**    Just to be clear which photographs,

14   can you tell -- we've identified already this

15   exhibit as 11-B, and there's a photograph that's

16   marked as number 1, does that show puddling?

17       **A.**    Yes.

18       **Q.**    Okay.  How about number 2, does that

19   show puddling?

20       **A.**    Yes.

21       **Q.**    Same questions as to 3, 4, 5, 6 and 7.

22           Do those photographs show puddling?

23       **A.**    Yes, as to 3.  Yes, as to 4.  Yes, as

24   to 5.  Yes, as to 6.  Yes, as to 7.

25       **Q.**    Okay.  So I want to go back and look

1    at number 1, and I know that we're not on the

2    video, but this is for my purpose.

3              Where do you see puddling in number 1,

4    if you can just point that to me -- point that out

5    to me.

6         **A.**    Well, you're talking about clear

7    water.  There may indeed be puddling here.  You

8    just can't see it.  But you can see it where

9    there's a reflection.  It's like a mirror effect.

10        **Q.**    Okay.  So wherever you see a mirror

11   effect you believe there's puddling?

12        **A.**    Yeah.  I think the mirror effect does

13   indicate some degree of water retention on the

14   surface, and to one degree or another you can see

15   it more clearly out in these areas, to the right

16   side.

17             I recall doing my testing right off of

18   this area, and very clearly at the time that I was

19   there, there was puddling.

20             So I'm using, I guess, both my

21   experience onboard and the photographs.

22             And here's a couple more on this 11-B

23   -- 11-A, if you want to mark those.

24        **Q.**    11-A.  So what I'll do on 11-A is mark

25   1, 2 is already marked and 4.

 **JEANNIE REPORTING (305) 577-1705**

```
 1                  So if we're looking at 11-A, 1, 2, 3,

 2    4, you would indicate there's puddling there also?

 3         A.    I see puddling in 1.   I see puddling

 4    in 4.   I see puddling in 2.   I see puddling in 3.

 5         Q.    Okay.   Did you ever measure the

 6    elevations of the planks of the teak materials that

 7    were on the deck?

 8         A.    No.

 9         Q.    Now, going back to your report on

10    page 3, there's a statement there that says the

11    average value of all wet testing measurements was

12    0.45.

13                  Are you talking about the average of

14    the eight groups of tests that you did?

15         A.    All the wet testing.   It does not --

16    does not include the dry.

17         Q.    Okay.

18                  So you did seven wet groups of

19    testing; is that what you're referring to?

20         A.    Well, I think we've gone over that

21    earlier.   I think I could agree that if you insist

22    on grouping them the way you have, then there are

23    seven.

24         Q.    Well, let's just do it this way.   Why

25    don't you tell me how you arrived at the average
```

330

1             Is that the same -- when you refer to

2    or use the term "architectural use"?

3             A.    No.   The architectural use, in this

4    case, is an exposed deck on shipboard.   That would

5    be the architectural use.

6             Q.    Okay.

7             Do you believe that a specific test

8    result must be achieved for a floor surface to be

9    safe for pedestrians?

10            A.    Do I -- can I hear that again?   Do I

11   what?

12            Q.    Do you believe a specific test result

13   on your tribometer --

14            A.    No.

15            Q.    -- must be achieved for a floor

16   surface to be safe for pedestrian use?

17            MR. PELTZ:   Object to the form.

18            THE WITNESS:   I think on average the

19            test result must be achieved, the minimum

20            standard must be achieved, yes.

21            It depends on the type of use and

22            occupancy as well, exposure.

23   BY MR. HAMILTON:

24            Q.    And that minimum standard is?

25            A.    Well, it's 0.6 aboard the vessels, and

**JEANNIE REPORTING (305) 577-1705**

```
1      it's 0.5 in terrestrial environments, unless it's a

2      ramp or unless it's a handicap access walkway or

3      something like that.

4              Q.    And 0.6 is based solely on 1166?

5              A.    Based upon 1166, correct.

6              Q.    Can a speed at which a pedestrian

7      moves across the floor contribute to a slip?

8              A.    I'm certain it can, but it has nothing

9      to do with the quality of the floor surface.

10             Q.    Can gait contribute to slip?

11             A.    I'm sure it can, but it has nothing to

12     do with the quality of the floor surface.

13             MR. PELTZ:  Object to the form of the

14             last two questions.

15     BY MR. HAMILTON:

16             Q.    Is there a standard that currently

17     exists for English XL?

18             MR. PELTZ:  Object to the form.

19             THE WITNESS:  Yes, there is.  I think

20             it's 1679.  But if you say "currently

21             exists," that standard is no longer

22             supported.  It's still available, however,

23             at ASTM.

24     BY MR. HAMILTON:

25             Q.    I'm sorry.  You said it's no longer?
```

**JEANNIE REPORTING (305) 577-1705**

1    similar or not?

2         **A.**    Well, I would like to be more specific

3    with regard to this matter.

4         **Q.**    Yes.

5         **A.**    When I say "substantially similar," we

6    are talking about a teak deck that is wetted by

7    contamination of liquid form.  That's what I'm

8    saying is substantially similar, because

9    performance under the standardized test reflects

10   the nature of those conditions.

11        **Q.**    Is the purpose of -- when one talks

12   about "substantially similar," is the purpose

13   whether the incident is sufficient to place the

14   premises owner on notice of the need to take

15   further action to determine the need for corrective

16   action?

17             MR. HAMILTON:  Objection as to form.

18             THE WITNESS:  Yes.  I think you have

19             -- if you have reports of adverse effects

20             or adverse performance of a -- of a deck or

21             a floor surface, then you're obliged to

22             investigate that, and determine whether it

23             is some sort of a coincidence or there's

24             some defective conditions.

25   BY MR. PELTZ:


**JEANNIE REPORTING (305) 577-1705**

1    Q.    You've identified a number of these

2    accidents as being substantially similar.  We won't

3    go through the number again because it's in the

4    record.

5         But, in your opinion, were each of

6    those accidents -- the facts of those accidents and

7    the information that was available sufficient to

8    place the NCL, on notice of the need to take

9    further action to determine whether there was a

10   need to take corrective action or not?

11        MR. HAMILTON:  Objection to form.

12        THE WITNESS:  The answer is yes, and I

13        think -- let me just see here.

14        Yeah, I even mentioned that in my

15        report, that they had knowledge by their

16        everyday and similar prior slip and fall

17        incidents, that they should inspect this

18        deck for suitability as to the conditions

19        of use.

20   BY MR. PELTZ:

21        Q.    As far as determining the context in

22   the context of whether accidents were substantially

23   similar, would one look at simply Mr. Hamilton's

24   definition of "in the vicinity" as being within ten

25   feet, or would one look to the entire teak deck on

  **JEANNIE REPORTING (305) 577-1705**

344

```
 1     Deck 11?
 2          A.    I think he should look --
 3                MR. HAMILTON:  Objection to form.
 4                THE WITNESS:  -- at the entire teak
 5           deck because it's all exposed, I mean, in
 6           those areas certainly that are exposed to
 7           wetting.  And as a matter of fact, even the
 8           areas under cover are very substantially
 9           exposed to wetting because that's where the
10           -- the water is naturally going to drain,
11           depending on the degree of rainfall, and
12           that's where the squeegee effort to get the
13           puddles off the surface were directed.
14     BY MR. PELTZ:
15          Q.    And just so we're clear on this, with
16     regard to -- specifically to two of the incidents
17     that involved -- one second.
18                Incident 30, which they identified as
19     one of the ones involving rainwater, was that in
20     very close proximity to the area where Terry
21     Sorrels' accident happened?
22                MR. HAMILTON:  Objection as to form.
23                THE WITNESS:  I would say it's in the
24           same vicinity, and, of course, it's the
25           same teak deck and the same wet conditions.
```

```
 1    BY MR. PELTZ:
 2          Q.   And the description as provided by NCL
 3    of it being midship to starboard side, near a pool,
 4    is that the same definition that they gave with
 5    regard to -- or they would indicate with regard to
 6    Terry Sorrels' accident?
 7          A.   It was, and it wouldn't matter to me
 8    --
 9                MR. HAMILTON:  Same objection as to
10          form.
11                THE WITNESS:  It was, and it wouldn't
12          matter to me whether it was starboard or
13          port side.  It's the same deck and the same
14          conditions.
15    BY MR. PELTZ:
16          Q.   Incident number 29, which was another
17    incident in which a passenger slipped and fell as a
18    result of rainwater, was this in the same essential
19    area you tested when you tested with regard to
20    Incident 20?
21          A.   Yes, it is.
22                MR. HAMILTON:  Same objection as to
23          form.
24    BY MR. PELTZ:
25          Q.   What were your findings with regard to
```

 **JEANNIE REPORTING (305) 577-1705**

1      that particular area?

2                    MR. HAMILTON:   Which area, 20?

3                    MR. PELTZ:   Yes.

4                    THE WITNESS:   With regard to Area 20,

5            I had an average -- they're all below .5,

6            and the average was 0.42.

7      BY MR. PELTZ:

8            Q.   With regard to the letter that you

9      discussed with Mr. Hamilton regarding OSHA -- I

10     think it was marked as Exhibit number 12.

11           A.   Yes.

12           Q.   -- does it -- does the response

13     indicate, quote:   "A coefficient of friction of 0.5

14     is not intended to be an absolute standard value.

15     A higher coefficient of friction may be necessary

16     for certain work tasks, such as carrying objects,

17     pushing or pulling objects or walking up and down

18     ramps?

19           A.   Yes, it does.   And I've indicated in

20     my testimony that's true.

21           Q.   And is that one of the reasons that --

22     in dealing with the ASTM standard for ships, which

23     are ships on the high seas which can present an

24     unstable platform, that the committee recommended a

25     standard of 0.6?



**JEANNIE REPORTING (305) 577-1705**

```
 1                  MR. HAMILTON:  Form objection as to

 2          form.

 3                  THE WITNESS:  Yes.

 4                  MR. HAMILTON:  Speculation.

 5                  THE WITNESS:  Yes, in my opinion that

 6          would be the reason.

 7     BY MR. PELTZ:

 8          Q.    And just one last question.

 9                Where are your field notes?

10          A.    Here.

11          Q.    Okay.

12                With regard to the average you got, if

13     you were to add up the specific values under each

14     of your wet slip resistance tests, would those come

15     to .45?

16                  MR. HAMILTON:  Objection as to form.

17                  THE WITNESS:  Again, I can't tell you

18          if it includes on the rubber or not on the

19          rubber.  I can't say, as I sit here.

20          However, it's not as though -- it's a

21          question of whether the average at any

22          point or particular location.  The average

23          in general is below a 0.25, meaning the

24          deck itself doesn't qualify.  And that's

25          all I can tell you.
```



**JEANNIE REPORTING (305) 577-1705**

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

Miami Division


CASE NO. 13-21413-CIV-Cohn/Seltzer


TERESITA SORRELS and

JOSEPH SORRELS, her husband,     

       Plaintiff,

vs.

NCL (BAHAMAS) LTD., a Bermuda

company d/b/a NORWEGIAN CRUISE LINE,


       Defendants.


------------------------------/


       150 Southeast 2nd Avenue,

       Miami, Florida,

       Friday, August 9, 2013,

       10:00 a.m.


D E P O S I T I O N

of

SOLANGE WINIFRED

taken on behalf of the Plaintiff pursuant to a Notice

of Taking Deposition.

- - - - - -

1    the photographs show?

2         A.   He told me to point around where the

3    accident happened and I showed him.  He took photos

4    with my hand pointing.  I sort of remember.

5         Q.   Do you recall whether there were any signs

6    in the area at the time?

7         A.   No, sir.

8         Q.   You do not recall or there were not any

9    signs?

10        A.   No, sir, I don't remember.

11        Q.   So you do not recall seeing any signs

12   warning about the deck being slippery or anything of

13   that nature?

14             MR. RAMIREZ:  Objection; asked and

15   answered.

16        A.   No, sir, I don't know.

17        Q.   Were there any barricades or the plastic

18   devices they use at times to warn people that the

19   areas are slippery when wet?  Was there anything like

20   that there?

21             MR. RAMIREZ:  Objection; asked and

22   answered.

23        A.   I don't remember seeing anything, any sign.

24        Q.   When you were working as the restaurant

25   steward for the Garden Cafe, would you at times mop

1          A.    No, sir.

2          Q.    You never were involved in cleaning the

3     floors for the Outdoor Cafe?

4               MR. RAMIREZ:  Objection to form; asked and

5     answered.

6          A.    Can you repeat that?

7          Q.    Did your job duties ever involve cleaning

8     the floor of the Outdoor Cafe?

9          A.    Yes, sir.

10         Q.    When you cleaned the floor, would you mop

11    it or would you spot clean it, or what type of

12    cleaning would you do of the floor?

13         A.    It depends on whatever is on the floor.

14         Q.    So if someone spilt some water or liquid,

15    you would be involved with cleaning it up?

16              MR. RAMIREZ:  Objection to form.

17         A.    Yes, sir.

18         Q.    Was there a regular clean up that was done,

19    that the restaurant stewards or other people would do

20    of the Outdoor Cafe floor?

21         A.    The deck department, depends on whatever

22    the deck department would do.

23         Q.    So when you would clean the floor of the

24    Outdoor Cafe, it was generally when someone had spilt

25    something.  Is that correct?

FRIEDMAN, LOMBARDI & OLSON
C O U R T    R E P O R T E R S

1          MR. RAMIREZ:  Objection to form;

2    mischaracterizes testimony.

3          Q.    I am trying to find out from you, what were

4    the occasions or the circumstances that you would be

5    involved in cleaning up the floor of the Outdoor

6    Cafe; you mentioned sometimes when people would spill

7    things.  Were there other times or other occasions as

8    well?

9          A.    Only if there was a spill.

10          Q.    When someone would spill something on the

11    Outdoor Cafe floor and you would clean it up, would

12    you put up one of those warning signs?

13          A.    Yes, sir.

14          Q.    What does the warning sign look like and

15    what would it say?

16          A.    Caution, wet floor.

17          Q.    About how big would the sign be?

18          A.    A yellow cone.

19          Q.    Was it one of those signs that would kind

20    of open up and look like a triangle-type thing?

21          A.    Yes, sir.

22          Q.    Would it have a picture of someone actually

23    slipping on the sign --

24          MR. RAMIREZ:  Objection to form.

25          Q.    -- or a diagram of someone slipping?

18

```
 1         A.   Yes, sir.

 2         Q.   It would say slippery or wet or caution,

 3    wet floor?

 4              MR. RAMIREZ:  Objection to form.

 5         A.   I can't remember.

 6         Q.   Something along those lines.

 7              MR. RAMIREZ:  Same objection.

 8         A.   Maybe.

 9         Q.   Were you instructed to put those signs out

10    every time that you saw something that was wet on the

11    floor of the Outdoor Cafe, so that people would not

12    slip in it?

13              MR. RAMIREZ:  Objection to form.

14         A.   Yes, sir.

15         Q.   When you were cleaning the floor of the

16    Outdoor Cafe when it was wet, would you use anything

17    else besides that warning sign to advise people that

18    the floor was slippery?

19              MR. RAMIREZ:  Objection to form.

20         A.   No, sir.

21         Q.   Were you instructed, as part of your job,

22    that whenever you saw water or some other liquid on

23    the floor of the Outdoor Cafe that you would put up a

24    sign immediately and to clean it up as soon as

25    possible?
```

FRIEDMAN, LOMBARDI & OLSON
C O U R T    R E P O R T E R S

19

1      A.   Yes, sir.

2           MR. RAMIREZ:   Objection to form.

3      Q.   Was the reason for that because the floor

4   could be slippery when wet and you did not want

5   people to fall?

6           MR. RAMIREZ:   Objection; compound.

7      Q.   Was the reason for that because the floor

8   would get slippery when it was wet?

9      A.   Yes, sir.

10     Q.   Did you ever see any passenger or crew

11  member slip on the Outdoor Cafe floor?

12     A.   No, sir.

13     Q.   Did you ever see any passenger or crew

14  member slip on any of the teakwood floors on the ship

15  other than Mrs. Sorrels?

16     A.   No, sir.

17     Q.   Would you have safety meetings?

18     A.   Yes, sir.

19     Q.   How often are the safety meetings?

20     A.   Sometimes twice a month.

21     Q.   Did you have the same safety meetings in

22  your position as the restaurant steward as you do now

23  as the assistant waiter?

24     A.   Yes, sir.

25     Q.   Who would run the safety meetings?

23

1        Q.   In the safety meetings, did they tell the

2   staff that it was important whenever the floor was

3   wet to put up some type of warning sign?

4             MR. RAMIREZ:   Objection to form.

5        A.   Yes, sir.

6        Q.   Was the reason that they told you to do

7   that because the deck could get slippery and they did

8   not want passengers to fall?

9             MR. RAMIREZ:   Objection; calls for

10  speculation.

11       A.   Can you repeat that, sir, please?

12       Q.   Was the reason that they told you to put up

13  the warning signs whenever you saw some liquid on the

14  deck because it would make the deck slippery and they

15  wanted to prevent passengers from falling?

16            MR. RAMIREZ:   Same objection.

17       A.   It could be for different reasons.

18       Q.   Was that one of the reasons?

19       A.   It could be.

20       Q.   What were the other reasons that they would

21  tell you?

22       A.   I don't remember now.

23       Q.   Is that the only reason you remember at

24  this time?

25       A.   Yes, sir.

1    that day.

2         A.   Yes, sir.

3         Q.   And so you would have been observing where

4    you were walking --

5              MR. RAMIREZ:  Objection to form.

6         Q.   -- to make sure it was safe for you.

7         A.   No, sir.

8         Q.   You did not pay attention to where you were

9    walking to make sure you could walk safely?

10             MR. RAMIREZ:  Objection to form;

11   mischaracterizes testimony.

12        A.   No, sir.

13        Q.   Why not?

14        A.   Because I could have seen it was wet,

15   because I have seen that the deck was wet.

16        Q.   So you did not feel the need to take any

17   additional precautions because the deck was wet?

18        A.   No, sir.

19        Q.   As you were walking, you did not see any

20   signs warning that the deck was wet that night?

21             MR. RAMIREZ:  Objection; asked and answered

22   seven times already.  This is the last time I am

23   going to allow it.

24        Q.   Is that correct, ma'am?

25        A.   Sir, I don't remember because I wasn't

1    paying attention to that.

2         Q.   My only question is, you do not, as we sit

3    here today, recall seeing any warning signs that

4    night anywhere on that deck where the accident

5    happened?

6              MR. RAMIREZ:   Objection; asked and

7    answered.

8         A.   I don't remember.

9         Q.   Going back to the time that you went back

10   to the scene of the accident with the security

11   officer and he took a couple of pictures, did he do

12   anything else?

13        A.   I don't remember.

14        Q.   Did anyone else come up and join the two of

15   you while you were there that night?

16        A.   I don't remember.

17        Q.   As an assistant waiter, what are your

18   general job duties?

19        A.   Busting tables, serving beverages to the

20   guests, serving food.  That's it, welcoming the

21   guests.

22        Q.   Do you enjoy your work on the ship?

23        A.   Yes, sir.

24        Q.   Do you hope to continue working for NCL in

25   the future?

FRIEDMAN, LOMBARDI & OLSON
C O U R T   R E P O R T E R S

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO. 13-21413-CIV COHN/SELTZER

TERESITA SORRELS and          )
JOSEPH SORRELS, her husband,   )
                              )
                  Plaintiffs, )
                              )
vs.                            )
                              )
NCL (BAHAMAS) LTD., a Bermuda  )
company d/b/a NORWEGIAN        )
CRUISE LINE,                   )
                              )
                  Defendants. )
-----------------------------)


TELEPHONIC DEPOSITION OF
MILAN RAI


Taken on Behalf of the Plaintiffs


DATE TAKEN:  September 17, 2011
TIME:        3:21 PM - 4:10 PM
PLACE:       2350 S. Dixie Highway
             Miami, Florida 33133



Reported By:
Michele Anzivino, RPR
Notary Public, State of Florida

16

1    time you got there?

2              MR. RAMIREZ:  Objection to form.

3              THE WITNESS:  I'm not sure, sir.  No.

4    BY MR. PELTZ:

5        Q.    At any time have you viewed the security

6    video which shows the actual accident?

7        A.    No, sir.

8        Q.    Okay.  So you have not attempted to compare

9    the location that you photographed with the location

10   where the fall took place on the security video; is

11   that correct?

12       A.    Yes, sir.

13       Q.    Just so we are clear on this, did you ever

14   look at the security video of this accident?  And by

15   that I would include the day of the accident itself.

16       A.    No, sir.

17       Q.    Okay.  Is there anything else that you

18   recall doing or that the incident report indicated you

19   did other than take these four photographs?

20       A.    No, sir.

21       Q.    Okay.  Do you recall seeing any signs

22   anywhere on deck 11 warning passengers that the deck

23   can be slippery when wet on the day of the accident?

24       A.    I don't remember, sir.

25       Q.    Have you read Ms. Winifred's deposition?

1    that the deck department would put up the signs when

2    it was raining on deck 11?

3              MR. RAMIREZ:  Objection to form.

4        Mischaracterizes testimony.

5              THE WITNESS:  Yes, sir.

6    BY MR. PELTZ:

7        Q.    Sorry.  We could not hear your answer.

8        A.    Yes, sir.

9        Q.    Who is the head of the deck department?

10       A.    That would be the chief officer.

11       Q.    Okay.  The chief officer?  We are having a

12   little -- I want to make sure I have it correct.  Is

13   that the chief officer who would be the head of the

14   deck department?

15       A.    Yes, chief officer.

16       Q.    Does the boatswain report to the chief

17   officer?

18       A.    Yes.

19       Q.    Are you in the deck department or are the

20   security staff in a different department?

21       A.    Can you repeat the question, sir?

22       Q.    Yes.  Are the security guards and the

23   security officer in the deck department or are you in

24   a different department?

25       A.    We are part of the deck department, but our

```
 1                UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF FLORIDA
 2                      MIAMI DIVISION

 3          CASE NO:   13-CV-21413-COHN/SELTZER

 4

    TERESITA SORRELS and JOSEPH
 5  SORRELS (her husband),

 6          Plaintiff,

 7  vs.

 8  NCL (BAHAMAS) LTD., a Bermuda
    company d/b/a NORWEGIAN CRUISE LINE,
 9
            Defendants.
10  _____/

11

12
                        MERCY HOSPITAL
13                      3659 South Miami Avenue
                        Suite 5005
14                      Outpatient Building
                        Monday, 1:02 p.m.
15                      September 23, 2013

16

17

18          DEPOSITION OF DELIA DE LEON

19

20          Taken before Corinne Grassini, Florida

21  Professional Reporter, Notary Public in and for the

22  State of Florida at Large, pursuant to Notice of

23  Taking Deposition filed in the above case.

24

25
```

**JEANNIE REPORTING (305) 577-1705**

```
 1     for the duration of the cruise until she got off, I

 2     basically nursed her.  I stayed -- not that I

 3     nursed her, but I stayed with her, brought her

 4     food, brought her water, made sure she was

 5     comfortable, made sure she was taking her pain

 6     medication.

 7              Q.   Did she tell you a little bit more

 8     details about the accident?

 9              A.   I just remember that she was in a lot

10     of pain, she was wanting to get off the cruise, and

11     that it was just a slip and a fall, a slip and a

12     fall.

13              Q.   Did she tell you anything about having

14     noticed that the deck was wet when she came out to

15     the deck?

16              A.   I don't remember her saying it, but I

17     do know that that was part of the issue, the wet

18     deck.

19              MR. PELTZ:  Object to the form and

20          predicate of the last question.

21     BY MR. BARBA:

22              Q.   Did she mention to you as far as when

23     she came out on to the deck and walked on the deck

24     that she didn't know or did not realize that the

25     deck was wet?
```

```
 1              THE WITNESS:  Yes.
 2    BY MR. PELTZ:
 3         Q.   Is that correct?
 4         A.   Yes.
 5         Q.   And just so we're clear about that,
 6    and before your experience in falling, slipping and
 7    falling on this wet wood deck on a cruise ship, you
 8    did not take any special precautions in walking on
 9    wood decks of cruise ships?
10              MR. BARBA:  Objection.
11              THE WITNESS:  I -- I -- no.
12    BY MR. PELTZ:
13         Q.   Okay.  Now, when you first saw Terry
14    in the medical facility --
15         A.   Uh-huh.
16         Q.   -- after the accident, was she in
17    extreme pain at that time?
18              MR. BARBA:  Objection.
19              THE WITNESS:  I don't remember her
20              complaining as much about pain, just as a
21              shock, just kind of shocked, the impression
22              of seeing her hand the way that it was, and
23              -- but I just remember more pain like the
24              next day.
25
```

**JEANNIE REPORTING (305) 577-1705**

```
 1        BY MR. PELTZ:
 2             Q.   Okay.  And when you say there was, at
 3        one point you said it was tough for the girls to
 4        see her hand the way it was hanging?
 5             A.   Uh-huh.  Uh-huh.
 6             Q.   What did you mean by that?
 7             A.   I just remember the girls, they're 14,
 8        13 years old, just talking and talking, and oh, and
 9        she fell and her hand and we saw her hand, that it
10        was just hanging, and, you know -- in an abnormal
11        way.
12             Q.   Did you see that yourself?
13             A.   No.
14             Q.   So that was before you actually
15        arrived?
16             A.   Uh-huh.
17             Q.   I'm sorry, you have to answer yes or
18        no.
19             A.   Oh.
20             Q.   No problem?
21             A.   I did not see it.  I just heard them
22        say.
23             Q.   Okay.  Was that upsetting to them,
24        what they saw?
25             A.   Yes.
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO.:  13-21413-CIV-Cohn/Seltzer


TERESITA SORRELS and
JOSEPH SORRELS, her husband,

       Plaintiffs,

vs.

NCL (BAHAMAS) LTD., a
Bermuda company, d/b/a
NORWEGIAN CRUISE LINE,

       Defendant.

_____/


               2350 South Dixie Highway,
               Miami, Florida,
               Tuesday, 1:35 p.m.,
               July 2, 2013.


D E P O S I T I O N

of

JANE E. KILGOUR

taken on behalf of the Plaintiffs
pursuant to a Re-Notice of Taking Deposition

- - -

1       A.    That's my understanding, yes.

2       Q.    Is the video time-coded in some fashion?

3       A.    It has a time stamp on it, but I don't know

4    if it's ship time, real time.  That, I don't know.

5       Q.    Greenwich mean or --

6       A.    That, I have no idea.

7       Q.    Are there any signs in the area that

8    Ms. Sorrels walked?

9       A.    There are signs, I believe, on the jacuzzi

10   and on the pool, but where, exactly, they're located,

11   I can't -- I can't say with certainty at this stage.

12      Q.    What do the signs on the jacuzzi and the

13   pool say?

14      A.    Say, for instance, not to go in the jacuzzi

15   with diapers, if you're little, and just general

16   warnings, et cetera --

17      Q.    Okay.

18      A.    -- you know, that they have.

19            It also does have an indication that you

20   should use caution when moving about the deck.

21      Q.    Were there any signs indicating that the

22   deck could be slippery when it was wet?

23      A.    I'm not aware of that.

24      Q.    Okay.  Was there anything special put out

25   because it had been raining?

54

1              MR. HAMILTON:   Objection as to form.

2         Q.   By that, I mean anything that would not be

3    out there ordinarily on the deck?

4         A.   What do you mean?

5         Q.   Well, some type of barricades or anything

6    of that nature.   You know, those yellow cones that

7    people use that say "Slippery When Wet," anything of

8    that nature?

9         A.   I'm not sure if there was anything there.

10   It appears as if it had just finished raining.

11              I did not see anything like that in the

12   surveillance.

13        Q.   Is there anything else you remember that

14   the video showed other than what you have discussed

15   so far?

16        A.   As I indicated, it showed Mrs. Sorrels; it

17   showed the crew member coming to assist her, and it

18   appears to be another individual who is bending down

19   to talk to her, and then there's a number of other

20   passengers that are walking past her.

21        Q.   So that there would have been, actually, a

22   video depiction of the person who bent down to assist

23   her?

24        A.   Yes.   My understanding is that individual

25   is seen.   That's what I saw.

1   one-minute break, and then we'll resume.  It's my

2   turn now.

3              THE WITNESS:  Okay.

4        [Short recess taken.]

5        Q.   Item Number 7 on the notice on which you

6   have been designated refers to the design,

7   construction and specific materials used for the

8   flooring in the area where the plaintiff's accident

9   occurred and where the accident involving Lori Perry

10  occurred.

11             First of all, can you tell me what the

12  flooring was in the area where Terry Sorrels'

13  accident happened?

14       A.   It's unfinished teak wood; natural teak.

15       Q.   Okay.  And that's real teak, not the faux

16  teak?

17       A.   It's -- I believe it's real.  I believe it

18  came from a tree.

19       Q.   How long has that particular deck had teak

20  wood?

21       A.   Since the ship was launched.

22       Q.   When was that?

23       A.   The end of 1999; beginning of 2000.

24       Q.   Is that the original deck?

25       A.   Yes.  That's correct.

1      Q.    It's never been replaced?

2      A.    That's correct.

3      Q.    So that was the teak the way the ship was

4   ordered; teak in that area?

5            MR. HAMILTON:   Objection as to form.

6      A.    That's my understanding.

7      Q.    Okay.  What is the material and the deck

8   where Lori Perry was injured?

9      A.    It's also teak wood.

10     Q.    Same thing?

11     A.    It's the same surface.

12     Q.    Okay.  So the wood surface is identical for

13  both locations?

14     A.    Yes.  They're both natural teak wood.

15     Q.    There's no difference in them, that you're

16  aware of?

17     A.    Not that I'm aware of.

18     Q.    Now, the wood in the deck where Lori

19  Perry's accident happened, was that also on the ship

20  originally?

21     A.    That's my understanding.

22     Q.    Has this ship been refurbished at all?

23     A.    It's gone through dry-dock.

24     Q.    Did they do anything in connection with the

25  flooring material?

1      A.    My understanding --

2            MR. HAMILTON:  Objection as to form.

3      Q.    This material, the teak wood?

4            MR. HAMILTON:  Objection as to form, scope.

5      A.    My understanding is it's lightly sanded,

6   but it doesn't need much more than that.

7            The deck -- the wood is maintained, as I

8   said, on a daily and a weekly basis.

9      Q.    So looking at Exhibit 3, is the whole area

10  that is around the pools, where -- let me show you

11  this.  This whole area here, is this whole area here

12  teak?

13     A.    I believe that most of it is.  I think,

14  with the exception of perhaps right along the ledging

15  here, it might be tile.

16     Q.    Okay.

17     A.    Yes.

18     Q.    So on Deck 11, is it fair to say that the

19  middle part of it is uncovered?

20     A.    Yes.  That's correct, because it's a pool.

21     Q.    Right.

22            Let's see.  In the bow area, the front

23  part, it's covered?

24     A.    Yes, I believe it is.

25     Q.    And in the back area, not all the way back,

1   but in the back area, a portion of it is covered?

2           MR. HAMILTON:   Objection as to form.

3   Outside the scope.

4           If you know.

5       A.   That's correct.

6       Q.   Then at the stern, right at the end in the

7   area where Lori Perry's accident happened, that's

8   uncovered?

9       A.   No.   I believe where -- I believe where her

10  incident occurred, it was covered.

11      Q.   But the whole part of that area is

12  uncovered?

13      A.   A portion of it.

14      Q.   Right.   Okay.

15          Now, the whole middle area that is

16  uncovered, that would all be teak, except for

17  possibly, as you said, right adjacent to the pool,

18  where there might be tile?

19      A.   That is my understanding, is that there is

20  some tile in that area.

21      Q.   And the whole rear portion here, where

22  the -- where it says "Great Outdoor Cafe" --

23      A.   Uh-huh.

24      Q.   -- that whole area would be teak, the same

25  as the center part?

1        A.   My understanding is it's mostly teak, and,

2   again, with the exception of -- I believe there are

3   some tiles that --

4        Q.   I understand.

5        A.   -- are adjacent to the -- to this --

6        Q.   This area here, the front part of the ship

7   around the Outrigger Lounge, is any of this outside?

8             MR. HAMILTON:   Objection as to form.

9   Scope.

10       A.   That, I don't know.

11       Q.   Okay.  Are any of the other decks on the

12  Norwegian Sky teak?

13            MR. HAMILTON:   Objection as to form.

14  Scope.

15       A.   I don't know.  I don't know if it is.

16       Q.   Let me ask you this:  Is teak used on any

17  of the decks in the indoor portions?

18       A.   I don't believe so.

19       Q.   And as far as --

20       A.   Oh, with the exception of, of course, the

21  Great Outdoor, because where Lori Perry fell, it's

22  covered and it's teak, so --

23       Q.   What is the name of the deck that would be

24  immediately above Deck 11?

25       A.   It's probably Deck 12.

1        Q.    Does it have a name?

2        A.    You know, like --

3        Q.    Like Promenade?

4        A.    I would have to look at the deck plan,

5    because I don't know.  That's beyond what I'm here

6    for today.

7              MR. HAMILTON:  Objection.  Outside the

8    scope.

9        Q.    Do you know, the area where the jogging

10   track is, whether that's made out of teak?

11             MR. HAMILTON:  Objection.  Outside the

12   scope.

13       A.    That is something I do not know.

14       Q.    Do you know whether other NCL ships besides

15   the Sky use the same type of teak decking?

16             MR. HAMILTON:  Objection.  Outside the

17   scope.

18       A.    No, I don't know.

19       Q.    Have you been on any of these other ships?

20       A.    Yes, I have, but when you're walking along,

21   you're just not really, you know, going, "Oh, is it

22   teak?"

23             Yes, I have been on other ships.

24       Q.    And you don't know whether any of the other

25   ships have teak?

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO:   13-21413-CIV-Cohn/Seltzer

TERESITA SORRELS and
JOSEPH SORRELS, her husband,

 COPY

      Plaintiffs,

vs.

NCL (BAHAMAS) LTD., a
Bermuda company d/b/a
NORWEGIAN CRUISE LINE,

      Defendant.

_____/

              2350 South Dixie Highway,
              Miami, Florida,
              Friday, 10:05 a.m.,
              August 23, 2013.


D E P O S I T I O N
of
JANE KILGOUR
taken on behalf of the Plaintiffs
pursuant to a Notice of Taking Deposition

- - -


FRIEDMAN, LOMBARDI & OLSON
C O U R T   R E P O R T E R S

16

1      that.

2           Q.    Is it your contention that that's work

3      product?

4           A.    The information would be -- yes.  Yes.

5      Exactly.

6           Q.    By virtue of the fact that your response to

7      the request for production is accurate, you believe

8      that she fell on the teak portion of the pool deck?

9           A.    That is correct.

10          Q.    And as to where she fell in relationship to

11     the spot that Mrs. Sorrels fell, do you have any

12     idea?

13          A.    No.

14          Q.    Has the teak deck been changed in any

15     fashion on Deck 11 between 2009 and the present?

16          A.    No.

17          Q.    Do you have any other information with

18     regard to Ms. Moser's accident that you are prepared

19     to discuss other than what you have told us so far?

20          A.    No.

21          Q.    Do you know if she was injured or not?

22          A.    That -- I'm not prepared to answer that.  I

23     don't have that information here.

24          Q.    That would be something you would be

25     claiming work product privilege on?

30

1         MR. PELTZ:  You did not have time.

2         MR. HAMILTON:  Both of us didn't have time,

3   but, really, it's irrelevant.  It's irrelevant at

4   this time.

5         No one is stopping you from asking your

6   questions at this time.  I'm just asking you to be

7   mindful of the fact that you have asked quite a few

8   questions already in a previous deposition and gotten

9   the same answers.

10        Q.   Captain Myrkatis, is he located at your

11  corporate headquarters?

12        A.   Yes, he is.

13        Q.   Okay.  The second accident that NCL has

14  identified as having occurred on the same or

15  substantially similar flooring materials located in

16  the Norwegian Sky involved a Linda Ramsey.  Is that

17  correct?

18        A.   That is correct.

19        Q.   Okay.  Can you tell me the complete

20  circumstances of her accident?

21        MR. HAMILTON:  So as not to be repetitive,

22  I'm just going to -- you recall my previous

23  instruction to you, Ms. Kilgour, on privilege?

24        It's going to be the same for all

25  accidents, so I would ask you to talk about any

FRIEDMAN, LOMBARDI & OLSON
C O U R T   R E P O R T E R S

1    nonprivileged information you have.

2              MR. PELTZ:  Just so we're clear on it, I

3    don't agree with that limitation, but go ahead and

4    answer the way you are going to answer.

5              MR. HAMILTON:  And the instruction stands

6    for all of the questions relating to the prior

7    incidents and/or subsequent incidents.

8              I'm assuming that Mr. Peltz doesn't agree

9    on any, so we can both agree to have a standing

10   disagreement or objection.

11             MR. PELTZ:  Perfect.  That will hopefully

12   save many pages in the transcript.

13             MR. HAMILTON:  And cost.

14             THE WITNESS:  All right.  The information

15   that Ms. Ramsey provided to us is that her -- she

16   fell on Deck 11, okay, which is the deck in question

17   here.

18             She was born on September 21, 1966.

19   Female.  American.  It occurred at 4:30 p.m., and it

20   was immediately reported.

21             She was wearing sandals at the time.  She

22   claims that she was under the influence of alcohol.

23   She blames herself for the incident.

24             There was an eyewitness.  Her name is Amy

25   Faulkner, and she did not make any indication of any

32

1    rain water when she reported this.

2         Q.   Did she indicate the existence of any

3    water, liquid or foreign substance on the deck?

4         A.   No.  She claims that she slipped, but

5    that's the only information that I have.

6         Q.   And there may be additional information

7    that you don't have with you.  Is that correct?

8         A.   Again, there may be other information

9    that's contained in the incident report, which I'm

10   not instructed to speak about.

11        Q.   And, specifically, does NCL have any

12   information whatsoever to indicate whether or not

13   there was any water or foreign substance on the deck

14   in the area where she fell?

15        A.   That, I don't know.

16        Q.   So we're clear on that, that information

17   may exist in your incident report or some other

18   source, but you have not researched that and are not

19   prepared to testify?

20        A.   That is correct.  That's correct.

21        Q.   Do you have any contact information for

22   Linda Ramsey?

23        A.   I don't know.  It's possible that she

24   provided us with her home address.

25        Q.   Did she bring any type of claim or lawsuit?

FRIEDMAN, LOMBARDI & OLSON
C O U R T   R E P O R T E R S

1    example, it's also a hurricane outside, then there's

2    deck watch individuals; there's security that go

3    through the area.

4           They might lock the deck in extreme weather

5    conditions.

6           The deck watch person might call the --

7    he's in constant communication, or can be, with the

8    bridge as to if there is a -- what he would say or

9    think is an extremely hazardous condition on the

10    deck, so, I mean, that is something that's done.

11           It's not a written procedure or whatnot,

12    but --

13       Q.   Okay.

14           MR. HAMILTON:  Let me take a quick break,

15    if you don't mind.

16           MR. PELTZ:  No, not at all.

17           MR. HAMILTON:  Okay.

18      [Short recess taken.]

19       Q.   Okay.  While it may have been open and

20    obvious that it was raining, was there any

21    indication, any signs or warnings or barricades that

22    the exterior decks would be slippery when wet?

23           MR. HAMILTON:  Objection as to form.

24       A.   In this particular case or time?

25       Q.   Yes.  Yes.

1    A.   I'm not aware if there was a barricade or a

2  sign in the immediate area where Ms. Sorrels was.

3    Q.   The Norwegian Sky sails rain or shine?

4    A.   Yes.

5    Q.   Is there any warning given to passengers,

6  that you're aware of, who were sailing on the

7  Norwegian Sky that the exterior teak decks could be

8  slippery when wet?

9         MR. HAMILTON:  Objection as to form.

10  Predicate.

11    A.   One of the things that we do is, during the

12  lifeboat drill, which, as a matter of fact, occurred

13  just hours before Mrs. Sorrels fell, is to caution

14  passengers to use care when maneuvering around the

15  decks; that they can be wet.

16    Q.   Okay.  But my question is:  Does NCL

17  recognize that the teak decks are slippery when wet?

18         MR. HAMILTON:  Objection as to form.

19  Predicate.

20    A.   I think one of the things that I testified

21  to the last time is that Norwegian Cruise Line had

22  retained an expert -- and again, I think there was --

23         MR. HAMILTON:  You can go ahead.

24         THE WITNESS:  There was a conversation

25  about that between the attorneys here but,

FRIEDMAN, LOMBARDI & OLSON
COURT REPORTERS

1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 13-21413-CIV COHN/SELTZER

TERESITA SORRELS and )
JOSEPH SORRELS, her husband, )
)
                  Plaintiffs, )
)
vs. )
)
NCL (BAHAMAS) LTD., a Bermuda )
company d/b/a NORWEGIAN )
CRUISE LINE, )
)
                  Defendants. )
------------------------------)

COPY

DEPOSITION OF

DAVID B. WILLS

Taken on Behalf of the Plaintiffs

DATE TAKEN:   October 4, 2013
TIME:         10:06 AM - 1:13 PM
PLACE:        2350 S. Dixie Highway
              Miami, Florida 33133

Reported By:
Michele Anzivino, RPR
Notary Public, State of Florida

1          A.     The two pages consist of a front page which

2     have my numerical test results from using an English

3     Excel tribe bow meter on the 11th deck of the Sky.

4          Q.     Was that the same measuring device that

5     Dr. Zollo used?

6          A.     It is.

7                 MR. RAMIREZ:  Same type.

8                 THE WITNESS:  That's correct.  He and I have

9          separate machines, but they are the same model.

10    BY MR. PELTZ:

11         Q.     Right.

12         A.     To the best of my knowledge.

13         Q.     Right.  I wasn't implying that you broke

14    into his office and you took his.  I'm just saying

15    that you used the same type of machine.

16                MR. RAMIREZ:  I'm the one who interjected

17         that possibility into it.

18                MR. PELTZ:  Okay.

19                THE WITNESS:  The second page of this

20         two-page document has a diagram which indicates

21         that something is marked by a green top bottle,

22         another location is marked by a pen, another

23         location is marked by a small bottle, and a fourth

24         location is marked by tape.

25

1    BY MR. PELTZ:

2        Q.    Okay.

3        A.    And these items are just simply small items

4    that I had with me during the inspection, I laid them

5    on the deck of the Sky and took a photograph or

6    possibly multiple photographs that included the

7    general locations where the testing were conducted.

8        Q.    Okay.  And then the numbers would correspond

9    to the testing that you performed at each of the four

10   locations?

11       A.    That's correct.

12       Q.    Okay.  And you performed dry tests and wet

13   tests at each location?

14       A.    That's correct.

15       Q.    I'm sorry.  There is a little asterisk with

16   something at the bottom.  What does that say?

17       A.    It says "wetted with drinking water from

18   onboard tap."

19       Q.    Okay.  Okay.  So on the day that -- on June

20   14 what were the weather conditions like on that day

21   when you went out and did your test?

22       A.    It was a beautiful day.

23       Q.    Typical day in paradise?

24       A.    Exactly.

25       Q.    Okay.  So the conditions differed

16

1    significantly from the date that you went out the

2    second time on September 16 which was when Dr. Zollo

3    did his test?

4        A.    That's correct.

5        Q.    Okay.  Now, in order to do your wet testing

6    then, you took drinking water from an onboard tap to

7    put in a cup and just poured it out?

8              MR. RAMIREZ:  Objection to form.

9              THE WITNESS:  I put in it a pitcher if I

10       remember correct.

11   BY MR. PELTZ:

12       Q.    Okay.  Did you dump the entire pitcher for

13   each of the tests or did you use a portion of it?

14       A.    I used a portion of it.

15       Q.    About how much of the pitcher did you use

16   for each test?

17       A.    I don't know.

18       Q.    Okay.  Less than a cup?

19       A.    I think less than a cup for each test.

20       Q.    Okay.  And you felt that that was sufficient

21   to allow you to do accurate readings?

22       A.    I did.

23       Q.    Okay.  And so in your opinion then when you

24   did your test using less than a cup of water, did you

25   feel that that would produce a substantially similar

1    condition on those teak decks to what existed at the

2    time of Terry Sorrels's accident?

3              MR. RAMIREZ:  Objection to form.  Predicate.

4              THE WITNESS:  The condition that I created

5         by doing the wet test by the pouring of the water

6         that we've discussed on the deck is very similar

7         to the condition that is present after rainfall.

8    BY MR. PELTZ:

9         Q.    Okay.

10        A.    But may well have wetted the deck to a more

11   significant degree than what was present when

12   Ms. Sorrels's incident occurred.

13        Q.    Okay.  Well, since the purpose of your test

14   was to determine the slip resistance on at least a

15   part of the deck in the area where she fell, did you

16   feel that by using less than a cup of water to put on

17   the teak deck that that would be a substantially

18   similar condition for you for the purposes of doing

19   your inspection and testing and report in this case?

20             MR. RAMIREZ:  Objection, form, lack of

21        predicate.

22             THE WITNESS:  I believe that it was a valid

23        method for doing the test.

24   BY MR. PELTZ:

25        Q.    Okay.  And by that you mean you would

FRIEDMAN, LOMBARDI & OLSON
C O U R T   R E P O R T E R S

1    indicate that you felt that it would create a

2    substantially similar condition for you to test?

3           MR. RAMIREZ:  Objection to form.

4       Mischaracterizes testimony.

5           THE WITNESS:  As I said before, I think

6       actually the application of the water that I did

7       likely produced a surface that had more water on

8       it than was present at the time of her incident.

9       Because I understand that it stopped raining prior

10      to Ms. Sorrels's walk across the deck.  In this

11      case I poured water on the deck and then utilized

12      an English Excel very shortly thereafter with

13      enough water on the deck for a splash to occur

14      when the foot of the English Excel hit the deck.

15   BY MR. PELTZ:

16      Q.   Okay.  The question I have though is just

17   I'm assuming, and correct me if I'm wrong, that when

18   you did your test on June 14 that for your test to be

19   valid for the purposes of your opinions in this case

20   that you -- it was important for you to try and create

21   a condition that was substantially similar to the

22   condition that existed at the time of the accident.

23          MR. RAMIREZ:  Objection to form.

24      Mischaracterizes testimony.

25          THE WITNESS:  What I did was I tested this

1    deck in a dry condition and then in a wet

2    condition, and as I said before, the wet condition

3    under which I tested this deck may well have been

4    considerably more wetted, more water present at

5    the location where tests occurred than I believe

6    the condition under which Ms. Sorrels walked

7    across the deck.

8  BY MR. PELTZ:

9    Q.    Okay.  And just so we are clear in this,

10  then in your opinion you felt that by taking less than

11  a cup of water and putting it on the teak deck would

12  provide a valid comparison as to -- for you as to the

13  slip resistance that would have existed on the date of

14  the accident?

15          MR. RAMIREZ:  Objection to form.

16      Mischaracterizes testimony.  Asked and answered

17      three times already.

18          MR. PELTZ:  To me it's an obvious question.

19          MR. RAMIREZ:  What's obvious that you are

20      trying to put words in the witness's mouth.

21          MR. PELTZ:  Hector, excuse me.  You are

22      coaching now.

23          MR. RAMIREZ:  I am not coaching.  I'm trying

24      to get this deposition to proceed in a reasonable

25      way.

1          MR. PELTZ:  Hector, you know better.

2          MR. RAMIREZ:  You asked the question five

3     times.

4          MR. PELTZ:  You know better.

5          MR. RAMIREZ:  So do you, Mr. Peltz.

6  BY MR. PELTZ:

7     Q.  By performing the test the way you did,

8  Mr. Wills, by using less than a cup of water to pour

9  on the teak deck and then measuring the slip

10  resistance, did you feel that that would be a valid

11  comparison to the conditions that existed at the time

12  of Terry Sorrels's accident?

13          MR. RAMIREZ:  Same objection.

14          THE WITNESS:  I'll answer the question

15     differently this time.  By pouring the water on

16     the deck in the way that I did, I created a deck

17     condition that was as wet as I could create, and I

18     thereafter did the testing, the wet testing in

19     that condition.  As I've stated before, it is

20     entirely possible and it is my opinion based on

21     what I understand of the circumstance and my

22     examination of the video surveillance that the wet

23     condition that I created on the deck would likely

24     have been considerably weather, more water present

25     at the test location upon was present when

1        Ms. Sorrels fell.

2   BY MR. PELTZ:

3        Q.    My only question at this point is is it your

4   opinion that the condition that you created with a cup

5   of water was a valid comparison to the conditions that

6   existed at the time of the accident?

7             MR. RAMIREZ:   Objection to form.

8   BY MR. PELTZ:

9        Q.    Did it produce a substantially similar

10  condition for the purposes of your tests?

11       A.    I conducted a dry test and I conducted a

12  very wet test.  I can't tell you precisely how wet the

13  floor was at the time when she had her unfortunate

14  incident, and I simply wetted the deck to the maximum

15  amount that I could before I conducted the test such

16  that the foot of the machine created splashes when I

17  was taking the test.

18       Q.    The reason I use "substantially similar"

19  rather than "exact" is because, you know, it may not

20  be possible for anyone to recreate the condition

21  exactly.  So that was why I asked you.  Very simple

22  question.  My question just is were the circumstances

23  of the testing that you created in your opinion, did

24  they create a substantially similar condition as

25  existed on the date of the accident in order to allow

FRIEDMAN, LOMBARDI & OLSON
C O U R T   R E P O R T E R S

22

1  you to do valid testing?

2         MR. RAMIREZ:  I'm going to object to the

3      form of the question.  Predicate.

4         THE WITNESS:  I believe the testing that I

5      did was valid testing.

6  BY MR. PELTZ:

7      Q.   Okay.  Now let's -- when you did your

8  tests -- once again, all my questions are referring to

9  the test of June 14 at this point, okay?

10     A.   Okay.

11     Q.   Now I notice you got different results for

12  each of the four areas that you tested; is that

13  correct?

14     A.   Certainly.

15     Q.   Did you test them using the same -- did you

16  test them utilizing the same procedure?

17     A.   Yes, I did.

18     Q.   So when you say -- let's just look for a

19  second at the one that says tape, okay, the last one.

20  The first one says bow.  By that you mean that you

21  moved the Excel machine in the direction of the bow?

22     A.   Yes, I set the machine such that it struck

23  towards the bow of the vessel.

24     Q.   Then the next you would have tested

25  starboard, then stern which would be like in the

1    BY MR. PELTZ:

2        Q.    Okay.  Now, the area of the pen, the overall

3    skid resistance was even lower than the tape, correct?

4        A.    Yes.  The pen measured .4.

5        Q.    Which is still your contention today for the

6    purposes of this litigation is a safe walking surface?

7            MR. RAMIREZ:  Objection to form.

8            THE WITNESS:  That's correct.

9    BY MR. PELTZ:

10       Q.    Okay.  And the bottle, the pen, the small

11   bottle and the tape, you have pictures of them as to

12   their locations on these photographs you've provided?

13       A.    I do.

14       Q.    Okay.  Now, were these -- did you

15   subsequently, you said you subsequently looked at the

16   videotape, the security video?

17       A.    Yes, I did.

18       Q.    Did it appear to you that the areas that had

19   been pointed out to you by Mr. Ramirez for testing

20   were in the area where Terry Sorrels fell?

21       A.    Yes.

22       Q.    Were you able to make a determination from

23   the security video as to the exact planning plank

24   first slipped on?

25       A.    No.  The video is -- does not provide

1    sufficient resolution to do that.

2        Q.    Okay.  Did you feel that the planks you

3    tested were within the area where it's likely that she

4    began to fall?

5        A.    I tested some representative planks in the

6    area where she apparently fell.

7        Q.    Okay.

8        A.    And then subsequently verified that the area

9    was indeed the approximate area.

10       Q.    But you were not able to identify which of

11   the specific planks she fell on because of the

12   resolution of the video?

13       A.    That's correct.

14       Q.    Okay.  When you did your testing you had the

15   opportunity to do it with just Mr. Ramirez without

16   either myself or Dr. Zollo being present, correct?

17       A.    That's correct.

18       Q.    And did anyone videotape what you were

19   testing?

20       A.    No.

21       Q.    So there was no record that we have,

22   pictorial record or video record of what you did other

23   than the still photographs that you took?

24       A.    Well, I potentially could modify that answer

25   by saying there potentially is surveillance video

1   into this matter, did you make inquiry to determine

2   whether there were any signs or warnings posted on the

3   day of the accident?

4        A.    No, I did not.

5        Q.    Are you aware of any signs or warnings being

6   posted on the day of the accident?

7        A.    I am not.

8        Q.    Did you ask anyone whether there were signs

9   or warnings posted?

10       A.    No.

11       Q.    Did you think that would be important?

12       A.    I wasn't asked to provide an opinion in that

13   regard.

14       Q.    So you have no opinions in that regard?

15       A.    I do not.

16       Q.    Okay.  For the purposes of identification,

17   is this group of pictures the pictures that you took

18   on September 16?

19       A.    Yes.  These photos were taken by me on

20   September 16.  First photograph includes my

21   handwritten note indicating that it was on the 16th of

22   September and has my file number in that photograph.

23   And then subsequent photographs do in fact have a date

24   stamp on the photograph.

25       Q.    Okay.  We'll mark these as Exhibit 9.

1            UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF FLORIDA
2
                 MIAMI DIVISION
3
        CASE NO. 13-CV-21413-COHEN/SELTZER
4

5  TERESITA SORRELS and JOSEPH            COPY
   SORRELS (her husband),
6
             Plaintiffs,
7                                     VOLUME I
   vs.                                A.M. SESSION
8
   NCL (BAHAMAS) LTD., a Bermuda
9  company d/b/a NORWEGIAN CRUISE LINE,

10           Defendant.
   _____/
11

12

13
                        150 Southeast 2nd Avenue
14                      10th Floor Conference Room
                        Miami, Florida
15                      Friday, July 12, 2013
                        10:00 a.m. - 12:00 p.m.
16                      12:30 p.m. -  4:55 p.m.

17

18     VIDEOTAPED DEPOSITION OF TERESITA SORRELS

19

20      Taken before JACKQULYN G. HOLLAND, Registered

21 Professional Reporter and Notary Public in and for the

22 State of Florida at Large, pursuant to Defendant's Amended

23 Re-Notice of Taking Videotaped Deposition of Teresita

24 Sorrels filed in the above cause.

25

50

```
 1        Q.   Uh huh.
 2        A.   That was that Friday, Saturday, Sunday.
 3        Q.   Okay.  And what time did you actually board the
 4   Norwegian Sky?
 5        A.   The day of.  It was probably five o'clock.
 6        Q.   Did you work that day?
 7        A.   I don't recall.
 8        Q.   Okay.
 9        A.   I don't think so.
10        Q.   Do you recall what the weather was at the time
11   that you boarded the ship?
12        A.   It had -- it was raining.  It had ... it was
13   raining.
14        Q.   Okay.  I hope they didn't have you out in the
15   rain trying to get onboard -- on line to the ship.
16        A.   It was raining.
17        Q.   Okay.
18        A.   It was drizzling.
19        Q.   How long had it been drizzling?  If you know?
20        A.   I couldn't tell you how long.
21        Q.   Okay.  I assume you boarded with your daughter?
22        A.   I did.
23        Q.   Okay.  What did you do once you got onboard?
24        A.   (No verbal response.)
25        Q.   What's the first thing you did?
```

1     A.   I don't recall.  Because it was just a, you

2 know, three-day.  So.

3     Q.   Okay.

4     A.   And we -- I remember going to the Keys and

5 getting off at the Keys in Key West.  So.

6     Q.   Less, less time?

7     A.   But I know -- I, I ... it wouldn't be something.

8 I mean ...

9     Q.   Okay.

10     A.   I wouldn't recall --- I don't recall.  But it

11 wouldn't be unusual, going in the pool.

12     Q.   Okay.

13     A.   I mean.

14     Q.   All right.  So you were at this lounge for

15 approximately 15 minutes or something along like that, not

16 long.  And I guess you said you decided to call it a

17 night?

18     A.   Yes, I decided to call it a night.

19     Q.   And what did you do?

20     A.   Well, I told them, you know, I'm going to go

21 ahead and pick up Katrynna.  It was a little bit over

22 midnight.  And I got out of the lounge, I went across the

23 deck, and ... to pick her up at the teen center.

24     Q.   All right.  You don't recall what deck the

25 lounge is on; is that correct?  Or you do?

83

1    A.   Actually, it must have been deck 11, which is

2  where the teen center is?  Right?  I think that's where,

3  if I recall correctly.

4    Q.   Okay.  So the lounge you were at was on deck 11?

5    A.   If I recall.  I'm not a hundred percent if I

6  took an elevator to go down, but I know that I had to go

7  to the teen center, so.

8    Q.   Okay.

9    A.   I don't ...

10    Q.   Okay.

11    A.   ... recall exactly.

12    Q.   If you don't recall, by all means tell me.  But

13  when -- as -- tell me which way you walked, what you had

14  to do to get from the lounge to the teen center.

15    A.   I went out the -- there was a -- two double

16  door, glass, as I, I guess got my way out.  And I went

17  across the deck.  And ... heading to the teen center.

18    Q.   Okay.

19    A.   Where ...

20    Q.   I'm sorry, I don't want to interrupt you.

21    A.   No, that's ...

22    Q.   You said where ...?

23    A.   Well, that's where my acc-- the slip and fall

24  occurred.

25    Q.   Okay.  So the deck, when you say you walked

JAY H. PILCHICK & ASSOCIATES   (305) 358-7156

1  across the deck, you're referring to the deck where your

2  accident occurred?

3      A.    That is correct.

4      Q.    Okay.  In order to get from the lounge to the

5  deck where your accident occurred, did you have to use any

6  stairs or elevator?

7      A.    From the lounge or from ...

8      Q.    From the lounge.

9      A.    From the lounge, I can't recall.  I just can

10  tell you that there were two glass doors that I exit -- to

11  be able to exit to get to the teen center.

12      Q.    Okay.  The two glass doors that you ... you

13  went through, that are you saying to exit to get to the

14  teen center --

15      A.    Uh-huh.

16      Q.    -- where would those two glass doors take you

17  up -- take you to?

18      A.    To the outside deck.

19      Q.    Okay.  So once you went through these two glass

20  doors you were on the outside deck?

21      A.    Correct.

22      Q.    All right.  Before going to the outside deck

23  through these two doors, do you recall ever being on that

24  outside deck before that moment?

25      A.    I don't know that I -- I don't recall being on

85

1   the same, if I was on the same deck.  Or not.

2       Q.   Okay.  At any time before going through these

3   two double doors do you recall ever being out on an outer

4   deck on the Norwegian Sky?

5       A.   I may have been on the outer deck at some point.

6       Q.   Okay.  Do you remember at what point in time

7   that was?

8       A.   I can't recall exactly.

9       Q.   Were you on the outer deck before going to your

10  cabin for the first time?

11      A.   You mean when I first -- what exactly time are

12  you referring to?

13      Q.   After you boarded the ship, I know you did the

14  buffet thing, or whatever, but before you actually went to

15  your cabin for the first time, is that when you were on

16  the outer deck?

17      A.   I was -- I did go on -- there was a ... outer

18  deck right after the lounge or the area -- not the lounge.

19  The buffet.  There were two door-- double doors that would

20  take you to an outer deck.

21      Q.   Okay.

22      A.   So.  Yes, I did go to that outer deck.

23      Q.   Okay.

24      A.   I remember that.

25      Q.   Okay.  So whatever time it was when you

1  concluded eating at the buffet, you walked out into the

2  outer deck?

3      A.   There was, where the buffet was and the

4  sitting --

5      Q.   Uh-huh.

6      A.   -- there were two glass doors that you actually

7  went out, and I don't know if there was an outside bar.

8      Q.   Okay.

9      A.   I'm not even ... that I did go out in that deck,

10  that I can recall.

11      Q.   Okay.  And that's the outer deck?

12      A.   And that's the outer deck.

13      Q.   Okay.  After the buffet and you went by that bar

14  area on the outer deck, was it raining at that time?

15      A.   It had been raining.  So I'm not -- I can't

16  remember if it was actually raining at that same time, but

17  it had been raining.

18      Q.   Right.  And you --

19      A.   That day.

20      Q.   Right.  And you said when you -- when you got to

21  the ship, was it still -- I understand it was still

22  drizzling.

23      A.   Yes.

24      Q.   Right?

25      A.   Yes.

87

1      Q.    Okay.

2      A.    Uh-huh.

3      Q.    At any point in time did you become aware that

4  it stopped raining?

5      A.    I believe it did, stop and go, but I couldn't

6  tell you ...

7      Q.    Okay.  And so specifically after you'd eaten and

8  you're standing by this bar on the outer deck outside of

9  the buffet area, do you recall whether it was raining or

10 not at that time?

11     A.    It may have rained.  It -- I recall that it

12 could have been -- yeah.  It may have rained ...

13     Q.    Okay.  Are you saying --

14     A.    ... on and off.  I'm not sure if it was raining

15 at the same time that I was out there.

16     Q.    Okay.  That's what I'm asking.

17     A.    I can't recall if it was raining at the ...

18     Q.    Okay.

19     A.    ... time I was out there.

20     Q.    Okay.  Can you tell me what the condition of the

21 deck flooring was at the time, given that it had been

22 raining -- drizzling when you bothered the ship, and as

23 you mentioned before, you believe it was off and on?

24     A.    That's when I first boarded the ship, you're

25 saying, or --

JAY H. PILCHICK & ASSOCIATES  (305) 358-7156

1      Q.    No.   When you first came up to this outer deck

2  and you're by this bar after eating at the buffet place.

3      A.    Uh-huh.   What do you mean about the condition of

4  the deck?

5      Q.    Was the deck wet?

6      A.    If it was raining, the deck would be probably

7  wet.

8      Q.    Okay.

9      A.    I would assume that it was wet, yes.

10      Q.    Okay.   Did you observe the deck to be wet when

11  you were standing at the bar?

12      A.    (No verbal response.)

13            MR. PELTZ:   Object to --

14  BY MR. RAMIREZ:

15      Q.    Or near the bar?

16            MR. PELTZ:   Object to the form.   She didn't say

17      she was standing at the bar.

18  BY MR. RAMIREZ:

19      Q.    Let me rephrase the question.

20            Did you observe the deck to be wet when you went

21  to the outer deck outside of the buffet area and where you

22  indicated that there was a bar?   A bar?

23      A.    The deck - I would assume that the deck was wet,

24  because it had been raining.

25      Q.    Okay.   And I appreciate that, but I'm not asking

```
 1  you to assume; I'm asking you, can you tell me whether you
 2  observed-- looked and observed that the deck was in fact
 3  wet at that time?
 4          MR. PELTZ:  Do you mean whether she has a
 5      specific recollection of having done that.
 6          MR. RAMIREZ:  Yeah.
 7          THE WITNESS:  I can't recall exactly.
 8  BY MR. RAMIREZ:
 9      Q.  Okay.  Okay.  But it would not have been a big
10  surprise for you that it was wet, given that it had
11  rained.
12      A.  That is correct.
13      Q.  Okay.
14          MR. PELTZ:  Can we take a couple-minute break; I
15      need to use the restroom.
16          MR. RAMIREZ:  I think we can actually take a, we
17      can take a lunch break; it's almost 12.
18          MR. PELTZ:  Well, how long do you plan on going
19      to?
20          THE VIDEOGRAPHER:  Do you want to go off?
21          We're off the record.
22          (Informal discussion off the record.)
23          (A brief luncheon recess was taken.)
24
25                  - NO HIATUS -
```

1             UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF FLORIDA

2

3                MIAMI DIVISION

4       CASE NO. 13-CV-21413-COHEN/SELTZER

5  TERESITA SORRELS and JOSEPH        COPY
   SORRELS (her husband),

6

7       Plaintiffs,          VOLUME II
   vs.                        P.M. SESSION

8  NCL (BAHAMAS) LTD., a Bermuda
9  company d/b/a NORWEGIAN CRUISE LINE,

10      Defendant.
   _____/
11

12

13              150 Southeast 2nd Avenue
14              10th Floor Conference Room
                 Miami, Florida
15              Friday, July 12, 2013
                 10:00 a.m. - 12:00 p.m.
16              12:30 p.m. - 4:55 p.m.

17

18    VIDEOTAPED DEPOSITION OF TERESITA SORRELS

19

20    Taken before JACKQULYN G. HOLLAND, Registered

21 Professional Reporter and Notary Public in and for the

22 State of Florida at Large, pursuant to Defendant's Amended

23 Re-Notice of Taking Videotaped Deposition of Teresita

24 Sorrels filed in the above cause.

25

1    Q.   Is that what it looked like?

2    A.   I would, I would think that, yes, that's what it

3  looked like.

4    Q.   Okay.  And this wood plank - decking - is the

5  decking that you referred to earlier that you would have

6  assumed was wet, based on the fact that it had rained at

7  the time you were boarding, and off and on thereafter?

8    A.   Yes.

9    Q.   Okay.  For however amount of time that you were

10  there, did you have any difficulty walking on that deck?

11    A.   I don't recall that I would, that I would have,

12  that I had any difficulty walking on the deck.

13    Q.   Okay.  Did you fall on that deck?

14    A.   At that time?

15    Q.   Right.

16    A.   No, I did not.

17    Q.   Okay.  Did you slip on the deck at that time?

18    A.   At that time?  No, I did not slip.

19    Q.   Because of the fact that it had rained and the

20  deck was wet, did you do anything to be a little bit more

21  cautious on how you walked on that deck?

22    A.   I would not have -- um, I would assume that on a

23  ship that ... it rains, that the deck would get wet, and

24  that it will be save for anyone to be walking on it.  So I

25  would have not had thought that it was dangerous to walk

1  on a wet deck.

2      Q.   Okay.  Appreciate that, but that wasn't my

3  question.  My question was --

4          MR. PELTZ:  Well, I object to the form, though.

5          MR. RAMIREZ:  What do you object to?

6          MR. PELTZ:  Well, you're saying that's not the

7      question --

8          MR. RAMIREZ:  What's the legal objection?

9          MR. PELTZ:  -- I think she's answered your

10     question.  If you want to ask her the question --

11         MR. RAMIREZ:  I don't think so.  And you say you

12     don't; and I don't.  So --

13         MR. PELTZ:  Well, you can ask the question

14     without the --

15         MR. RAMIREZ:  I don't know what the legal

16     objection is.

17         MR. PELTZ:  I object to the form.  Just you can

18     ask --

19         MR. RAMIREZ:  Okay.

20         MR. PELTZ:  -- the question without the

21     predicate.  Okay.

22         MR. RAMIREZ:  Okay.

23  BY MR. RAMIREZ:

24     Q.   Okay.  My question to you, Mrs. Sorrels was:

25  knowing that the deck was wet, and you're walking on it,

100

1  did you do anything extra than you would normally do to

2  prevent from slipping or -- and -- slipping?

3       A.   I walked normally, like I normally do, normally

4  do.

5       Q.   Okay.  Did you take any other precaution other

6  than whatever precaution you would take when you normally

7  walk, at that time?

8       A.   I walked normally, like I normally would walk.

9       Q.   Okay.  Do you take any precaution when you

10 normally walk?

11          MR. PELTZ:  Object to the form.

12          MR. RAMIREZ:  What's the objection to form?

13          THE WITNESS:  I take ...

14          MR. PELTZ:  Object to the form.

15          MR. RAMIREZ:  Yeah.  What's the objection?

16          MR. PELTZ:  "Do you take any" -- I mean, I just

17     think it's so vague.

18          MR. RAMIREZ:  Okay.

19          THE WITNESS:  What exactly are you referring to?

20 BY MR. RAMIREZ:

21      Q.   Okay.  Okay.  When you walk, do you do anything

22 to prevent from falling?  Generally?

23      A.   I watch where I'm going.

24      Q.   Okay.  That's a caution you would take; right?

25      A.   Uh-huh.

101

1       Q.   So that's what I'm asking you:   What cautions do

2   you take in your normal walking?

3       A.   I watch where I'm going.

4       Q.   Okay.

5       A.   Walk normally.

6       Q.   What do you mean by walk normally?

7       A.   At the same normal walking pace that I always...

8       Q.   Okay.   Anything else than watch where you're,

9   where you're  walking?

10          MR. PELTZ:  Object to the form.

11          THE WITNESS:  What exactly do you mean?

12   BY MR. RAMIREZ:

13       Q.   Do you exercise any other caution other than

14   watching where you're walking?

15          MR. PELTZ:  Object to the form.

16          Go ahead.

17          MR. RAMIREZ:  All right.

18          THE WITNESS:  I am sorry, but I don't understand

19      the question.

20   BY MR. RAMIREZ:

21       Q.   Okay.  You indicated to me that when you walk --

22       A.   Uh-huh.

23       Q.   -- to make sure you don't fall, you look where

24   you're going.

25       A.   Correct.

1 normally watch what you're walking; on a ship you would

2 assume that a ship that would, you know, sail rain or

3 shine, that if -- it would be safe to walk in a, a, you

4 know, wet deck, especially that there's pools and there's,

5 you know, jacuzzis around and.  So unless that area would

6 be barricaded, or something to that effect, I would

7 normally walk and would watch where I'm going.

8     Q.   Okay.  So let me ask you the question again.

9 Because I didn't ask you what your assumption was.  I was

10 asking you --

11          MR. PELTZ:  Object to the form.

12 BY MR. RAMIREZ:

13     Q.   -- do you test, if you know a floor is wet, do

14 you do any kind of test to see if a floor is slippery

15 before walking on it?

16     A.   I'm not understanding what you mean by testing

17 the floor.  So I can't -- I don't -- I'm not understanding

18 what you're asking me about testing.  I ...

19     Q.   Okay.

20     A.   Like I said, I walk normally and I look and

21 walk -- see where I'm going.

22     Q.   Okay.  Do you know how to check a floor to see

23 if it's slippery or not?

24          MR. PELTZ:  Object to the form.

25          THE WITNESS:  What do you mean by checking?

```
 1  through those double doors onto the outer deck --

 2       A.   Uh-huh.

 3       Q.   -- what did you see?

 4       A.   I walked like I normally walk.  And next thing I

 5  know, I slipped and fell.  And I went back, kind of side--

 6  you know, kind of, kind of went back, and I put my right

 7  hand, realized that, once I actually hit the floor,

 8  realized I was in a puddle.  I was in a ... and my hand

 9  was completely deformed.

10       Q.   Okay.  You said you were in a puddle?

11       A.   I'm sorry?

12       Q.   You said that you were in a puddle?

13       A.   Yeah.  The minute I slipped and fell, and I

14  touched the ground and my right hand went on, I realized

15  that there was a puddle of water.  There was an

16  accumulation of water.

17       Q.   Did you say --

18       A.   A pud--

19       Q.   -- a little puddle?

20       A.   There was an accumulation of water.

21       Q.   Okay.

22       A.   A puddle.

23       Q.   Okay.  Did you earlier say a little puddle?

24       A.   No.

25       Q.   Or did I misunder--
```

1    A.   No.

2    Q.   -- mishear?

3    A.   I said puddle.

4    Q.   Okay.

5    A.   Accumulation of water.

6    Q.   Okay.

7         And did you -- you observed that by your hand or

8  by your vision?

9    A.   My vision and hand -- well.  My vision and hand.

10  I had the hand down and I realized that I was -- I was in

11  shock.  I -- my whole hand was deformed.  Pain.

12    Q.   And where was that puddle in relation to you

13  when you observed it?

14    A.   I didn't observe it until I was actually on

15  the -- that I actually slipped and was on the floor.

16    Q.   Okay.  You were on the floor.

17    A.   Yes.

18    Q.   What position was your body when you observed

19  that puddle?

20    A.   I was -- my -- I was already -- I was sitting.

21    Q.   Okay.

22    A.   Kind of a sitting position already.  And my

23  hand, my right hand, on the floor.

24    Q.   Okay.  So when you say you were sitting on the

25  floor --

```
 1       A.    I had slipped.
 2       Q.    -- the Indian style?  Where were your legs?  You
 3  were -- when you are saying you were sitting --
 4       A.    Uh, uh --
 5       Q.    -- you were on your buttocks?
 6       A.    Right.
 7             MR. PELTZ:  Let him finish the question.
 8    BY MR. RAMIREZ:
 9       Q.    Okay.   All right.
10       A.    Right.
11       Q.    Can you physically show me how you were on the
12  floor?
13       A.    I don't recall exactly.
14       Q.    Okay.
15       A.    I couldn't recall exactly.  But I know that when
16  I slipped, I ... I ... I went backwards, and I put my hand
17  down.
18       Q.    Okay.  And for the record, you're indicating
19  with --
20       A.    My hand --
21       Q.    -- your right hand.
22       A.    My right hand.
23       Q.    Okay.
24       A.    Uh-huh.
25       Q.    And so was it with your right hand that you felt
```

1  a puddle?

2       A.   And my -- and I saw it.  It was right on --

3       Q.   I will get to the saw part.

4            MR. PELTZ:  Let her finish her answers, please.

5            THE WITNESS:  It was my hand and, and I saw it;

6       my buttock was right on it, on that puddle.

7  BY MR. RAMIREZ:

8       Q.   Okay.  But you put your hand in the --

9       A.   Yes.

10      Q.   -- your right hand in the puddle?

11      A.   It was on there when I --

12      Q.   Okay.

13      A.   Yes.

14      Q.   Okay.  So the puddle was to the right of your

15  body?

16      A.   I'm not sure if it was only to the right; it was

17  probably ... I was sitting on it.

18      Q.   Okay.  Well, how big was the puddle?

19      A.   It -- what I was able-- what I saw was basically

20  right, maybe the diameter of my-- of myself, like just

21  where my hand was and my body.

22      Q.   Okay,

23      A.   In terms of the buttocks area.

24      Q.   To your recollection, when you fell, and you're

25  observing this puddle that you're describing to me, were

1  just -- and simply look down.

2      A.    (No verbal response.)

3            MR. PELTZ:  Object --

4            THE WITNESS:  I'm sorry.  What's --

5            MR. PELTZ:  -- to the form.

6            MR. RAMIREZ:  Okay.

7            THE WITNESS:  What's the question again?

8  BY MR. RAMIREZ:

9      Q.    Sure.  Other than to, to become aware that there

10 was a puddle on the floor, at the time that your were on

11 the floor, the only thing you did was put your hand on it

12 and use your vision?

13     A.    Well, when I slipped and fell, I landed on the

14 puddle.

15     Q.    Okay.

16     A.    So that's when I saw that there was water.  And

17 there was puddle.  There was something more than -- and my

18 hand, it was --

19     Q.    Right.  And you -- but my question is you were

20 able to observe that water simply by the use of your

21 vision.

22            MR. PELTZ:  When she was sitting down?

23            THE WITNESS:  When?

24            MR. RAMIREZ:  I've never gotten her up; I

25       lifted her up.  Yes.

JAY H. PILCHICK & ASSOCIATES  (305) 358-7156

141

1           MR. PELTZ:  Okay.

2           THE WITNESS:  Yes.  When I was down already.

3  BY MR. RAMIREZ:

4      Q.   Okay.  When you were down, did you observe there

5  to be any puddles anywhere else, other than in your

6  immediate area?

7      A.   I couldn't say.  I couldn't say.  I was in, I

8  was in shock; it was dark.

9      Q.   Okay.  Okay.

10          Before you fell had you seen any other puddles?

11     A.   I had not.

12     Q.   Okay.

13     A.   That I can recall.

14     Q.   After you fell did you see any pud-- any other

15  puddles?

16     A.   After I fell, I was very much in shock.

17     Q.   Okay.

18     A.   I was such in shock that I just don't even know

19  how I got up.  But I got up.

20     Q.   Okay.

21     A.   So.

22          MR. RAMIREZ:  Can I have my question read back.

23          THE COURT REPORTER:  I believe this is the

24     question you're asking.

25          (Whereupon, the requested portion of the

JAY H. PILCHICK & ASSOCIATES   (305) 358-7156

1   did you have any difficulty seeing where you were walking?

2           MR. PELTZ:  Object to the form.

3           THE WITNESS:  I didn't have any difficulty

4       seeing ...

5   BY MR. RAMIREZ:

6       Q.   Okay.

7       A.   ... myself.  No.

8       Q.   Okay.  Did you have any difficulty observing the

9   condition of the floor that you were stepping on?

10      A.   I didn't have any difficulty.

11      Q.   Okay.  So the lighting was sufficient for you to

12  observe the condition of the floor --

13          MR. PELTZ:  Object to the form.

14  BY MR. RAMIREZ:

15      Q.   -- that you were walking on?

16      A.   From what I could see.

17      Q.   And just because there was an objection, let me

18  just rephrase the question.

19      A.   Uh-huh.

20      Q.   As you were walking on the outer deck from the

21  double door to the spot, to the spot of your fall, was the

22  light -- lighting sufficient for you to observe the

23  condition of the wooden deck?

24          MR. PELTZ:  Object to the form.

25          THE WITNESS:  I cannot say that it was

```
 1        sufficient, or not.
 2  BY MR. RAMIREZ:
 3        Q.   Okay.
 4        A.   One way or the other.
 5        Q.   Okay.  So did you have trouble seeing the floor?
 6        A.   I personally was able to see the floor --
 7        Q.   Okay.
 8        A.   -- in terms of myself, in terms of my sight.
 9        Q.   Okay. So it was sufficient for you to observe
10  the condition of the floor with the lighting --
11        A.   But it was still dark.
12             MR. PELTZ:  Object to the form.  Predicate.
13  BY MR. RAMIREZ:
14        Q.   Okay.
15             Was the lighting sufficient for you to observe
16  the condition of the floor?
17             MR. PELTZ:  Object to the form and predicate.
18             THE WITNESS:  I couldn't answer if it was ... I
19        don't recall the specifics of that.
20  BY MR. RAMIREZ:
21        Q.   Of course not.  Okay.
22             Okay.  Before -- from the moment you walked onto
23  the outer deck up until the spot of your fall, did you
24  have to avoid and walk around any puddles?
25        A.   Before when?  Before I got out of the deck -- of
```

```
 1  BY MR. RAMIREZ:
 2      Q.   Well, before, you mentioned that at work when
 3  there's a spill or there's something on the floor, you
 4  would go get cones, and put it there, to tell people;
 5  right?
 6      A.   Right.  But that's the regular floor.
 7      Q.   Yeah.  And I'm just talking about floors in
 8  general.
 9      A.   Oh.
10      Q.   And the reason you do that is because you
11  recognize that a floor that's wet tends to be more
12  slippery than a floor that's dry.
13           MR. PELTZ:  Object to the form and predicate.
14  BY MR. RAMIREZ:
15      Q.   Is that correct?
16      A.   A floor that may have a, you know, a wet area,
17  yes.
18      Q.   Yes, it tends to be more slippery than a dry
19  floor?
20           MR. PELTZ:  Object to the form and predicate
21      here.  Not an expert in the subject.
22           MR. RAMIREZ:  This is life experience
23           MR. PELTZ:  Object to the form and predicate.
24           THE WITNESS:  I can't answer that, I don't --
25  BY MR. RAMIREZ:
```

296

1      Q.   You can't answer that?

2      A.   No.  I'm not --

3      Q.   You're not an expert.

4      A.   Well, I don't know exactly, you know, what

5  you're asking me.

6      Q.   Okay.

7      A.   So I ...

8      Q.   You have two children, correct, Mrs. Sorrels?

9      A.   I do.

10     Q.   Okay.  And at any point in time in the lives of

11  your children, have you ever told them to be careful when

12  walking on a wet floor?

13     A.   Not that I can recall.

14     Q.   Not that you can recall.

15          (Discussion off the record.)

16          THE VIDEOGRAPHER:  You want to go off?

17          MR. RAMIREZ:  Yeah, might as well.

18          (A brief recess was taken.)

19          THE VIDEOGRAPHER:  We'll back.

20  BY MR. RAMIREZ:

21     Q.   Okay.  Mrs. Sorrels, before we took a quick

22  break, I had asked you if you had ever instructed your

23  daughters to be careful walking on a wet floor.  And you

24  said you didn't recall.  Do you remember that?

25     A.   I did ... remember.

JAY H. PILCHICK & ASSOCIATES   (305) 358-7156

1              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF FLORIDA
2
       CASE NO.:   13-CV-21413-COHN/SELTZER
3

4    TERESITA SORRELS and
    JOSEPH SORRELS (her husband),
5
        Plaintiff,
6
    vs.
7
    NCL (BAHAMAS) LTD.,
8    a Bermuda company d/b/a
    NORWEGIAN CRUISE LINE,
9
           Defendant.
10    _____/

11

12                  150 S.E. 2nd Avenue
                  Suite 1200
13                  Miami, FL  33131
                  Thursday, 5:30 p.m.
14                  September 19, 2013

15

16
        DEPOSITION of KATRYNNA SORRELS
17

18

19      Taken before JENNIFER QUINTANA, Court

20    Reporter and Notary Public in and for the State

21    of Florida at Large, pursuant to Notice of

22    Taking Deposition filed in the above-styled

23    cause.

24

25



4

1      let us know and we'll stop.

2              A    (Nods head.)

3              Q    Now, can you tell us what your date

4      of birth is?

5              A    10-27-97.

6              Q    That makes you how old?

7              A    Fifteen.

8              Q    Just basic things.  Who is your mom?

9              A    Terry.  Teresita Sorrels.

10             Q    Who's your father?

11             A    Joseph Sorrels.

12             Q    Who do you live with?

13             A    Both of them and my grandmother.

14             Q    Now, did you accompany your mother

15     on the cruise on the Norwegian SKY in April of

16     2012?

17             A    13, April 13.

18             Q    April of 2012, the year.

19             A    Oh, yeah.

20             Q    Okay.  So my next series of

21     questions:  Did you board the ship with her on

22     the outside of the cruise?

23             A    Yes.

24             Q    What I want to just ask you about

25     is, basically, what did you do at that point

```
 1    when you boarded the ship?  Do you recall what
 2    the weather was that day when you were boarding
 3    the ship?
 4            A    It was raining.
 5            Q    And when you boarded the ship, what
 6    was the first thing you did?
 7            A    I don't remember.
 8            Q    You don't know if you went straight
 9    to your cabin?
10            A    I don't remember.
11            Q    You don't know if you went up to the
12    pool deck?
13            A    I don't remember what we did.  I
14    don't remember.
15            Q    At any point during the cruise, do
16    you remember being on the pool deck?
17            A    Yes.
18            Q    When was the first time you were on
19    the pool deck?
20            A    I don't remember.
21            Q    Was it before your mom's fall or
22    after your mom's fall?
23            A    Before.
24            Q    Can you tell me approximately how
25    long before?
```



```
1            A    I don't remember.
2            Q    Was it daytime when you were on the
3     pool deck?
4            A    Yes.
5            Q    Do you know if the ship had already
6     left the port?
7            A    Don't know.
8            Q    When you were on the pool deck, did
9     you observe what was happening on the pool deck?
10                Describe to me what it looked like,
11    the pool deck.
12           MR. PELTZ:  You mean what the pool deck
13       looked like or what was going on on the pool
14       deck?
15           MR. RAMIREZ:  Let me -- I mean on the
16       pool deck.  I think I threw two questions at
17       you.
18    BY MR. RAMIREZ:
19           Q    What was happening on the pool deck
20    when you were there the first time?
21           A    A lot of people.
22           Q    How long were you on the pool deck
23    for on that occasion?
24           A    I don't know.
25           Q    When you say you don't know, can you
```

```
 1    approximate when -- did you just walk through

 2    the pool deck or did you stay there for a while?

 3          A    I don't remember.

 4          Q    We need to have an audible response,

 5    so if you can speak up a little bit.

 6                When you were on the pool deck that

 7    first time, did you observe the condition of the

 8    floor?

 9          A    No.

10          Q    So as we sit here today, do you know

11    whether or not the deck was wet?

12          A    I'm assuming since it was raining.

13          Q    Okay.  But as we sit here today, do

14    you have any recollection that you observed the

15    floor and that it was, in fact, wet?

16          A    I don't know.  I'm assuming that it

17    was.

18                MR. PELTZ:  At this point, he's asking

19          you not to guess, but do you have any

20          specific recollection of having looked and

21          remembering what it was, is what he's asking.

22                THE WITNESS:  No.

23    BY MR. RAMIREZ:

24          Q    When you were on the pool deck, at

25    any point in time, did you have an accident?
```



**JEANNIE REPORTING   (305) 577-1705**

```
1              A    No.

2              Q    At any point in time, did you slip?

3              A    No.

4              Q    Do you recall what type of footwear

5    you were wearing at the time?

6              A    I don't remember.

7              Q    Was your mom with you when you were

8    at the pool deck at this point in time?

9              A    Yes.

10             Q    Do you recall eating at a buffet

11   area that was on that deck?

12             A    I don't remember.

13             Q    When you left that pool deck, where

14   did you go?

15             A    I don't remember.

16             Q    Did you return to that pool deck,

17   either walking through it or going there

18   specifically to spend time at any point in time

19   prior to your mom's fall?

20             A    I don't remember.

21             Q    So as we sit here today, you only

22   have a recollection of being at the pool deck

23   once before your mom's fall?

24             A    Yes.

25             Q    Was anyone else with you and your
```

JEANNIE REPORTING   (305) 577-1705

24

```
 1      wet, are you a little bit more careful than you
 2      are when the floor is dry?
 3              MR. PELTZ:  Objection to the form and
 4          predicate.
 5              THE WITNESS:  I mean, I don't really
 6          know, like...
 7   BY MR. RAMIREZ:
 8          Q   I'm sorry?
 9          A   I don't recall, like, just walk.
10          Q   Has anyone ever told you to be
11      careful when you walk on the floor that's wet?
12              MR. PELTZ:  Objection to form.
13              MR. RAMIREZ:  What's wrong with the
14          form?
15              MR. PELTZ:  You haven't given her any
16          circumstantials.  It's not limited by the
17          time, scope, subject matter or any other
18          factor, whether inside or outside with a
19          pool, whether...
20              MR. RAMIREZ:  Okay.  I understand.
21              THE WITNESS:  Can you repeat the
22          question?
23   BY MR. RAMIREZ:
24          Q   Sure.  Has anyone ever told you that
25      you should be careful walking on a floor that's
```



1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO. 13-21413-CIV COHN/SELTZER

TERESITA SORRELS and        )
JOSEPH SORRELS, her husband, )
                            )
              Plaintiffs,   )
                            )
vs.                         )
                            )
NCL (BAHAMAS) LTD., a Bermuda )
company d/b/a NORWEGIAN       )
CRUISE LINE,                  )
                            )
              Defendants.   )
------------------------------)

ORIGINAL

DEPOSITION OF
BRYAN EMOND

Taken on Behalf of the Plaintiffs

DATE TAKEN:   October 4, 2013
   TIME:         2:27 PM - 4:12 PM
   PLACE:        2350 S. Dixie Highway
                 Miami, Florida 33133

Reported By:
Michele Anzivino, RPR
Notary Public, State of Florida

FRIEDMAN, LOMBARDI & OLSON
C O U R T   R E P O R T E R S

1    BY MR. PELTZ:

2        Q.    In order for an individual to determine

3    there's a risk of slipping on a wet teak deck, the

4    deck would have to have a certain degree of

5    slipperiness or a -- is that correct?

6                MR. RAMIREZ:  Objection to form.

7                THE WITNESS:  Again, I think it's outside of

8            the area where I've prepared to testify and I do

9            not have any answer for that.

10   BY MR. PELTZ:

11       Q.    That's one of your listed opinions?

12       A.    No, it's not.  I don't discuss --

13       Q.    You said Ms. Sorrels had ample opportunity

14   to assess her risk of slipping on a wet teak deck?

15       A.    This was a different question.

16       Q.    In order for a passenger to be able to

17   address the risk of slipping on a wet teak deck, the

18   passenger would have to appreciate that the teak deck

19   posed a hazard of slipperiness to them, right?

20       A.    Yes.

21       Q.    And so what would be -- how would you define

22   that hazard of slipperiness to a passenger?

23       A.    I didn't say hazard of slipperiness.  Should

24   be able to detect the level of slip resistance.  It's

25   a qualitative assessment.

37

1    Q.    So you're saying the passenger would be able

2    to assess the slip resistance by feel?

3    A.    She would be able to assess her risk of

4    slipping by feel whether she -- if she felt that as

5    she's walking across if it felt slippery or not.   I'm

6    saying she had ample opportunity to assess it.

7    Q.    So you're saying if she walked for 100 feet

8    and didn't feel that there was a risk of slipping on

9    the deck, that there was no risk of her slipping on

10   the deck?

11        MR. RAMIREZ:   Objection to form.

12        THE WITNESS:   No.   I'm saying she had an

13   opportunity to assess it.   That's all I've said.

14   BY MR. PELTZ:

15   Q.    But if the slipperiness of the deck differed

16   in the first 100 or 130 feet that she walked on,

17   compared to the area where she fell she would not have

18   an ample opportunity to assess the risk of slipping,

19   would she?

20   A.    If that were the case, yes.

21   Q.    Just so we are clear on this, you are not

22   going to answer my question in which I've asked you

23   what is the appropriate -- what do you consider to be

24   the appropriate standard for skid resistance for a

25   teak deck used on a cruise ship?

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2
            CASE NO.:  13-CV-21413-COHN/SELTZER
 3

 4   TERESITA SORRELS and
     JOSEPH SORRELS (her husband),
 5
          Plaintiff,
 6
     vs.
 7
     NCL (BAHAMAS) LTD.,
 8   a Bermuda company d/b/a
     NORWEGIAN CRUISE LINE,
 9
                  Defendant.
10   _____/

11

12                           150 S.E. 2nd Avenue
                             Suite 1200
13                           Miami, FL  33131
                             Friday, 9:35 a.m.
14                           September 20, 2013

15

16

17          DEPOSITION of MARTA ARBULU

18

19        Taken before JENNIFER QUINTANA, Court

20   Reporter and Notary Public in and for the State

21   of Florida at Large, pursuant to Notice of

22   Taking Deposition filed in the above-styled

23   cause.

24

25
```



JEANNIE REPORTING   (305) 577-1705

23

```
 1    before?

 2            A    Yes.

 3            Q    Approximately how many cruises have

 4    you taken?

 5            A    Maybe two or three before that one.

 6            Q    Do you know which lines?

 7            A    No, I don't recall the lines, but

 8    they were not from this area.  Not from Miami.

 9            Q    Okay.

10            A    One was called Le Ponant.  I'm

11    sorry.  I remember one.  One ship was called Le

12    Ponant.  It was a French ship.  I don't recall

13    the other ones.

14            Q    Okay.  They used to say The Big

15    Three in the auto.  The Big Three:  Carnival,

16    Royal Caribbean and Norwegian.

17            A    No.  No.  No.

18            Q    It wasn't one of those?

19            A    No, because it wasn't -- I didn't

20    take board from here.

21            Q    Okay.  Now, when you got to the

22    restaurant with the buffet that has the

23    indoor/outdoor seating, was the vessel still in

24    port?

25            A    Yes.
```

JEANNIE REPORTING   (305) 577-1705

```
 1          Q    Was it still daytime?

 2          A    Yes.

 3          Q    Was it still raining?

 4          A    On and off.

 5          Q    When you were in there, did you

 6    actually go to the outdoor area of the

 7    restaurant?

 8          A    I recall the parents were inside;

 9    the children were outside.

10          Q    Okay.  As we sit here today, you

11    don't recall going outside to the deck?

12          A    Yes, I did, because I took some

13    pictures of the children -- of the -- of them as

14    a group.

15          Q    Okay.  Did you observe the condition

16    of the deck at the time you were taking these

17    photographs?

18          A    Yes.

19          Q    What was the condition?

20          A    Wet.

21          Q    Do you recall if you saw any type of

22    puddles?

23          A    Yes.

24          Q    Now, when you said this was at the

25    back of the ship, would this be basically -- you
```

1     know how they'll have the railing?

2          A    Yes.

3          Q    Okay.  How did you take the

4     photographs, put them all against the railing

5     with the --

6          A    No.

7          Q    -- nice backdrop of the city?

8          A    Yes, exactly.  So they were at the

9     back.  And they were in a group and sitting at a

10    couple of tables together and then you could see

11    the downtown basically.

12         Q    Okay.  I have a good imagery now of

13    that.

14              And so when you're doing that in

15    that particular area, is there anything other

16    than the seating area for the restaurant?

17         A    No, it's just a -- just a restaurant

18    area.  Just tables and chairs.

19         Q    Was Mrs. Sorrels there?

20         A    Yes.

21         Q    Did the photographs include any of

22    the parents?

23         A    No.

24         Q    How long, approximately, did you

25    stay at that particular restaurant?

```
 1           A     I would say an hour.

 2           Q     And then what did you do next?

 3           A     I believe we went back to our rooms,

 4    changed because we had dinner plans.

 5           Q     Okay.

 6           A     And no -- let me change that.

 7    Before -- before going back to our rooms and

 8    changing because we had dinner times, we all

 9    went outside because the ship was departing.  So

10    we all wanted to, you know, take a look at the

11    view as we were leaving Miami.  So we did that

12    before.

13           Q     The whole "Love Boat" thing?

14           A     The "Love Boat" thing first and then

15    we changed.  And then we had a little cocktail,

16    now that I recall, and then we had dinner.

17           Q     In other words, they don't let you

18    throw confetti into the ocean and to the river

19    anymore.

20           A     Yes.  So we were -- we spreaded out

21    and went out to the upper deck and took pictures

22    and things like that while the ship departed.

23           Q     When you say the "upper deck," is

24    that a deck above the restaurant or are you

25    still talking about the same deck as the
```

JEANNIE REPORTING  (305) 577-1705