UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Miami Division

CASE NO: 13-21413-CIV-Cohn/Seltzer

TERESITA SORRELS and
JOSEPH SORRELS, her husband

       Plaintiff,

vs.

NCL (BAHAMAS) LTD., a Bermuda
company d/b/a  NORWEGIAN CRUISE LINE

       Defendants.

_____/

**PLAINTIFFS' RESPONSE TO DEFENDANT'S SECOND MOTION FOR SUMMARY JUDGMENT FOLLOWING ELEVENTH CIRCUIT REMAND**

      The Eleventh Circuit has already ruled that the Plaintiff has established sufficient evidence as to notice to defeat a summary judgment motion.

> Rather, the issue is whether NCL had actual or constructive knowledge that the pool deck where Mrs. Sorrels fell could be slippery (and therefore dangerous) when wet, and whether it negligently failed to post a warning sign after the rain that preceded Mrs. Sorrel's accident....**The testimony of Ms. Winifred and Mr. Rai – that warning signs were sometimes posted on the pool deck after rain – viewed in the light most favorable to Ms. Sorrels, is enough to withstand summary judgment as to notice**.

*Sorrels v. NCL (Bahamas) Ltd.*, 796 F.3d 1275, 1288 (11th Cir. 2015)(emphasis added).  Given the Eleventh Circuit's very clear and unequivocal ruling on the notice issue, this Court need look no further and the Defendant's Second Motion for Summary Judgment should be denied outright.

**Response to Defendant's Statement of So-Called Undisputed Facts**

      Pursuant to the provisions of Local Rule 56.1, the Plaintiff hereby responds to the Defendant's Statement of claimed undisputed facts and would respond to each of the numbered paragraphs therein as follows:

      1.      Agreed.

      2.      Agreed.

3.      The Plaintiff agrees that it had been drizzling intermittently prior to the time that she boarded the Norwegian Sky and thereafter during the day, however, she did not know for how long or exactly when. Sorrels deposition, pp. 50 and 86. The Plaintiff otherwise denies this statement as phrased.

4.      The Defendant denies this statement as phrased because it does not set forth a time frame. The Plaintiff testified that when she went to the buffet for dinner, which would have been at least 6-7 hours before the accident, she said she would have assumed the decks would have probably been wet at that time "if it was raining." Sorrels deposition, p. 88, Exhibit 1.

5.      The Plaintiff agrees that after boarding the Norwegian Sky, she at some point went to a "buffet place" that had two glass doors to the adjoining outside area, however, she does not recall whether she went out or stayed inside the doors. The Plaintiff further recalled that it had been drizzling intermittently.  However, the Plaintiff does not recall whether it was raining, while she was in the buffet area. The Plaintiff testified that she assumed that while it was raining, the deck was wet. Otherwise, the Plaintiff denies the statements contained in paragraph 5. Sorrels deposition, pp. 82-9, Exhibit 1.

6.      The Plaintiff agrees that Marta Arbulu testified that at some point after she boarded the ship, she had dinner at a buffet which had "indoor/outdoor sitting," while the vessel was still in port, which would have been at least 6 or 7 hours prior to the subject accident, and that Ms. Arbulu recalls that it had been raining off and on after she had boarded. Ms. Arbulu further testified that while the parents in the group ate in the inside portion of the buffet, she went outside at one point in order to take pictures. Ms. Arbulu testified that when she went outside to take these pictures, she observed that the deck was wet. Otherwise, the Plaintiff denies the statement asserted by the Defendant. Arbulu deposition, pp. 23-6, Exhibit 2.

7.      The Plaintiff agrees that she had no difficulty walking on the wet teak deck prior to the time that she actually slipped and fell.  However, otherwise denies the Defendant's statement as phrased. Sorrels deposition, p. 98-103, Exhibit 1.

8.      The Plaintiff agrees that Ms. Arbulu testified that she herself did not fall or have any difficulty walking on the wooden deck during the brief time period that she walked on the deck. However, the witness further testified that when she had walked on the teak deck it had not been raining and the deck was dry. The Plaintiff agrees that Ms. Arbulu testified that she did not observe any crew member or passenger fall on the wooden deck. The Plaintiff otherwise denies the

2

Defendant's statement.

9.      The Plaintiff denies this statement since it is taken out of context and incomplete. The statement does not contain a time frame. Katrynna Sorrels testified that when she boarded the ship, which would have been close to 12 hours prior to the subject incident, it was raining at that time. She further indicated that at some point thereafter, which she could not identify, she was on the pool deck. When asked whether she "observe[d] the condition of the floor," she responded by saying "no." See Katrynna Sorrels deposition, pp. 4-8, Exhibit 3.

10.      The Plaintiff denies the accuracy of the statement attributed to her, because it inaccurately distorts her testimony. The Plaintiff testified during her deposition that she is aware that a cruise ship sails in both rain and shine and that accordingly, it was her understanding and expectation that an exterior deck would be safe for anyone to be walking on when wet from the rain. If the deck was not safe or slippery because of rain, the Plaintiff testified that she would have expected the cruise ship operator to warn or otherwise advise passengers. Sorrels deposition, pp. 98-103, Exhibit 1.

The specific reference to the Plaintiff's deposition by the Defendant omits important parts of both the question and answer. As reflected on page 295 of her deposition, defense counsel was asking the Plaintiff about a spill on an interior hospital floor of undefined composition where she worked. When defense counsel asked her whether such a spill might tend to make the floor more slippery than a dry floor, the Plaintiff said "I can't answer that," since she was not an expert. See Sorrels deposition, pp. 295-6, Exhibit 1..

Likewise, the reference to the testimony of the Plaintiff's 15 year-old daughter contained in this numbered statement is likewise taken out of context. During her deposition, Defendant's counsel asked the Plaintiff's young daughter if when she visits a friend who has a swimming pool, whether she would be "a little bit more careful" when the pool area was wet then dry. Katrynna responded over objection by saying "I really don't know." Deposition, pp. 24, Exhibit 3. Defendant's counsel then asked the teenager whether anyone had ever told her that she should be more careful walking on a floor that was wet, without any description whatsoever as to the type of flooring or the circumstances. The witness responded over objection, "I don't recall. It is kind of obvious." Deposition pp. 25, Exhibit 3.

11.      The Plaintiff agrees that in the early morning hours of Saturday, April 14, 2012, she listened to music in a lounge aboard the ship with other parents and left the ship around midnight

to go to the teen center to pick up her daughter. She further agrees that en route, she passed through a door way and stepped out into an open air wooden deck located on deck 11. The Plaintiff agrees that she walked some distance on the deck, but is not sure of the exact distance, prior to slipping and falling.

12.     The Plaintiff agrees that she walked some distance on the deck, but is not sure of the exact distance, prior to slipping and falling.

13.     The Plaintiff did not claim that she slipped and fell on a puddle. Instead, she testified that after she slipped and fell forward, she landed in a sitting position on the deck. As she sat on the deck in great pain and shock, with her wrist "deformed" from the severity of the fracture, she felt a puddle to the right side of her body with her hand, which may have also been under her buttock. As reflected by the security video, the Plaintiff's body traveled some distance forward after her feet went out from underneath her before she landed on the deck. The Plaintiff further testified 15 months after the subject incident, that she did not have any specific recollection one way or another of seeing any puddles prior to falling. Sorrels deposition, pp. 129-132, 140-1, Exhibit 1.; Zollo deposition, pp. 300-1, Exhibit 4.

14.     The Plaintiff agrees that the Defendant has accurately quoted testimony from her deposition, which was taken 15 months after her incident, in which what has been described by her treating physician as a "high impact" and complex fracture, following which witnesses have described the Plaintiff as being in a state of shock and in severe pain. See deposition of Delia De Leon, pp. 23 and 49-50, Exhibit 5. It should be further noted that the security video, which to this date has never been identified on the Defendant's Rule 26 Disclosures, was not produced until after the Plaintiff's deposition.

15.     The Plaintiff disagrees with the statement as phrased by the Defendant. When asked on her deposition whether the "lighting [was] sufficient for you to observe the condition of the wooden deck," the Plaintiff responded by stating "I cannot say that it was sufficient, or not. . . one way or the other." Although the Plaintiff acknowledged that she had an unobstructed view, "it was still dark." Sorrels deposition, pp. 161-2, Exhibit 1.

16.     The Plaintiff disagrees with the statement as phrased by the Defendant, which is accompanied by any references to the record. While the Plaintiff agrees that the deck was wet as a result of rain water, the evidence in the case has shown that liquids, including rain water will cause outside contaminants (ie: suntan lotion, etc.) in the pores of the teak to mobilize to the surface,

which will in turn cause it to become more slippery in certain areas. Zollo deposition, p. 212, Exhibit 4.

17.     The Plaintiff denies that the Defendant's statement, which is not attributed to any source in the record, is accurate. As discussed in more detail below, there is overwhelming evidence in this case that the deck constituted a hidden defect and/or trap, especially as a result of its highly variable slip resistance as found by the experts for both parties.

18.     The Plaintiff admits that there is CCTV footage of her incident.

19.     The Plaintiff admits that while the security video was provided, it was not produced by the Defendant until after her deposition.  The Plaintiff gave her deposition 15 months later based upon her memory of the events that night.

20.     The Plaintiff admits that the Defendant accurately quoted her interrogatory response. However, the Plaintiff further testified that after she slipped and fell forward, she landed in a sitting position on the deck. As she sat on the deck in great pain and shock, with her wrist "deformed" from the severity of the fracture, she felt a puddle to the right side of her body with her hand, which may have also been under her buttock. As reflected by the security video, the Plaintiff's body traveled some distance forward after her feet went out from underneath her before she landed on the deck. The Plaintiff further testified 15 months after the incident, that she did not have any specific recollection one way or another of seeing any puddles prior to falling. Sorrels deposition, pp. 129-132, 140-1, Exhibit 1; Zollo deposition, pp. 300-1, Exhibit 4.

21.     The Plaintiff did not claim that she slipped and fell on a puddle. Instead, she testified that after she slipped and fell forward, landing in a sitting position on the deck. As she sat on the deck in great pain and shock, with her wrist "deformed" from the severity of the fracture, she felt a puddle to the right side of her body with her hand, which may have also been under her buttock. As reflected by the security video, the Plaintiff's body traveled some distance forward after her feet went out from underneath her before she landed on the deck. The Plaintiff further testified 15 months after the incident, that she did not have any specific recollection one way or another of seeing any puddles prior to falling. Sorrels deposition, pp. 129-132, 140-1, Exhibit 1; Zollo deposition, pp. 300-1, Exhibit 4.

22.     The Plaintiff did not claim that she slipped and fell on a puddle. Instead, she testified that after she slipped and fell forward, she landed in a sitting position on the deck. As she sat on the deck in great pain and shock, with her wrist "deformed" from the severity of the fracture, she felt

5

a puddle to the right side of her body with her hand, which may have also been under her buttock. As reflected by the security video, the Plaintiff's body traveled some distance forward after her feet went out from underneath her before she landed on the deck. The Plaintiff further testified 15 months after the incident, that she did not have any specific recollection one way or another of seeing any puddles prior to falling. Sorrels deposition, pp. 129-132, 140-1, Exhibit 1; Zollo deposition, pp. 300-1, Exhibit 4.

23.     Although the Defendant has correctly quoted excerpts from the Plaintiff's deposition, the Plaintiff denies the Defendant's statement that it "did not have any notice" of the puddle described by the Plaintiff. As reflected by the testimony of Dr. Zollo, the puddles are the result of uneven elevations between the various teak planks comprising the deck and they existed at the time of the accident as reflected by the security video as well as his own inspection 17 months later. See Zollo deposition, pp. 299-304, Exhibit 4.

Moreover, as discussed in more detail below, the existence or non-existence of a puddle is irrelevant to the liability issues in this case. What is relevant is the lack of sufficient slip resistance of the deck, which as discussed in more detail in the Plaintiff's Response to the Defendant's Amended Motion to Strike Dr. Zollo's testimony, has nothing whatsoever to do with the existence or non-existence of any puddle.

24.     Although the Plaintiff did not see anyone else slip on the deck where her accident occurred in the brief time that she was actually on the deck, the record contains evidence of at least 22 other substantially similar accidents. See Zollo deposition, pp. 229-30, 231-298, Exhibit 4; Defendant's Answers to Plaintiff's Interrogatories attached hereto as Exhibit "12."

25.     While Dr. Zollo testified that there was nothing inherently wrong with a teak deck, he further testified that a teak deck that had a wide variance in the slip resistance in a single plank as evidenced by his testing (and confirmed by the testing of Defendant's expert) created a hazardous condition.

26.     Admitted.

27.     While Dr. Zollo did not have an opinion on the products used, he testified the failure of having warning signs created a dangerous condition, and thereby Defendant failed to properly maintain the deck under the circumstances.

28.     Plaintiff admits the Defendant properly quoted its interrogatory response. However, Defendant's violation of its own internal policies and procedures regarding the placement of signage

6

as testified to by Ms. Winifred and Mr. Rai establish the Defendant failed to properly and reasonably maintain the deck under the circumstances.

29.     Denied. Defendant's violation of its own internal policies and procedures regarding the placement of signage as testified to by Ms. Winifred and Mr. Rai establish the Defendant failed to properly and reasonably maintain the deck under the circumstances.

30.     Denied.  See Affidavit of Dr. Ronald F. Zollo. (Exhibit 6)

31.     Denied.  See Affidavit of Dr. Ronald F. Zollo.

32.     Denied.  See Affidavit of Dr. Ronald F. Zollo.

33.     Denied.  See Affidavit of Dr. Ronald F. Zollo.

34.     There were at least 22 other similar accidents. See Zollo deposition, pp. 229-30, 231-298, Exhibit 4 and Defendant's Answers to Plaintiff's Interrogatories attached hereto as Exhibit "12."  The Plaintiff continues to maintain that they are all substantially similar but is not re-arguing this issue at this time in light of the Eleventh Circuit's opinion.

35.     While the Plaintiff admits that the *Norwegian Sky* was finished in 1999, before the promulgation of ASTM, in 2008 the *Norwegian Sky* was refurbished in which floors and various public areas on the vessel were redone after the promulgation of ASTM[1].  ASTM standards regardless of when they were promulgated that subsequently implemented standards still probative value in determining industry safety practices.

36.     While the Plaintiff admits that Carnival's Cruise Line's Company Safety Standard were issued in 2008, the *Norwegian Sky* was refurbished in which floors and various public areas on the vessel were redone.  Carnival's Cruise Line's Company Safety Standards, regardless of when they were promulgated that subsequently implemented standards still probative value in determining industry safety practices.

37.     The Plaintiff admits that the ASTM F1166-07 and Carnival Standards reference COF(w).  The Plaintiff otherwise denies this statement as phrased.

38.     Denied.  See Affidavit of Dr. Ronald F. Zollo, Exhibit 6.

39.     Denied.  Defendant's violation of its own internal policies and procedures regarding the placement of signage as testified to by Ms. Winifred and Mr. Rai establish the Defendant failed to properly and reasonably maintain the deck under the circumstances.

---

[1]hhttp://www.travelagentcentral.com/cruises/restorednorwegiansky

## Plaintiff's Statement of the Facts

Pursuant to the provisions of Local Rule 56.1(a) the Defendant sets forth the following undisputed facts:

1.      The Defendant was aware of the slippery nature of portions of the teak flooring located on deck 11, when wet, because it was undisputed that at times the deck department would post special portable signs on the outside deck warning passengers that the decks can be slippery when wet after or during rain. Deposition of Solange Winifred, pp. 24-8, Exhibit 7; Milan Rai, pp. 16-19, Exhibit 8.

2.      The Defendant was further aware of the slippery nature of the teak flooring located on deck 11 when wet as reflected by the testimony of Solange Winifred, who worked aboard the vessel as an assistant waiter. Ms. Winifred testified that she was instructed as part of her job that whenever she saw any liquid on the teak floor of the Outdoor Café, she should immediately put up a sign and clean it, because it was known to her supervisors that the teak floor would be slippery when it was wet. Winifred deposition, pp. 18-19, 23, Exhibit 7. Ms. Winifred further testified that this was one of the topics covered in her department's monthly safety meetings. Winifred deposition, pp. 22-3, Exhibit 7.

3.      The Defendant did not post any warnings signs at the time of the Plaintiff's accident advising passengers that the teak surfaces on deck 11 would be slippery when wet. See Winifred deposition, pp. 13, 28, Exhibit 7; Rai deposition, p. 16, Exhibit 8; Kilgour deposition I, pp. 53-4, Exhibit 9.

## Argument

As set forth by the Eleventh Circuit in *Tippens v. Celotex Corporation,* 805 F.2d 949, 952-3 (11th Cir. 1986), a summary judgment is only proper where

> There is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. F.R.Civ.P. 56(c). The district court shall consider all evidence of record when reviewing the motion for summary judgment - pleadings, depositions, interrogatories, affidavits, etc. - and can only grant summary judgment "if *everything* in the record . . . demonstrates that no genuine issue of material fact exists."
>
>                                          . . .
>
> If one or more of the essential elements is in doubt, then summary judgment must not be granted. Summary judgment is such a lethal weapon, depriving a litigant of a trial on the issue, caution must be used to insure only those cases devoid of any need for factual determinations are disposed of by

8

> summary judgment. Summary judgment should be granted only when the
> evidence produced by the non-moving party, when viewed in a light most
> favorable to that party, fails to establish a genuine issue.

(Emphasis in the original). *Also see Lane v. Celtex Corp.*, 782 F.2d 1526 (11th Cir. 1986).

As further observed by the Eleventh Circuit in *Reese v. Herbert,* 527 F.3d 1253, 1271 (11th Cir. 2008), "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Also see Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 850 (11th Cir. 2000); *Hairston v. The Gainesville Sun Publishing Co.*, 9 F.3d 913 (11th Cir. 1994). The limitations on the grant of summary judgment is "to be strictly construed so as to insure that factual issues will not be determined without the benefit of the truth-seeking procedures of a trial." *Jackson Tool & Die, Inc., v. Smith*, 339 F.2d 88, 91 (5th Cir. 1964).

### A. The unexpected degree of slipperiness of a teak deck is not an open and obvious condition.

The Plaintiffs have consistently maintained they do not claim that Norwegian was negligent because it failed to warn Mrs. Sorrels of "the open and obvious rain water on the outdoor deck." D.E. 129, p. 8. Rather, the Plaintiffs continue to contend that Defendant failed to warn Mrs. Sorrels that portions of the deck were <u>unreasonably slippery</u> when wet. To Defendant, this argument "is a distinction without a difference." D.E. 129, pp. 11-12. But the only district court in this jurisdiction that actually decided this exact issue on near identical facts duly noted the distinction. *Esanu v. Oceania Cruises, Inc.*, 2014 U.S. Dist. LEXIS 146673, (S.D. Fla. July 18, 2014).

In *Esanu*, the plaintiff slipped and fell on an outdoor deck, "which was unprotected from the elements, had accumulated rainwater from a recent storm and was extremely slippery." *Id*. The plaintiff had testified "that it had stopped raining at least half an hour, and as much as two or three hours, prior to the accident." *Id*. Unlike in the instant case, there was even a yellow caution sign to warn the plaintiff that the deck was slippery. *Id*. Regardless, the court denied the defendant's argument that the deck being slippery was an open and obvious condition:

> Defendant argues there should be no liability because water is an open and obvious condition, of which there is no duty to warn under maritime law. But this argument misses an essential element of this case. **Plaintiff does not argue that he did not know that the deck was slippery. Instead, he argues that he was not adequately warned of the extent to which the deck was slippery. In other words, Plaintiff argues that the degree to which the deck was slippery was not obvious, and his testimony adequately supports this theory.**

*Id*. at *4(citations omitted)(emphasis added). Here, Defendant misses the same essential element as the defendant in *Esanu*. Plaintiff is not claiming that it is not obvious that a wet deck is slippery, she is claiming–and has shown through testing of the deck–that the deck was more slippery than would be obvious.   While the Defendant misses this important distinction, its expert Bryan Emond does not, as he confirmed that knowing a deck is wet and knowing a wet deck was slippery "is a separate issue."  (Deposition, p.17, Exhibit 10).

The Defendant goes on at length to cite numerous non-binding cases from different jurisdictions for the proposition that "rain water is an open obvious condition for which there is no duty to warn."  [D.E. 129, pp. 8-10].  Each of these cases differ significantly to the present one for a number of different reasons.  First, none of these cases involve the application of maritime law, nor the controlling precedence of the Eleventh Circuit. Secondly, as previously pointed out, the Plaintiff has not asserted that the Defendant is liable for failure to warn her that the deck was wet or that it had puddles. Instead, it has always been the Plaintiff's contention that the Defendant failed to warn her that portions of the deck were slippery when wet, which is a far different proposition.

The two cases cited by the Defendant that were issued by Courts in this district, *Frasca v. NCL (Bahamas)*, 2014 WL 1385806 (S.D. Fla. April 9, 2014), and  *Luther v. Carnival Corp.*, 99 F. Supp. 3d 1368 (S.D. Fla. April 1, 2015), were <u>both decided prior to the Eleventh Circuit Court's rulings in this matter</u>.   As discussed below, neither case supports the Defendant's position.

Unlike *Esanu*, the circumstances in *Frasca v. NCL (Bahamas)*, 2014 WL 1385806 (S.D. Fla. April 9, 2014) are distinguishable from those here. Conclusive in that case was the fact that the "only factual basis for Frasca's claim ... [was that] he was walking and 'slipped and fell in an accumulation of liquid on the deck' that 'had leaked from the ceiling.'" *Id*. at *4. The plaintiff attempted to argue that the deck was slippery without having amended his complaint to state this claim, so the court granted summary judgment. *Id*. at *6. Having already effectively adjudged the case, the court, in obiter dicta, proceeded to state that "a slick deck caused by water from rain or mist is an open and obvious condition." *Id*.

Regardless that the analysis was unnecessary to the decision, it actually aligns with the reasoning in *Esanu*.   Frasca's untimely argument–that the deck was slippery–was the same argument  that *Esanu* tacitly rejected. *See* 2014 WL 4961426, at *2 ("Plaintiff does not argue that he did not know that the deck was slippery."). Unlike the Plaintiff, Frasca failed to allege that "he was not adequately warned of the extent to which the deck was slippery." *See id*. Further, *Frasca*'s

discussion focused only on whether it was open and obvious that a deck with rainwater could be slippery, not whether it could be more slippery than expected. *See* 2014 WL 1385806, at *7.

The other case cited by Defendant, *Luther v. Carnival Corp.*, 99 F. Supp. 3d 1368 (S.D. Fla. 2015) actually bolsters the Plaintiffs' argument and affirms the reasoning of *Esanu*. There, the plaintiff also slipped on an outdoor deck following rainy weather. *Id*. at 1369. His sole theory of liability was that the "defendant had a duty to act as to the wet deck and wholly failed to do so." *Id*. at 1371. As in *Frasca*, the court held that the defendant had no duty to warn Luther that a deck could be slippery from rain: "The ***mere fact*** that one slips and falls on a floor does not constitute evidence of negligence ... ." *Id*. at 1370-71 (emphasis added). But throughout the opinion the district judge explicitly made clear that she was basing her decision on the plaintiff's sole claim that the deck was wet:

> The single count of the complaint alleges that Defendant's negligence makes it liable for Luther's "traumatic hip injury" sustained when she slipped and fell on the deck of the ship following a period of rainy weather. ...
>
> There is no allegation that the deck was negligently designed or constructed.
>
> Similarly, although the pleading and Luther's response to the motion for summary judgment are replete with references to the "slippery" deck, **there is no allegation that the wood deck was unreasonably slippery** or constructed of a defective material that was extraordinarily slippery when wet. ...
>
> **Luther does not claim that the deck was more slippery than could ordinarily be expected** and courts have found that the slickness of a rain soaked deck does not, by itself, establish negligence. ...
>
> Last, the Court notes that the notice arguments advanced, if cursorily, by both Luther and Defendants are irrelevant because there are no allegations–and certainly no record facts showing–that the deck was unusually, extremely, or unreasonably slippery.

*Id*. at 1369-71 (citations omitted)(emphasis added). The court went on to note that *Frasca* "was decided on remarkably similar facts." *Id*. at 1371. ("The court in *Frasca* concluded that the dangers of slipping on the deck were apparent to the plaintiff ***inasmuch*** as 'the rainy/misty condition itself serves as an adequate warning that the deck would be wet and slick because it is obvious to a reasonable person.'" (quoting 2014 WL 1385806, at 1371) (emphasis added)).

As seen above, *Esanu*, *Frasca*, and *Luther* compliment each other and together hold that the

11

**degree to which a deck wet with rainwater will be slippery is not open and obvious**. Like the plaintiff in *Esanu*, and unlike the plaintiffs in *Frasca* and *Luther*, the Plaintiffs here claim that Defendant failed to warn them that the teak deck could become incredibly slippery–more so than a reasonable person would expect–when wet. They do not merely claim, as Defendant purports, that they did not know the deck could be slippery.

To support their claim that the Defendant's teak deck was unreasonably slippery, the Plaintiffs have offered the testimony of their expert, Dr. Ronald Zollo, who conducted slip resistance tests of the subject deck. The results of Dr. Zollo's tests indicated that portions of the subject deck fell below industry standards for slip resistance and there was a wide variance in the slip resistence on any given single plank in the area where the Plaintiff fell.  The Defendant's own expert, David Wills, found similar low slip resistance and confirmed that there is a wide variance.

Dr. Zollo test results showed:

1.  0.61 (north), 0.70 (south), 0.54 (east) and 0.55 (west)
2.  0.62 (north), 1.46 (south), 0.50 (east) and 0.54 (west)
3.[2]  0.51 (east), 0.6 (east), 0.46 (west), 0.43 (northeast), 0.48 (east), 0.64 (north)
4.[3]  0.25 (north), 0.28 (north), 0.34 (south), 0.32 (east), 0.14 (west) and 0.29 (west)

Mr. Wills test results for the same date had a similar wide spread divergence:
1.  0.35 (bow), 0.5 (starboard), 0.4 (stern) and 0.35 (port)
2.  0.45 (bow), 0.55 (starboard), 0.45 (stern) and 0.45 (port)
3.  0.7 (bow), .07 (starboard), 0.6 (stern) and 0.8 (port)
4.  0.55 (bow), 0.5 (starboard), 0.45 (stern) and 0.55 (port)
5.  0.35 (bow), 0.65 (starboard), 0.5 (stern) and 0.55 (port)
6.  0.4 (bow), 0.65 (starboard), 0.65 (stern) and 0.6 (port)
See Exhibit 3 to Wills deposition.

Mr. Wills also performed an earlier test on his own with defense counsel on June 14, 2013, which provided  even more disparate results:

1.  0.55 (bow), 0.75 (starboard), 0.55 (stern) and 0.85 (port)

[2]  This particular group of tests was performed on the rubbery substance separating the planks, which was more difficult to test because of the thin amount of rubber.  Accordingly, Dr. Zollo indicated that he had to perform some of this testing in different directions.  See Zollo deposition, pp. 169-70.

[3]  Dr. Zollo testified that because these test results were so far below the acceptable range of slip resistance, he performed additional tests in this area to double check the results.  Zollo deposition, p. 178-80.

2.    0.4 (bow), 0.5 (starboard), 0.3 (stern) and 0.35 (port)
3.    0.5 (bow), 0.75 (starboard), 0.4 (stern) and 0.8 (port)
4.    0.45 (bow, 0.55 (starboard), 0.4 (stern) and 0.45 (port)

See Exhibit 4 to Wills deposition.

Mr. Wills admitted that his results evidenced a "substantial variation" between the slip resistance on a single plank.   (Deposition of Mr. Wills, page 57, Exhibit 11).  Defendant's expert further admitted that depending on the direction that a person was walking on the deck there would be a different degree of slip resistance, (Id., at 90) which is significant because he further opined that the fact that the Plaintiff changed directions while walking was a contributing cause to her accident, (Id. 90).  He further conceded that there were no warnings given to passengers that there would be a significant difference in slip resistance based upon the direction they were walking. Id at 92.  By the admissions of the Defendant's own expert, **the variation in the slip resistance was not open nor obvious condition.**

The Defendant's other liability expert, Bryan Emond, further confirmed that the slippery nature of the deck is not open and obvious and can only be assessed by feel.  (Exhibit 10, p 25-26, and 36-37).  As explained by Mr. Emond, a person walking on the deck has to rely on their senses assess whether the deck was dangerously slippery as opposed to just merely seeing that it was wet.

Q:    And if someone was walking across a portion of the deck that was wet but not dangerously slippery, would that give the person the belief that the remainder of the deck also is not slippery?
A:    I think they would expect that they would be of similar consistency.

Q:    Right.  So if a person walked 100 or 135 feet on the deck and did not have difficulty walking on wet deck, would that provide them with the reasonable expectation that the remainder of the deck would have a similar consistency?
A:    Yes.

Id. at 25-26.

Q:    In order for a passenger to be able to address the risk of slipping on a wet teak deck, the passenger would have to appreciate that the teak deck posed a hazard of slipperiness to them, right?
A:    Yes.
    ....
A:    She would be able to assess her risk of slipping by feel whether she – if she felt that as she's walking across if it felt slippery or not. .....

Id. at 36-37.

The Defendant also cites three additional cases arising under Florida law involving slip and fall injuries on puddles adjacent to a pool. [D.E. 129, pp. 8-10] Not only do these cases all suffer from the same defects as the first batch discussed above, but each of these cases arose prior to Florida's adoption to comparative negligence at a time when any degree of contributory negligence would bar a plaintiff's claim as a matter of law. The importance of this distinction is clearly evidenced from the opinion in *Andrews v. Narber*, 559 So.2d 869 (1952), which expressly forms the basis for the two later cases.

Another significant difference between these cases is that they were also all based upon the claim that the defendant was negligent for allowing water to remain on the walkway area. In each of these cases, the flooring area was being utilized as a pool. Here, the pool was closed and the area was being used as a walkway for passengers to travel from one end of the ship to the other. As such, it was reasonably anticipated by the Defendant that the passengers would not be dressed in "pool attire or footwear," but instead the more formal clothes that would be expected to be used for shows, lounges and similar night time shipboard activities.

The Plaintiffs do not allege a condition that is open and obvious, and have supported their claim that the deck was unreasonably slippery with sufficient evidence that the deck was a dangerous condition based on the findings of both the Plaintiff and Defendant's experts.

## B.  There is Overwhelming Evidence That the Defendant Was on Notice of The Dangerous Nature of the Deck

Where notice is an issue, it can be established by proving constructive as well as actual notice. Actual notice exists where a carrier recognizes the need to post warning signs, but either fails to do so on the occasion in question or utilizes signs which are inadequate. *See e.g. Esanu v. Oceania Cruises, Inc.,* 49 F.Supp.3d 1078, 1081 (S.D. Fla. 2015)(in denying a summary judgment motion the Court found that "a reasonably jury could find the defendant had actual knowledge" by the use of portable "slippery when wet" sign); *Harnesk v. Carnival Cruise Lines, Inc.*, 1992 A.M.C. 1472 (S.D. Fla. 1991)(negligent placement of warning signs sufficient to establish actual notice of danger); *Mabrey v. Carnival Cruise Lines, Inc.*, 438 So.2d 937 (Fla. 3d DCA 1983)(Ferguson, J.).

Constructive notice can be proved in many different ways. One is through the existence of prior *similar* accidents. *See e.g. Beretta v. Home Lines, Inc.*, 1980 AMC 1857 (S.D. N.Y. 1990)(one

accident sufficient to create a question of fact on notice)[4].

Constructive notice can be shown through the failure of the vessel to meet either the company's own safety regulations or industry standards. *See e.g. Galentine v. Holland American Line-West Tours, Inc.*, 333 F.Supp. 2d 991 (W.D. Wash. 2004). *Also see Cook v. Royal Caribbean Cruises Ltd.*, 2012 WL 1792628 (S.D. Fla. May 15, 2012).   Even when a company standard is followed,

> "a reasonable jury could find that Defendant needed to do more in light of the unusual slippery and "ice-like" surface.  For example, a reasonable jury could determine that the sign did not give sufficient warning or the dangerous condition or that no sign would have given sufficient warning such that Defendant should have blocked off access to the area."

*Esanu* 49 F.Supp. 3d at 1081 (S.D. Fla. 2014).

Constructive notice of a defective condition can also be established by showing that a dangerous condition existed for a sufficient length of time that it should have been discovered through the exercise of reasonable care by the carrier. *See e.g. Erikson v. Carnival Cruise Lines, Inc.*, 649 So.2d 942 (Fla. 3d DCA 1995)(large puddle); *Grayson v. Carnival Cruise Lines, Inc.*, 576 So.2d 417 (Fla. 3d DCA 1991)(same).

Although it is only necessary to show the existence of notice under any one principle, substantial evidence of notice exists in this case under all of the principles above.

### 1.Actual Notice Has Been Established

The Eleventh Circuit found that the Defendant's use of portable caution signs was sufficient to establish <u>actual</u> notice. *Sorrels*, 796 F.3d at 1287 (11th Cir. 2015).

> The testimony of Ms. Winfred was relevant, however, and went to the **issue of NCL's knowledge** that they could be slippery when wet. Ms. Winifred explained at her deposition that the ship's deck department would sometimes post warning signs on the pool deck after it rained, and that she had been told post warning signs in the restaurant whenever there was water or some other liquid on the floor of the restaurant because it was known to her supervisors that the teak floor could be slippery when wet....**The testimony of Ms. Winifred and Mr. Rai – that warning signs were sometimes posted on the pool deck after rain – viewed in the light most favorable to Ms. Sorrels, is enough to withstand summary judgment as to notice**.

---

[4]The Plaintiff believes that it has established evidence of substantially similar incident as set forth in their Response to Plaintiff's Motion for Summary Judgment [D.E. 66]

(emphasis added)

Defendant now posits that the Eleventh Circuit should have framed the issue as whether Defendant knew that the deck could be "unreasonably slippery," or whether Defendant knew of an "alleged puddle." D.E. 129, pp. 17, 19.

Directly on point, is the Court in *Esanu v. Oceania Cruises, Inc.* 2014 U.S. Dist. LEXIS 146673, *4 (S.D. Fla. July 18, 2014):

> Fourth, the Defendant argues there is no evidence that it had actual or constructive notice of the dangerous condition. But clearly, the fact that Defendant erected a collapsible caution when wet sign on Deck 14 is evidence that it had actual notice that the blue surface was slippery when wet. Although the evidence that Defendant knew the precise degree of slipperiness is admittedly less conspicuous, this distinction is too fine to take issue of notice from the jury.

But despite Defendant's best efforts, it cannot replace the Eleventh Circuit's explicit statement of the issue (and subsequent explicit holding) with its own.

## 2. Constructive Notice is Established by the Clear Evidence in the Record that NCL Failed to Comply With Its Own Policies and Procedures As Well as Industry Standards
### a. NCL Violated its own Internal Standards

Solange Winifred, who was the first crew member to respond to the Plaintiff after she fell, testified that at various times there were "special signs that are posted on the outside decks," such as the one where this accident happened, warning passengers that the decks can be slippery when wet when it is raining. She testified that these temporary signs would be posted at some times, but not others. Winifred deposition, p. 24-8, Exhibit 7. Ms. Winifred's testimony was confirmed by Security Officer Milan Rai, who likewise testified that these temporary signs were posted on some occasions, but not others. Milan Rai deposition, p. 16-19, Exhibit 8. Neither Ms. Winifred nor Mr. Rai recalled seeing any signs posted on the evening of the accident. Winifred deposition, p. 13, 28, Exhibit 7; Rai deposition, p. 16, Exhibit 8. Also see Kilgour deposition I, pp. 53-4, Exhibit 9.

Ms. Winifred, who has worked for three years as an assistant waiter for NCL aboard the Norwegian Sky, also testified that her job duties involved cleaning the floor of the Outdoor Café located at the aft portion of deck 11, which contains the same teak deck flooring. Winifred deposition, pp. 16-17, Exhibit 7. Ms. Winifred further testified that she was instructed as part of her job that whenever she saw "water or some other liquid on the floor of the Outdoor Café," that she should immediately put up a sign and clean it, because it was known to her supervisors that the teak

"floor would get slippery when it was wet." Winifred deposition, pp. 18-19, 23, Exhibit 7. In fact, she testified that this was one of the topics covered in her department's monthly safety meetings. Winifred deposition, pp. 22-3, Exhibit 7.

Accordingly, the testimony of NCL's own crew members clearly establishes that the Defendant recognized the dangers posed by its teak deck when wet as well as the need to warn passengers of this danger. The above-described testimony constitutes competent substantial evidence to establish the Defendant's notice of the dangerous nature of its teak deck when wet. Because it is undisputed in the record that the Defendant did not utilize any signs to warn the Plaintiff or other passengers of the excessively slippery and dangerous nature of the teak deck when wet at the time of the subject incident, the above testimony also establishes the Defendant's liability for breach of its own rules and policies, providing yet another grounds on which the defendant's motion for summary judgment must be denied. See Winifred deposition, pp. 13, 28-30, Exhibit 7; Rai deposition, p. 16, Exhibit 8; Kilgour deposition, pp. 109-110, Exhibit 9; Wills deposition, p. 63, Exhibit 11.

### b. NCL Violated Industry Standards

After leading this Court astray once before by arguing that ASTM F1166-07 applied only to crewmembers (an argument soundly rejected by the Eleventh Circuit), Defendant once again attempts to mislead this Court by arguing that  ASTM F1166-07 and other industry standards like Carnival Cruise Lines Company Safety Standards have no relevancy because they were promulgated after the construction of the vessel and/or proper testing was not performed.

In raising these arguments the Defendant ignores the Eleventh Circuit's ruling that "evidence of custom within a particular industry, group, or organization is admissible as bearing on the standard of care in determining negligence .... Compliance or noncompliance with such custom, though not conclusive of negligence, is one of the factors the trier of fact may consider in applying the standard of care." *Sorrels*, 796 F.3d at 1282 (11th Cir. 2015).  The Defendant further ignores the Eleventh Circuit's instructions to the District Court that subsequently implemented standards still have probative value.

> At oral argument, counsel for NCL argued that the COF standard from ASTM does not apply because it was promulgated after the *Norwegian Sky* was built.  We decline to consider this argument because NCL did not press it below ......Should NCL make this argument on remand, the district Court may want to consider cases

17

> like *Keller v. United States*, 38, F.3d 16, 26, (1st Cir. 1994) (holding
> that district court did not err in finding that ASTM standard for fixed
> ladder safety possessed some probative value in determining industry
> safety practices, even though standard was promulgated after
> accident.

*Id. See e.g. Walsh v. South Part Marine Constr. Inc*., 121 F. Supp.2d 126 (U.S.D.C Maine 2000)
(there is no basis to turn a blind eye to OHSA regulations, which even if not directly applicable, are
potentially instructive.)  The Plaintiffs more fully address both of these arguments in their response
to the Defendant's Amended Motion to Strike Zollo, filed contemporaneously and adopted as if fully
set forth herein.

Finally, as noted above and also discussed in more detail in the Plaintiff's response to the
Defendant's Amended Motion to Exclude Dr. Zollo, there was also substantial evidence in the
record to establish that the Defendant violated industry standards by utilizing a teak deck in which
portions had a slip resistance of under 0.5 and 0.6. *See Cook*, 2012 WL 1792628 (S.D. Fla. May 15,
2012).

### c.  The Length of Time of the Condition Establishes Notice

There is also significant evidence in the record to establish that NCL was aware that it had
been raining on and off throughout the day of the subject accident since at least 5:00 p.m., if not
earlier. [D.E. 129, page 2]  Nevertheless, NCL took no steps to sweep the decks clear of water as
reflected by the photographs (Wills deposition, Exhibit 8) attached hereto as part of Exhibit "12,"
which were taken on the date of the subject inspection or to post the warning signs discussed by
crew members Winifred and Rai.

Directly on point is *Esanu,* 2014 U.S. Dist. LEXIS 146673, *4  where the Court ruled:

> Third, Defendant argues there is no evidence that it had a reasonable
> opportunity to correct the dangerous condition. But Plaintiff testified
> that it had stopped raining at least half an hour before the accident
> and as long as two or three hours before the accident.    And a
> reasonable jury could determine that the Defendant should have
> corrected the dangerous condition within this time period.
> Alternatively, a reasonable jury could determine that Defendant
> should have done something to correct the dangerous condition
> before the rain stopped.  For example, Defendant could have blocked
> off access to the blue surface on Deck 14 or could have provided
> better warning.

Likewise, given that it had been raining when the Plaintiff boarded the vessel and continued

to rain on and off throughout the day as Defendant asserts [D.E. 129, page 2] a reasonable jury could determine that the Defendant had an opportunity to place warning signs as it routinely did on other occasions and/or Defendant could have blocked off access to the area.

None of the few maritime cases cited by the Defendant helps its cause either. *Monteleone v. Bahama Cruise Lines, Inc.*, 838 F.2d 63 (2d Cir. 1988) and *Luby v. Carnival Cruises, Inc.*, 633 F.Supp. 40 (S.D. Fla. 1986) both involved passengers who tripped and fell over protruding objects, which as repeatedly discussed above, differ considerably from the dangerous trap which existed in this case. Just as importantly, *Monteleone* hinged upon the shipowner's lack of notice of the dangerous condition, as did the additionally cited opinions in *Keefe v. Bahama Cruise Line, Inc.*, 867 F.2d 1318 (11th Cir. 1989), *Adams v. Carnival Corp.*, 2009 AMC 2588 (S.D. Fla. 2009); *Levi v. Regal Cruises Ltd.*, 116 F.3d 465 (2d Cir. 1997)(unpublished), *Cummiskey v. Chandris, S.A.*, 719 F.Supp. 1183 (S.D. Fla. 719) and *Mercer v. Carnival Corp.*, 2009 AMC 802 (S.D. Fla. 2009). Unlike these cases, there is considerable evidence, as discussed above, establishing that the Defendant had both actual and constructive notice of the dangerous slippery condition created by its teak deck when wet and yet failed to take the appropriate action to either remedy it or warn its passengers of it.

Finally, the Defendant's reference to the decision in *Wish v. MFC Crociere S.A.*, 2008 WL 5137149 (S.D. Fla. Nov. 24, 2008) is equally unavailing. Unlike the present case, the shipowner in *Wish* placed 6 warning signs on the deck "advising passengers that the deck may be slippery when wet." This same message was also repeated on plaques attached to all entrances of the pool deck. In addition, the ship also had 6 crew members hired to remove excess water with squeegees and mops. Unlike this case, the court in *Wish* noted "significantly, there is nothing in the record to suggest that those policies and procedures, which include warning signs and clean up crews were not in place."

Another significant difference in *Wish* is that the accident occurred mid way through a 12 day cruise, unlike the present case in which the subject accident occurred on the first evening of the cruise. Ms. Wish who had six days in which to familiarize herself with the vessel, testified that she was aware of the fact that the deck was slippery when wet. As discussed above, Ms. Sorrels on the other hand has testified that it was her expectation that the deck was safe to walk on prior to her actual fall. As also previously discussed at length, this expectation was reasonable in light of the lack of warnings to the contrary and the highly variable nature of the slip resistance of the deck, particularly in the area leading up to the point where the Plaintiff slipped and fell.

## Conclusion

Contrary to the Defendant's contention, the Plaintiff has not asserted that she "slipped and fell on rain water." Instead, the basis of the Plaintiff's lawsuit is the overwhelming evidence which has established that the teak deck utilized by the Defendant for its passengers aboard the Norwegian Sky had a dangerously low slip resistance in certain parts when wet and that the Plaintiff slipped and fell while walking on the teak passage way after it had rained. The precipitating cause of the Plaintiff's accident was a dangerous and defective floor surface which had an inadequate slip resistance (coefficient of friction) in portions when it became wet, regardless of the source of the liquid.

The Defendant's preliminary statement also persists in continuing to make the same repeated misstatements, which the Defendant has continually made throughout the course of this case. The Plaintiff has never claimed "that Norwegian was negligent because it failed to warn her of the open and obvious rain water on the outdoor deck." See NCL motion, p. 1. Both Terri Sorrels herself as well as her expert, Dr. Ronald Zollo, have clearly and repeatedly acknowledged that the Plaintiff was aware that it had been raining and that the deck was likely wet when she first walked out onto it. Instead, it has always been the Plaintiff's contention that the Defendant failed to warn her that portions of the deck were slippery when wet, which is a far different proposition.

As set forth above, viewing all the evidence in the light most favorable to the Plaintiffs, there is more than enough evidence in the record to withstand summary judgment.

DATED February 26, 2016.

Respectfully submitted,


By:   */s/ Carol L. Finklehoffe*
      CAROL L. FINKLEHOFFE (FL.BAR NO.: 15903)
      E-mail: Finklehoffe@leesfield.com
      **LEESFIELD SCOLARO, P.A.**
      Attorneys for Plaintiffs
      2350 South Dixie Highway
      Miami, Florida 33133
      Telephone:  305-854-4900
      Facsimile:  305-854-8266
      *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on **February 26, 2016**, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing is being served this day on all counsel of record identified on the Service List below in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically notices of Electronic Filing.

By:   */s/ Carol L. Finklehoffe*
CAROL L. FINKLEHOFFE (FL.BAR NO.: 15903)
E-mail: Finklehoffe@leesfield.com

## SERVICE LIST

| | |
|---|---|
| **CAROL L. FINKLEHOFFE** (F.B.N. 0015903)<br>E-mail: Finklehoffe@leesfield.com<br>LEESFIELD SCOLARO, P.A.<br>2350 South Dixie Highway<br>Miami, Florida 33133<br>Telephone:     305-854-4900<br>Facsimile:     305-854-8266<br>*Attorneys for the Plaintiffs* | **JERRY D. HAMILTON, ESQ.**(F.B.N. 970700)<br>       Email:<br>jhamilton@hamiltonmillerlaw.com<br>**HECTOR RAMIREZ, ESQ.** (F.B.N. 484857)<br>Email: Hramirez@hamiltonmiller.com<br>**JESSICA CALVO, ESQUIRE** (F.B.N. 484857)<br>HAMILTON, MILLER & BIRTHISEL, LLP<br>150 S.E. Second Avenue, Suite 1200<br>Miami, FL 33131<br>Telephone: 305-379-3686<br>Facsimile:  305-379-3690<br>*Attorneys for Defendants* |